ams

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNIVERSITY OF KANSAS and KANSAS ATHLETICS, INC.,**<br><br>        **Plaintiffs,**<br><br>**vs.**<br><br>**LARRY SINKS, CLARK ORTH, LARRY SINKS ENTERPRISES, INC. and VICTORY SPORTSWEAR, L.L.C. (collectively d/b/a/ Joe-College.com),**<br><br>        **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Case No. 06-2341-JAR** |

## MEMORANDUM AND ORDER

Plaintiffs University of Kansas ("KU") and Kansas Athletics, Inc. ("Kansas Athletics") filed this action against defendants Larry Sinks, Clark Orth, Larry Sinks Enterprises, Inc. and Victory Sportswear, L.L.C. alleging violations of state and federal trademark laws through the unauthorized and unlicensed sale of KU apparel. The following summary judgment motions are before the Court: (1) Motion for Summary Judgment on Plaintiffs' Claims (Doc. 130) by KU and Kansas Athletics; (2) Motion for Summary Judgment (Doc. 131) by defendant Clark Orth; (3) Motion for Summary Judgment (Doc. 134) by defendant Larry Sinks; and (4) Motion for Summary Judgment (Doc. 136) by all defendants. In addition, the Court considers the following evidentiary motions in conjunction with the motions for summary judgment: (1) Motion in Limine to Exclude Evidence Concerning Third-Party Use of Plaintiffs' Marks (Doc. 116); (2) Motion to Strike Declarations of Vander Tuig, Drucker, Temple, Baker, Campbell and Bonilla (Doc. 158); and (3) Motion to Strike Weblog (Doc. 160).

As described more fully below, the Court denies the motion to exclude evidence of third-party use, denies the motion to strike the declarations of Vander Tuig and Drucker, grants the motion to strike the declarations of Temple, Baker, Campbell, and Bonilla, and grants in part and denies in part the motion to strike weblog evidence.  The Court further denies defendant Sinks' motion for summary judgment, defendant Orth's motion for summary judgment and the motion for summary judgment filed by all defendants.  Finally, the Court grants in part and denies in part plaintiffs' motion for partial summary judgment.

## I.        Evidentiary Motions

The parties have filed motions asking to Court to rule on the admissibility of certain evidence, or to strike certain evidence submitted in support of summary judgment.  The Court addresses them at this time.[1]

**A.       *Motion to Strike Declarations of Paul Vander Tuig, Michael Drucker, Stephanie Temple, Karen Baker, Grace Campbell, and Mario Bonilla (Doc. 158)***

### 1.        Vander Tuig and Drucker

Defendants ask the Court to strike the declarations of Paul Vander Tuig, the Trademark Licensing Director for KU, and Michael Drucker, the Vice President and Associate General Counsel of the Collegiate Licensing Company ("CLC").[2]  Defendants argue that Vander Tuig's deposition should be stricken because he was not properly designated as a witness under Fed. R. Civ. P. 30(b)(6) and that both Vander Tuig's and Drucker's declarations should be stricken

---

[1] The Court addresses Plaintiffs' *Daubert* Motion to Exclude the Survey and Expert Report of James T. Berger (Doc. 120) and defendants' Motion to Exclude the Testimony and Opinions of Plaintiff's Expert Witness (Doc. 129) in a separate Memorandum and Order.

[2] Defendants' counterclaims against plaintiffs and cross-claims against CLC have been dismissed with prejudice.  (Doc. 193.)

because they constitute inadmissible hearsay and lack foundation.

Defendants maintain that Vander Tuig, who was not designated by KU as a Rule 30(b)(6) witness, should have been designated as such and that his declaration is now being offered to "patch up holes" left by KU's designated Rule 30(b)(6) witness, Theresa Gordzica, who is the chief business and financial planning officer for KU.  According to defendants, at some point during or after Gordzica's deposition testimony, "it became apparent that [she] was not the appropriate person for Plaintiffs to designate . . . or that she was poorly prepared to address issues set forth in Defendants' Rule 30(b)(6) notice."

Because defendants issued a Rule 30(b)(6) notice to KU, KU was required to "designate one or more officers, directors, or managing agents, . . . and may set forth, for each person designated, the matters on which the person will testify. . . . The persons so designated shall testify as to matters known or reasonably available to the organization."[3]  Business entities "have a duty to make a conscientious, good-faith effort to designate knowledgeable persons for Rule 30(b)(6) depositions and to prepare them to fully and unevasively answer questions about the designated subject matter."[4]  If an entity instead produces a witness who is unable to respond to the items in the deposition notice, it has a duty to provide a substitute.[5]

In their motion, defendants question KU's choice of Gordzica as its Rule 30(b)(6) designee instead of Vander Tuig, who defendants urge was a more suitable corporate representative.  In support of this assertion, defendants point to the substantial portion of Vander

---

[3]Fed. R. Civ. P. 30(b)(6).

[4]*Starlight Int'l Inc. v. Herlihy*, 186 F.R.D. 626, 639 (D. Kan. 1999); *see also Payless Shoesource Worldwide, Inc. v. Target Corp.*, No. 05-4023-JAR, 2007 WL 1959194, at *1 (D. Kan. June 29, 2007).

[5]*Herlihy*, 186 F.R.D. at 639.

Tuig's declaration that is responsive to their Rule 30(b)(6) notice.  While defendants make a strong case for why Vander Tuig would have most certainly been a suitable Rule 30(b)(6) designee for KU, they do not make any showing about why Gordzica was not.  The Court is unable to find any authority for the contention that a business entity must designate each and every person within the organization who is able to respond to a deposition notice; only that the entity must fulfill its obligation to prepare the chosen designee to fully answer the questions propounded in such notice.  Here, while defendants make the conclusory argument that Gordzica was not the best person for KU to designate, they fail to develop an argument about why or how she was not fully prepared to respond to questions or topics set forth in their deposition notice. While it may very well be true that Vander Tuig was highly qualified to respond to defendants' Rule 30(b)(6) inquiries, the Court is unable to conclude that his entire declaration should be stricken simply because KU decided to rely upon it in its motion for summary judgment rather than Gordzica's deposition testimony.  Accordingly, the Court denies defendants' motion to strike Vander Tuig's declaration as a sanction for some violation of Rule 30(b)(6).

Defendants maintain that both Vander Tuig's and Drucker's declarations should be stricken because they are not based on personal knowledge, or are based on inadmissible hearsay and reference documents for which there is no foundation.  Fed. R. Evid. 602 requires that a testifying witness "ha[ve] personal knowledge of the matter" testified to.[6]  Also, Fed. R. Civ. P. 56(e) requires that affidavits be made on personal knowledge and "set forth such facts as would be admissible in evidence . . . .  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits."  "Under the personal knowledge

---

[6]Fed. R. Evid. 602.

standard, an affidavit is inadmissible if 'the witness could not have actually perceived or observed that which he testifies to.'"[7]  Statements of "mere belief in an affidavit must be disregarded."[8]

Defendants urge the declarations at issue here are not based on personal knowledge because of the following preliminary statement made in both: "the facts set forth in this Declaration are based on my personal knowledge, review of corporate records, or interviews with appropriately knowledgeable persons."  But "Rule 56(e)'s requirements of personal knowledge and competence to testify may be inferred if it is clear from the context of the affidavit that the affiant is testifying from personal knowledge."[9]  Here, it is clear from the context of the declarations that both Vander Tuig and Drucker are competent to testify to the matters discussed in their respective declarations.  Vander Tuig is the Trademark Licensing Director for KU and Drucker is the Vice President and Associate General Counsel for CLC.  The Court finds that personal knowledge of the subject matter attested to can be inferred based on the declarants' respective positions within KU and CLC.  Further, the statements made in both declarations are particular and detailed, which further supports their attestations of personal knowledge.[10]

---

[7]*Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006).

[8]*Id.* (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)).

[9]*Told v. Tig Premier Ins. Co.*, 149 F. App'x 722, 725 (10th Cir. 2005) (citing *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990)).

[10]A finding that these declarants lack personal knowledge is made more difficult by the generalized allegations made in the motion to strike.  For example, defendants could certainly not argue that Vander Tuig is unable to state, based on his personal knowledge in association with the referenced exhibit, that "KU owns a State of Kansas registration for the mark KIVISTO FIELD."  (*See* Doc. 142, Tab 1 at ¶ 17.)  Yet, this fact is controverted in the summary judgment briefs based solely on this argument in the motion to strike.  (*See* Doc. 162 at 17 ¶ 62.) Despite the fact that the exhibits attached to the declaration are voluminous, the declaration itself is only forty paragraphs in length.  The Court declines to parse through each of these paragraphs to make specific findings in the

Defendants complain that the attestation clauses in these declarations refer not only to personal knowledge, but also to interviews with others and  reviews of corporate documents. Defendants ask how they are to know which source of information formed the basis of each statement in the declarations.  In their response, plaintiffs represent that although they reviewed corporate records and spoke to others in preparing the background of issues discussed in the declarations, "each of the facts set forth therein were and are based upon their personal knowledge."  Indeed, plaintiffs have filed supplemental declarations stating as much.[11]  The Court is unable to conclude, based on the record, that these declarants' statements are not based on personal knowledge, as set forth above.[12]  The statements made by them are not conclusory statements outside the realm of their knowledge-base given their respective positions within KU and CLC.  To the extent that each statement in the declarations is supported by corporate documents, those are authenticated, attached as exhibits and cited properly as such.  The Court denies defendants' motion to strike the Vander Tuig and Drucker declarations.

### 2.      Temple, Baker, Campbell, and Bonilla

Defendants also ask the Court to strike the declarations of Temple, Baker, Campbell, and Bonilla, who were employees of the KU Bookstore, or KUstore.com at the time their declarations were made.  These declarants all attested to instances of actual confusion among consumers who they encountered through the KU Bookstore or KUstore.com.  Plaintiffs did not

---

absence of any particularized argument from the parties.

[11](*See* Docs. 174, 175.)

[12]Defendants' request for this Court to strike the Vander Tuig and Drucker declarations would essentially require the Court to find that the original declarations constituted misrepresentations to the Court.  The Court declines to make such a finding.

disclose these declarants or their testimony to defendants under Rule 26 and defendants first

learned of these witnesses when they received plaintiffs' summary judgment motion.  Plaintiffs

represent that they first became aware of these witnesses on June 4, 2007—nine days prior to

filing their summary judgment motion and do not deny that they disclosed the witnesses to

defendants for the first time on June 13, 2007, when they filed their summary judgment motion.

Because these witnesses were not properly disclosed under Rule 26, defendants ask the Court to

strike the declarations under Rule 37(c)(1), which provides:

> A party that without substantial justification fails to disclose
> information required by Rule 26(a) or 26(e)(1), or to amend a prior
> response to discovery as required by Rule 26(e)(2), is not, unless
> such failure is harmless, permitted to use as evidence at a trial, at a
> hearing, or on a motion any witness or information not so
> disclosed.

Whether a violation of Rule 26(a) is "substantially justified" or "harmless" is left to the broad

discretion of the Court.[13]  The following factors guide this discretion: "'(1) the prejudice or

surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the

prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the

moving party's bad faith or willfulness.'"[14]

Plaintiffs argue that the only possible prejudice suffered by defendants is that they did not

have an opportunity to depose these witnesses during discovery.  Plaintiffs submit that

defendants' counsel, "never even asked KU to make these witnesses available; and had they

done so, KU would have offered them for deposition."  The Court finds this contention

---

[13]*See, e.g.*, *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002) (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999)).

[14]*Id.* (quoting *Woodworker's Supply, Inc.*, 170 F.3d at 993).

disingenuous.  It is unclear to the Court how defendants were expected to request these witnesses be made available during discovery when the identities of these witnesses were not disclosed to them until the filing of the summary judgment motions.  In fact, defendants did ask Gordzica during her deposition for all evidence that KU had of actual confusion; she replied that "[t]he blog is the evidence of actual confusion."[15]  Also, defendants' counsel emailed plaintiffs' counsel on May 21, 2007 to confirm that certain Bates-numbered documents were indeed the "blog" documents Gordzica referred to in her deposition.  Plaintiffs' counsel responded by email that "[w]ith respect to 'actual' confusion, these documents are the only KU documents we currently have that reflect 'actual' confusion.  There also has been testimony in various depositions (including, e.g., Erin Adams and Carrie Sinks) regarding additional instances of actual confusion . . . ."[16]  This representation, made less than one month before the summary judgment motion was filed, certainly could not have placed defendants on notice that they needed to request that KU make the actual confusion witnesses available for deposition.

Plaintiffs suggest that defendants should have filed a motion for continuance for further discovery under Rule 56(f).  Rule 56(f) may be used as "an alternative to a response in opposition to summary judgment under 56(e) and is designed to safeguard against a premature or improvident grant of summary judgment."[17]  While defendants certainly could have filed such a motion, the rules do not contemplate that this is a prerequisite to filing a motion to strike under Rule 37(c)(1).  None of the authority cited by plaintiffs supports such a proposition; nor the

---

[15](Doc. 159, Ex. 2 at 311:21–22.)

[16](Doc. 159, Ex. 4 at 1.)

[17]*Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 833 (10th Cir. 1986)

suggestion that defendants somehow waived a claim of prejudice by not filing a request for a continuance under Rule 56(f).[18]

Allowing this new evidence at the summary judgment stage will prejudice defendants. They had no notice of these witnesses until the summary judgment motion was filed. Also, it is clear from defendants' exhibits that defendants very deliberately attempted to discover the exact evidence plaintiffs relied upon to support their contention of actual confusion among consumers. At no time did plaintiffs indicate that they would rely on testimonial evidence from these Bookstore and KUStore.com employees. In fact, plaintiffs affirmatively represented that the evidence they would rely upon to establish actual confusion was restricted to a weblog and certain deposition testimony. Allowing defendants the opportunity to cure this prejudice would require reopening discovery and probably postponing the trial. Further, plaintiffs have failed to make any attempt to justify their failure to disclose beyond stating that these witnesses were not made known to them prior to June 4, 2007. But the Court agrees with defendants that these employees, whose declarations refer to time periods preceding the close of discovery, could have easily been located by plaintiffs prior to this time. Plaintiffs offer no reason why these witnesses were discovered at such a late date. As such, there has been no showing by plaintiffs that the failure to disclose these witnesses was substantially justified or harmless and the Court finds that the motion to strike the declarations of Temple, Baker, Campbell, and Bonilla should be granted.

---

[18]*See id.* (finding district court properly refused to vacate summary judgment when response brief's mere statement that "Although discovery has not yet been completed . . . ," was inadequate to serve as a request for a continuance under Rule 56(f)); *see also Hackworth v. Progressive Casualty Ins. Co.*, 468 F.3d 722, 731–32 (10th Cir. 2006) (finding inadequate request within response memorandum for continuance under Rule 56(f)), *cert. denied*, 127 S. Ct. 2883 (2007). If plaintiffs are correct that a party opposing summary judgment should be required to file a Rule 56(f) affidavit under these circumstances, it could be argued that this otherwise unnecessary step in the process constitutes prejudice in and of itself.

**B.**     *Motion to Strike Lawrence Journal-World Weblog (Doc. 160)*

Next, the Court considers defendants' motion to strike weblog entries as inadmissible hearsay.  Plaintiffs rely on certain internet postings to the *Lawrence Journal-World* to support their claims of (1) actual confusion and (2) consumers' belief that defendants' products bearing KU's trademarks and other indicia degrade the goodwill and positive associations of KU and its trademarks.  Plaintiffs argue that the internet postings do not violate Fed. R. Evid. 801 or 802 because they were not submitted in order to prove the truth of the matter asserted, but were instead submitted to demonstrate the declarants' mental states.[19]

Under the Federal Rules of Evidence, hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[20]  With certain exceptions, hearsay evidence is not admissible.[21]  Fed. R. Evid. 803, however, provides an exception for statements that demonstrate "the declarant's then existing state of mind."[22]

Defendants cite cases where courts found internet postings unreliable and refused to consider them as evidence of the truth of the matter asserted.[23]  But plaintiffs argue that the

---

[19]Defendants also argue that the evidence is inherently unreliable because the declarants are anonymous and their credibility could not be verified.  To the extent that this is an authentication or foundation argument, it is not developed.  Vander Tuig states in his declaration that he "reviewed postings to KUsports.com, the online message boards hosted by the Lawrence Journal-World, . . ." that are attached to his declaration.  (Doc. 142, Tab 1 at ¶ 32.)  Beyond that, the Court finds this goes to the weight, not the admissibility of the evidence.  Defendants, however, may renew the objection at trial, along with any objection under Fed. R. Evid. 403.

[20]Fed. R. Evid. 801(c).

[21]Fed. R. Evid. 802.

[22]Fed. R. Evid. 803(3).

[23]*St. Clair v. Johnny's Oyster & Shrimp, Inc.*, 76 F. Supp. 2d 773, 774 (S.D. Tex. 1999) (excluding internet evidence submitted to prove that defendant actually owned the vessel CAPT. LE'BRADO, stating that "any evidence procured off the Internet is adequate for almost nothing, even under the most liberal interpretation of the

10

*Lawrence Journal-World* weblog is being submitted as evidence of the declarants' mental states rather than as truth of the matter asserted, and therefore, such evidence comes within the exception provided in Fed. R. Evid. 803(3) and point to cases admitting internet evidence under similar circumstances.[24]  The parties essentially debate whether or not this evidence is being offered to prove the truth of the matter asserted.

While the Court agrees that the line is a fine one, it will consider the weblog evidence to the extent that it is not offered to prove the truth of the matter asserted.  For example, plaintiffs offer the following posting in support of their claim of actual confusion:

> I saw somebody wearing a "Rock Out With Your Hawk Out" shirt last year on TV at AFH.  I have never seen on [sic] of these anywhere else.  It was a standard KU blue shirt, bearing a strong resemblance to the other KU "novelty" shirts (like the "Muck Fizzou" design).  But I wonder now if it was a homemade effort. Does anybody know where to get one?[25]

This evidence is not admissible in order to prove that the person the declarant saw on TV was wearing a shirt that bore a strong resemblance to other KU shirts or that the declarant saw someone on TV wearing the referenced shirt.  The statement is only admissible to show that the

---

hearsay exception rules found in Fed. R. Civ. P. 807."); *Engers v. AT & T*, No. Civ.A.98CV3660(JLL), 2005 WL 3988698, at *2 (D.N.J. Sept. 8, 2005)  (finding inadmissible hearsay evidence because "[the "ad hoc" internet survey] is submitted only to demonstrate the truth of the matter asserted in the survey results, namely, that 221 people never received the Summary Plan Description in early 1998").

[24]*Garden of Life, Inc. v. Letzer*, 318 F. Supp. 2d 946, 965 (C.D. Cal. 2004) (considering internet message board postings as evidence of actual confusion); *RDK Corp. v. Larsen Bakery, Inc.*, No. 02-C-0675, 2006 WL 2168797, at *11 n.10 (E.D. Wis. July 31, 2006) (considering internet postings as evidence of confusion because they were not submitted for the "truth of the matter asserted" and did not violate the hearsay rule); *Karen J. Connelly, S.Y.K., LLC v. ValueVision Media, Inc.*, No. Civ.04-4559 DWF/SRN, 2004 WL 2569494, at *6-7 (D. Minn. Nov. 9, 2004) (considering internet message forum postings as evidence of confusion); *cf. Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1130 n.4 (10th Cir. 2003) ("[library books and information downloaded from the internet] were not admitted for the truth of the matter asserted therein, but rather for the very fact of their existence" and therefore were admissible).

[25](Doc. 142, Tab 1, Ex. T at 9.)

declarant was confused about whether he or she could purchase the referenced shirt and about who produced the shirt. Plaintiffs offer the following statement as an example of how defendants' products degrade the goodwill and positive association of KU and its trademarks: "Ditto for me. I don't like those two shirts either. KU can do better than to wear those lame classless shirts." This statement is not admissible to prove that the shirts are classless; instead, it is admissible to show that this declarant thinks that the T-shirts harm KU's reputation as having "classy" products. The Court intends to be diligent in only considering the weblog evidence to prove the state of mind of the declarants. Therefore, defendants' motion to strike is granted in part and denied in part.

### C. Motion in Limine to Exclude Evidence Concerning Third-Party Use of Plaintiffs' Marks (Doc. 116)

Defendants seek to admit evidence of third-party use of plaintiffs' trademarks as relevant to the strength of plaintiffs' marks and whether the marks are famous, for purposes of determining the dilution claims. Plaintiffs ask the Court to exclude the evidence under Fed. R. Evid. 402 because it is not relevant, and under Fed. R. Evid. 403 because its probative value is outweighed by prejudice to plaintiffs.

Plaintiffs contend that evidence of third-party use of a trademark is not relevant unless the third party is using the mark on goods similar to those provided by the plaintiffs and defendants in the present case. In general, "'[t]he greater the number of identical or more or less similar marks already in use on *different kinds of goods*, the less is the likelihood of confusion' between any two specific uses of the weak mark."[26] While evidence of third-party use of a mark

---

[26]*First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*, 101 F.3d 645, 653-54 (10th Cir. 1996) (emphasis added) (looking primarily at the use of "First" among businesses providing financial services); *see Universal Money Ctrs., Inc. v. AT&T*, 22 F.3d 1527, 1533 (10th Cir. 1994) (quoting *Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*, 628

is admissible, the weight to be given such evidence may be limited when the use of similar marks is not on similar goods.[27]   The evidentiary value of showing third-party use should address the "probable impact of the use of those marks on the minds of the target group of consumers."[28]

Plaintiffs also argue that a state registry, as provided by defendants is not relevant to a claim for trademark infringement unless the defendants can show that the businesses are either active or sell goods similar to those in dispute in the present case.  In *First Sav. Bank, F.S.B. v. First Bank System, Inc.*,[29] the Tenth Circuit held that third-party registrations of a particular mark were "'relevant to prove that some segment of the composite marks . . . has a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak.'"[30]   The Court finds that the business lists and registries are admissible.  To the extent that the state registry includes businesses that are inactive, this goes to

F.2d 500, 504 (5th Cir. 1980) (quoting Restatement of Torts § 729, cmt. g (1938))) (admitting evidence that "Universal" was used by six other financial institutions, two credit card companies, and 200 active businesses and therefore was a weak mark); *Hodgdon Powder Co., Inc. v. Alliant Techsystems, Inc.*, 497 F. Supp. 2d. 1221, 1231 (D. Kan. 2007) ("When determining commercial strength, the court considers the number of identical or more or less similar marks already in use on different kinds of goods, not just gunpowders"); *see also Vail Assocs., Inc. v. Vend-Tel-Co.*, –F.3d–, No. 05-1058, 2008 WL 342272, at *10 (10th Cir. Feb. 7, 2008) ("Use by others of a similar mark will tend to dilute any consumer recognition and association of that mark with the alleged owner.  Such use by third parties is therefore relevant to the issue of secondary meaning") (quotation omitted).

[27]*Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1337 (D. Kan. 2005).  Although the court admitted evidence comprised of a list of 763 businesses, 11 federal trademark registrations, and 33 state trademark registrations using some form of the disputed trademark, it found that such evidence did not weaken the plaintiff's mark because not all of these third parties were using the mark on "similar goods."  *Id.*

[28]*Id.*

[29]101 F.3d at 645.

[30]*Id.* at 654 (quoting 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11.27[2][b] (3d ed. 1995)).

the weight and not the admissibility of the evidence.[31]  Likewise, whether or not consumers

actually perceive and recognize the meaning of these marks is an issue of weight and not

admissibility.

Plaintiffs suggest that evidence of third-party use of the mark by licensees is inadmissible

because such evidence is not relevant to claims of unlicensed use of KU's trademarks.  Although

this issue was not discussed explicitly in *Big Dog Motorcycles, L.L.C. v. Big Dog Holdings,

Inc.*,[32] the court in that case considered evidence of third-party businesses that were licensed to

use the plaintiff's mark.[33]  The court concluded that evidence of licensed third-party use would

only weaken a mark if the defendant could demonstrate that the third-party's use of the mark was

"widespread" enough to "weaken the mark in the minds of apparel consumers."[34]  Plaintiffs

come forward with no authority for the proposition that this evidence is not relevant to the issue

of the marks' strength and fame.  The Court finds that evidence of licensed third-party evidence

is relevant and admissible.

Finally, the Court declines to rule at this point on whether the probative value of this

evidence outweighs its prejudicial impact under Fed. R. Evid. 403.  Instead, plaintiffs may renew

---

[31]*Universal Money Ctrs., Inc. v. AT&T*, 22 F.3d 1527, 1533 (10th Cir. 1994); *see Spectrum Vision Sys., Inc. v. Spectera, Inc.*, 35 F. Supp. 2d 797, 808 (D. Kan. 1998) (noting that "1,108 federal, state and common law service marks or trademarks us[e] the word "Spectrum" and therefore plaintiff's mark was weak); 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:88 (4th ed. 2007) [hereinafter MCCARTHY].

[32]402 F. Supp. 2d 1312 (D. Kan. 2005).

[33]*Id.* at 1337.  *But see Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1545, 1545 n.27 (11th Cir. 1985) (noting that evidence of unauthorized use of a mark would show that the mark is strong; evidence of unauthorized use would weaken a mark, but only if the third-party use "significantly diminish[es] the public's perception that the mark identifies items connected with the owner of the mark.").

[34]*Big Dogs Motorcycles, L.L.C.*, 402 F. Supp. 2d at 1337 (indicating that because the defendant did not "present[] the type of widespread use of the 'Big Dog(s)' mark on apparel that would serve to weaken the mark in the minds of apparel consumers," the court was required to conclude that the mark's commercial strength was strong).

14

the motion on this basis at trial if desired.  Plaintiffs' motion to exclude evidence of third-party use of plaintiffs' marks is denied.

## II.      Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[35]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[36]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[37]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[38]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[39]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[40]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[41]  If this initial burden is met, the nonmovant must then "go beyond

---

[35]Fed. R. Civ. P. 56(c).

[36]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[37]*Id.*

[38]*Id.* at 251–52.

[39]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[40]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[41]*Id.*

the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[42]  "Where, as here, the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[43]  When examining the underlying facts of the case, the Court is cognizant that all inferences must be viewed in the light most favorable to the nonmoving party and that it may not make credibility determinations nor weigh necessarily may consider only the evidence that would be available to the jury.[44]

## III.   Uncontroverted Facts

The following facts are either uncontroverted or stipulated to.  Plaintiff University of Kansas ("KU") has long been referred to by one of several names: "University of Kansas," "KU," or "Kansas."  KU is a general academic institution of higher learning, having its principal campus in Lawrence, Kansas.  It was founded in 1865 by the citizens of Lawrence under a charter from the Kansas legislature.  The United States Patent and Trademark Office ("USPTO")

---

[42]*Id.*

[43]*James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citing *Harrison W. Corp. v. Gulf Oil Co.*, 662 F.2d 690, 691–92 (10th Cir.1981)), *cert. denied*, 523 U.S. 1048 (1998).

[44]*Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1199 (10th Cir. 2006) (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995); Fed. R. Civ. P. 56(e)) (citations omitted).

has issued trademark registrations to KU for the marks "Kansas,"[45] "KU,"[46] "Jayhawks,"[47] "Allen Fieldhouse,"[48] "The Phog,"[49] and for various Jayhawk designs.  Kansas Athletics does not own any of the marks involved in this case.  KU does not own a registered trademark for the name "Hawk," but from time to time, KU has used the term "Hawks" as a shorthand for "Jayhawks."

The University has been referred to as "KU" or "Kansas" since the 1930s.  The Jayhawk is KU's official mascot and KU's athletic teams since at least as early as 1887 have been referred to as "the Jayhawks."  Although the Jayhawk mascot has appeared in various forms since it was adopted, its key features have remained the same for the past eighty years: a blue feathery body, a red head, and a large yellow beak.

KU owns State of Kansas registrations for the mark "Kivisto Field."  Kivisto Field is the name of the KU football field at Memorial Stadium and is named after Tom and Julie Kivisto, two KU alumni.  KU football games played on Kivisto Field are frequently televised on local and national television networks.

KU owns State of Kansas registrations for the marks "Allen Fieldhouse," "The Phog,"

---

[45]Including for "apparel, namely, T-shirts, sweatshirts, sport shirts, replica athletic uniforms, shorts, and sweaters, belts, gloves, slippers, ties and visors."  (Pretrial Order, Doc. 110 at 5–6.)

[46]Including for "apparel, namely, T-shirts, sweatshirts, sport shirts, replica athletic uniforms, shorts, sweaters, belts, gloves, handwarmers in the nature of mittens and gloves, hats, leather shoes, slippers, ties and visors."  (Pretrial Order, Doc. 110 at 6.)

[47]On December 21, 2006, four months following the filing of this action, KU filed Application Serial No. 77/069,556 with the USPTO for the mark "Jayhawks" for T-shirts, sweatshirts, jackets, sports shirts, golf shirts, replica athletic uniforms, shorts, sweaters, belts, mittens, gloves, hats, visors, neckties, leather shoes and slippers. (Pretrial Order, Doc. 110 at 16.)

[48]This was registered on March 27, 2007 to KU for "clothing, namely, t-shirts, sweatshirts and hats."

[49]This was registered on February 27, 2007 to KU for "clothing, namely, t-shirts, sweatshirts and hats."

"Late Night in the Phog," and "Beware of the Phog."  Allen Fieldhouse on the KU campus was dedicated on March 1, 1955 and is named after KU's famous former basketball coach, Forrest "Phog" Allen.  Today, Allen Fieldhouse hosts approximately thirty home basketball games per year for the men's and women's teams.  KU basketball games in Allen Fieldhouse are frequently broadcast on local and national television networks.  Allen Fieldhouse has long been referred to as "The Phog."  A banner bearing the phrase, "Beware of the Phog" hangs prominently in Allen Fieldhouse.  Every year, thousands of KU students and fans gather at Allen Fieldhouse to watch the KU men's basketball team open their season at an event known as "Late Night in the Phog."

KU does not own a registered trademark for the crimson and blue colors, but for more than one hundred hears, KU has used the crimson and blue color scheme as part of its Jayhawk mascot and in connection with its educational and entertainment services, athletics, student life, advertising, events, and website.  The media frequently refer to KU as "the crimson-and-blue."

KU does not manufacture apparel, but it licenses its trademarks to hundreds of different persons or entities and its marks appear on a wide variety of competing products with varying levels of quality.  KU licenses its marks to businesses in Lawrence as well as nationally.  The licensing of KU's trademarks is managed by cross-claim defendant Collegiate Licensing Company ("CLC") of Atlanta, Georgia.   KU's licensees are provided with art slicks that are incorporated into all license agreements.  The art slicks detail KU indicia, including trademarks, service marks, trade names, designs, logos, seals, and symbols.  The license agreements make clear that KU owns and licenses additional trademarks that may not appear on the art slicks.  An account representative for CLC routinely reviews KU licensees' products in the retail marketplace to make sure that they comply with product and licensing standards.  KU does not

18

permit the use of offensive language or references to sex or alcohol on officially licensed products.  KU monitors authorized uses of its color scheme and has set standards to instruct KU representatives and licensees as to how the crimson and blue color scheme is to be presented.

KU's licensed products are marketed in almost every conceivable type of media, including on the internet.  Sales of licensed products bearing KU's "Kansas" and "KU" marks contributed to the more than $12 million in wholesale sales, and at least $20 million in retail sales of licensed KU products in 2006 alone.

For a period of time, defendant Larry Sinks owned Midwest Graphics, Inc. ("Midwest Graphics"), which was a licensee of KU via the Licensing Resource Group and CLC.  Midwest Graphics followed the regular licensing procedures of submitting its designs for approval and accounting for royalties.  In October 1996, Sinks sold Midwest Graphics and in October 2001, he became the sole owner and only member of Victory Sportswear, L.L.C. ("Victory Sportswear").  In 2002, Sinks sought a license for Victory Sportswear from KU, via CLC, but was denied.  In January 2006, Victory Sportswear opened Joe-College.com as a subsidiary, which sells products that bear printed slogans and phrases that relate to college life and to KU in general.  The Joe-College.com retail store is located at 745 Massachusetts Street in Lawrence, Kansas—less than five miles from the KU campus.  Joe-College.com also sells merchandise through its website and for a period of time sold T-shirts to Jayhawk Food Mart in Lawrence, Kansas.  The business does not advertise or market its products except through its website.

Through its retail store and online operations, Joe-College.com sells T-shirts for approximately $15 each that vary in color and bear a number of different designs and/or slogans.  Joe-College.com does not currently sell any apparel licensed by KU.  However, Sinks stocked

some licensed merchandise he purchased from Grandstand Sportwear, a licensee of KU, that he

displayed along the back wall of the store until at least December 4, 2006.  In May 2006, Victory

Sportswear sold to defendant Clark Orth the screen printing operation of the company, which has

been used to manufacture all of  the products distributed by Joe-College.com except for those

purchased from Grandstand Sportwear.  Orth's screen printing business contracts with

businesses such as Joe-College.com for screen printing services.

       The Joe-College.com business sells blue T-shirts that display the following verbiage:

"Hawks," "Kansas," "Jayhawk," "Kivisto Field," "Allen Fieldhouse," and "Beware of the Phog."

The Joe-College.com business also sells T-shirts bearing the colors red and blue.  On February

27, 2006, Sinks applied for a federal trademark registration for the "Kivisto Field" mark for use

in connection with certain apparel.  At that time, Sinks was aware that KU's football field would

be named Kivisto Field.

       Joe-College.com also sells T-shirts that refer to specific players on the KU basketball

team, despite National Collegiate Athletic Association ("NCAA") Rule 12.5, which prohibits the

sale of commercial items bearing the name or likeness of college athletes.  Mario Chalmers is a

student athlete on the KU basketball team who wears jersey number 15.  Joe-College.com sells a

blue T-shirt that reads "Super Mario 15" in red and white lettering with an image of a basketball.

Russell Robinson is a student athlete on the KU basketball team who wears jersey number 3.

Joe-College.com sells a blue T-shirt that reads "Russell Mania 3" in red and white lettering with

an image of a basketball.  Brandon Rush is a student athlete on the KU basketball team.  Joe-

College.com sells a blue T-shirt that reads "I have a crush on B. Rush" in red and white lettering.

Defendants also sell unlicensed products that reference Bill Self, the current men's basketball

coach.  One example is a blue T-shirt that reads "Hawk Basketball" on the front and "Makin'

Noise for Bill's Boys" on the back.

Joe-College.com sells a number of unlicensed products that bear references to sex and

alcohol.  For example, one blue T-shirt reads "Kansas" on the front and on the back reads, "The

reason it's so windy in Lawrence is because KSU Sucks & Missouri Blows."  Another blue T-

shirt reads, "Sex, Alcohol, and Hawk Basketball."  Joe-College.com also sells products that use

offensive language.[50]

The Joe-College.com retail store currently has more than 100 signs posted that

affirmatively disclose the fact that the products for sale are not licensed, approved, sponsored, or

authorized by KU, or affiliated or associated with KU in any way.  However, as of July 21, 2006,

these disclaimers were not present at the store.  Sometime after the Complaint in this matter was

filed, similar disclaimers were added to the Joe-College.com website.  No consumers have ever

asked Sinks, or Erin Adams, who is the manager of the Joe-College.com retail store, whether the

designs sold there are licensed, approved by, or affiliated with KU.  Nor have any consumers

ever expressed confusion to Sinks or Adams about the products sold there.  However, defendant

Sinks' wife Carrie Sinks testified that she was unsure which products sold at Joe-College.com

were licensed and which were not.

There are at least 300 business entities using the term "Kansas" that are registered with

the Kansas Secretary of State to do business in Kansas and as of December 2006, there were

twenty-seven businesses in Lawrence that begin their names with the term "Jayhawk."  In March

2007, KU entered into an agreement with Jayhawk Food Mart, a convenience store located in

---

[50](*See, e.g.*, Doc. 144, Tab 2, Ex. A at 50, 64, 120, 121.)

Lawrence.  The agreement contemplates that Jayhawk Food Mart would pay KU a licensing fee of $20 for authorized use of the "Jayhawk" marks.

In a letter dated May 30, 2006, Lew Perkins, Director of Athletics for KU, requested that Sinks discontinue certain T-shirt designs sold by his company,[51] and that he "cease production and sale of any other items that infringe on the University's trademarks, including the term Kansas, and cease the use of designs that are closely identified with the University."  In that letter, Perkins emphasized the fact that many of the designs sold and produced through the Joe-College.com business were offensive to the University, or disparaged the athletic programs or coaches.  This action was subsequently filed by plaintiffs on August 16, 2006.  Plaintiffs assert the following claims: (1) Federal trademark infringement under 15 U.S.C. § 1114, (2) federal unfair competition under 15 U.S.C. § 1125(a), (3) federal trademark dilution, (4) trademark infringement under K.S.A. § 81-213, (5) trademark dilution under K.S.A. § 81-214, and (6) common law trademark infringement and unfair competition.  Approximately 140 designs utilized by defendants formed the basis of plaintiffs' claims in this case as of the filing of dispositive motions.[52]

## IV.   Discussion

The parties have filed a number of summary judgment motions that the Court now addresses in turn: (1) defendant Orth's Motion for Summary Judgment (Doc. 131); (2) defendant

---

[51]In the letter, Perkins specifically identified shirts that use the terms "Kansas," "Jayhawk[s]," "Hawk," the Jayhawk design, examples of those that are "offensive": "Kansas Drinking Team," "Kansas Swimming Team," "Muck Fizzou," "Our Coach is Phat," and examples of those that use student-athletes' names: "Super Mario 15" and "Moody Maniacs."  (*See* Doc. 139, Ex. O.)

[52]Plaintiffs have supplemented their exhibits since that time with many more designs that have been added to the Joe-College.com inventory in recent months.  (*See* Docs. 207, 208, 216, 217, 220.)

Sinks' Motion for Summary Judgment (Doc. 134); and (3) cross-motions for summary judgment filed by plaintiffs and defendants (Docs. 130, 136).[53]

### **Defendant Orth**

Defendant Orth seeks summary judgment on plaintiffs' Lanham Act claims, arguing that, as a mere printer of the allegedly infringing products at issue in this action, he is an innocent infringer and thus, subject only to equitable relief.  Under 15 U.S.C. § 1114(2)(A), liability under the Lanham Act is limited,

> Where an infringer or violator is engaged solely in the business of printing the mark or violating matter for others and establishes that he or she was an innocent infringer or innocent violator, the owner of the right infringed or person bringing the action under section 1125(a) of this title shall be entitled as against such infringer or violator only to an injunction against future printing.

As an initial matter, the parties disagree about whether Orth is engaged only in the business of printing.  Plaintiffs urge that his role in manufacturing the shirts at issue is more analogous to that of a manufacturer or wholesaler and so he is not entitled to claim the innocent infringer defense.  To support this position, plaintiffs argue that the price Orth charges to Joe-College.com covers both the cost of the T-shirt and any design and printing service,[54] thus he should not be deemed "printer."  The Court understands plaintiffs' argument to be that because Orth obtains the raw material for the T-shirts, rather than Joe-College.com, he is not engaged solely "in the business of printing the mark."  The Court is not persuaded by this fine distinction,

---

[53]The Court addresses the dismissal of defendants' counterclaims and cross-claim, along with plaintiffs' Motion for Attorneys' Fees (Doc. 197) in a separate order.

[54]None of the deposition testimony cited by plaintiffs sets forth the production process in the manner set forth in their response; it is at best an extrapolation of the testimony.  The testimony instead, supports Orth's contention that "Joe-College places an order for printed shirts, including the cost of the shirt, and Orth then merely prints the design and sells the printed design to Joe-College."

nor do plaintiffs cite any law in support thereof.[55]  The Court finds that Orth may be able to claim the innocent infringer defense, as he is in the business of printing, within the meaning of the statute.[56]

There is disagreement in the case law about what standard applies in determining whether a person is an innocent infringer under this provision.  Some courts have determined, citing legislative history to the 1989 amendment to section 32(2) of the Lanham Act, that the same "actual malice" standard applies as in defamation cases.[57]  But the Fifth Circuit has rejected this interpretation, arguing that an objective reasonableness standard applies.[58]  Under an actual malice standard, plaintiffs would have to prove that Orth acted either with knowledge of the infringement, or with reckless disregard as to whether the material infringed the trademark owner's rights.[59]  Under an objective reasonableness standard, Orth would be considered an innocent infringer "only if, regardless of state of mind, [his] conduct is reasonable."[60]  Plaintiffs urge that the objective reasonableness standard should be applied here, while Orth urges an actual malice standard applies.

---

[55]Plaintiffs point the Court to MCCARTHY, *supra* note 31, § 25.18.  That section deals with contributory infringement by a manufacturer or distributor who "aids or encourages his distributing customers to palm off its goods as those of another, or to infringe another's trademark."

[56]*See Polo Fashions, Inc. v. Ontario Printers, Inc.*, 601 F. Supp. 402, 403 (C.D. Ohio 1984).

[57]*See Gucci Am., Inc. v. Hall & Assocs.*, 135 F. Supp. 2d 409, 420 (S.D.N.Y. 2001); *World Wrestling Fed. Inc. v. Posters Inc.*, 58 U.S. P.Q.2d 1783, 1785 (N.D. Ill. 2000); *NBA Props. v. Untertainment Records LLC*, No. 99CIV2933, 1999 WL 335147, at *15 (S.D.N.Y. May 26, 1999).

[58]*Dial One of the Mid-South, Inc. v. Bellsouth Telecommc'ns, Inc.*, 269 F.3d 523, 526–27 (5th Cir. 2001); *see also Conopco, Inc. v. Rosa Distribs.*, 967 F. Supp. 1068, 1071 (N.D. Ill. 1997); *cf. Polo Fashions, Inc.*, 601 F. Supp. at 403 (applying objective reasonableness standard in pre-1989 amendment case).

[59]*See Gucci*, 135 F. Supp. 2d at 409 (citing *New York Times v. Sullivan*, 376 U.S. 254 (1964)).

[60]*See Dial One*, 269 F.3d at 525.

The Court finds that even under a heightened actual malice standard, a reasonable jury could find in favor of plaintiffs and thus, summary judgment is not appropriate. Plaintiffs point to Orth's deposition testimony, where he admits knowledge of KU's trademarks for at least the "Kansas" mark and the Jayhawk designs. Plaintiffs also point to Orth's testimony that certain shirts with the allegedly infringing marks were printed by Victory Sportswear. Finally, plaintiffs point to evidence that Orth used to work under Sinks at Victory Sportswear and had knowledge that Victory Sportswear was not a KU licensee at the time he printed certain allegedly infringing marks on products at issue. This evidence could persuade a reasonable jury that Orth acted with reckless disregard as to whether the T-shirt designs infringed on KU's marks.

Orth argues that he "did not print the marks which were the subject of KU's questioning regarding Orth's knowledge," but fails to point the Court to such evidence. It is undisputed that Sinks sold the screen printing portion of Victory Sportswear to Orth in May 2006 and that since then, Victory Sportswear has printed all of the products sold at Joe-College.com except for the few licensed products it purchased from a different printing company through early December 2006. As such, a genuine issue of material fact exists about whether Orth acted with knowledge of the alleged infringement, or acted with reckless disregard thereof when he printed the products at issue in this case from May 2006 on.

### Defendant Sinks

Defendant Sinks moves separately for summary judgment, arguing that he is not a proper party to this action, as he can not be held individually liable for the actions of Victory Sportswear, a limited liability company. Plaintiffs argue that Sinks is subject to individual liability based on his personal participation in the alleged infringement of KU's marks, and

based on his status as the sole owner of Victory Sportswear and its subsidiary, Joe-College.com.

While Sinks is correct that the Kansas Revised Limited Liability Company Act generally provides that an LLC's corporate liabilities in tort are solely those of the LLC and that no member or manager may be liable solely based on their status as a member or manager, it does not foreclose individual liability by a member who commits a tort.[61]  The other basis for member liability is if the Court "pierces the corporate veil" in the instance of an individual "who uses a corporation merely as an instrumentality to conduct his own personal business."[62]  Corporate officer liability in a patent infringement case has been explained as follows:

> In general, a corporate officer is personally liable for his tortious acts, just as any individual may be liable for a civil wrong. This general rule "does not depend on the same grounds as 'piercing the corporate veil,' that is, inadequate capitalization, use of the corporate form for fraudulent purposes, or failure to comply with the formalities of corporate organization." When personal wrongdoing is not supported by legitimate corporate activity, the courts have assigned personal liability for wrongful actions even when taken on behalf of the corporation. However, this liability has been qualified, in extensive jurisprudence, by the distinction between commercial torts committed in the course of the officer's employment, and negligent and other culpable wrongful acts.
> Thus, when a person in a control position causes the corporation to commit a civil wrong, imposition of personal liability requires consideration of the nature of the wrong, the culpability of the act, and whether the person acted in his/her personal interest or that of the corporation.[63]

Plaintiffs maintain that Sinks may be held personally liable, separate and apart from any

---

[61]*See Kerns ex rel. Kerns v. G.A.C., Inc.*, 875 P.2d 949, 957–58 (Kan. 1994) (explaining that an officer or director of a corporation is not liable for the torts of the corporation unless he or she commits or participates in the tort).

[62]*See Kvassay v. Murray*, 808 P.2d 896, 904 (Kan. Ct. App. 1991).

[63]*Braintree Labs., Inc. v. Nephro-Tech, Inc.*, 81 F. Supp. 2d 1122, 1132 (D. Kan. 2000) (quoting *Hoover Custom Metalcraft, Inc.*, 84 F.3d 1408, 1411 (Fed. Cir. 1996)), *aff'd* F. App'x 799 (Fed. Cir. 2001); *see also Babbit Elect., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1994); MCCARTHY, *supra* note 31, § 25.24.

theory based on piercing the corporate veil. The Court agrees. It is undisputed that Sinks is the sole owner of Victory Sportswear and its subsidiary, Joe-College.com. Plaintiffs have pointed the Court to evidence that Sinks creates and approves of the designs placed on all the products sold in the Joe-College.com store, stating that "[s]ome people have called me the Picasso of T-shirts . . . ." Plaintiffs have also pointed the Court to evidence that Sinks previously owned a company that was a licensee of KU, and was denied a license by KU after forming Victory Sportswear in 2002. This evidence, in addition to the cease and desist letter sent by Perkins to Sinks directly, is enough evidence to persuade a reasonable jury that Sinks actively, and knowingly caused the alleged trademark infringement of KU's marks. Therefore, summary judgment to Sinks on this basis is denied.

## Cross Motions for Summary Judgment

The parties have filed cross motions for summary judgment on all of the substantive claims and affirmative defenses in this case. The Court addresses these claims in the following order: (1) trademark infringement under the Lanham Act, (2) unfair competition under the Lanham Act, (3) trademark dilution under the Lanham Act, and (4) defendants' affirmative defenses.[64] The Court initially addresses defendants' arguments about the scope of the Lanham Act.

### *Application of Lanham Act to Plaintiffs' Marks*

Defendants begin their cross motion for summary judgment by arguing that plaintiffs essentially seek "a monopoly over anything blue, or which bears terms referencing KU or any of KU's rivals." They further argue that plaintiffs' marks are not protectable because they do not

---

[64]The parties appear to agree that the standards of liability on the state law claims are nearly identical to the federal standards, and thus, the conclusions on summary judgment should be the same for both.

identify the source of the products or relate to the quality of the products.  At bottom, defendants' challenge the distinctiveness of plaintiffs' color schemes, logos, and designs, and thus, their protectability.  The Lanham Act defines a trademark as "any word, name, symbol, or device, or any combination thereof . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."[65]  "'A mark must be capable of distinguishing the products [or services] it marks from those of others.'"[66]  There are five categories of marks with respect to protection: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful.[67]  The Tenth Circuit has explained:

> The trademark protection afforded each type of mark is related to how closely the mark identifies the source of the product.  "Because a generic mark refers to a general class of goods, it does not indicate the particular source of an item. Consequently, such a mark receives no legal protection and may not be registered alone as a trademark."  711 F.2d at 939.  At the other end of the spectrum, suggestive and fanciful marks may be registered without proof that they identify the source of the product.  *Id.*  Descriptive terms fall in the middle on the continuum.  "Because a descriptive term is one which a competitor would likely need to use in describing his product, the term does not indicate that a product comes from a single source. Therefore, a trademark that is descriptive may be registered only if it has acquired a secondary meaning by becoming 'distinctive of the applicant's goods in commerce.'"[68]  *Id.* at 939–40.

First, plaintiffs urge that the marks "KU," "Kansas," "Jayhawks," and the Jayhawk

---

[65]15 U.S.C. § 1127.

[66]*Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1215 (10th Cir. 2004) (quoting *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999)).

[67]*See id.*; *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 923 (10th Cir. 1986).

[68]*Id.* at 924.

designs are "incontestable," by statute.  15 U.S.C. § 1065 provides that a registrant's continuous use of a mark for five consecutive years after the date of registration is "incontestable," subject to certain provisions.  While it appears that the "KU" and "Kansas" marks and the Jayhawk design marks are incontestable under § 1065,[69] the "Jayhawk" mark is not, as it has not been in use for five consecutive years subsequent to the date of federal registration in 2006.  "An 'incontestable' mark cannot be challenged as lacking secondary meaning; such marks are conclusively presumed to be nondescriptive or to have acquired secondary meaning."[70]  Because the "KU" and "Kansas" marks and the Jayhawk design marks are accorded this presumption, the Court finds them protectable as a matter of law.

The distinctiveness presumption does not apply to the remaining marks.  The categorization of a mark is a factual question.[71]  The factfinder is "to determine, based on the evidence before it, what the perception of the purchasing public is."[72]  Rather than analyze the marks in this case according their categorization, both parties focus their arguments on whether plaintiffs' marks are related to the source or quality of the products.  Based on the statement of uncontroverted facts, it appears that plaintiffs also assert protection for the remaining marks, "Jayhawks," "Allen Fieldhouse," "The Phog," "Hawk(s)," "Kivisto Field," "Late Night in the Phog," "Beware of the Phog," and the crimson and blue color scheme in conjunction with other indicia of KU.  Yet, after setting forth the factual basis for these marks in their statement of

---

[69]As discussed more fully later in this Memorandum and Order, the fact that a mark is incontestable does not relieve plaintiffs of their burden of proving likelihood of confusion.  *See, e.g.*, *Universal Money Ctrs., Inc. v. AT&T*, 22 F.3d 1527, 1529 (10th Cir. 1994).

[70]*Beer Nuts, Inc.*, 805 F.2d at 924.

[71]*Donchez*, 392 F.3d at 1216.

[72]*Id.*

uncontroverted facts, plaintiffs do not articulate how these marks should be categorized for purposes of determining protectability, strength, or fame.

Defendants initially argue that because KU does not manufacture any goods, it does not control a "singular level of quality." They also argue that consumers are unable to discern the source of the product, i.e., who manufactured it. In *Qualitex Co. v. Jacobson Products Co.* [73] the Supreme Court explained, "trademark law . . . . quickly and easily assures a potential customer that *this* item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past." But it is unnecessary for the marks to be actually manufactured by plaintiffs in order to be protected; instead, widespread use by officially licensed entities is sufficient.[74] Indeed, "[o]ne of the ways that the law extends the benefits of trademarks and protects incentives to develop them is by allowing trademark owners to license the use of their marks to distributors and franchisees."[75] Defendants' argument would render any trademark licensed, rather than manufactured by the licensor, unprotected.

Moreover, defendants' argument that the trademarks fail to serve as quality-identifiers is misplaced. Defendants suggest that KU's marks do not assure a consumer that he is purchasing a product with a guaranteed level of quality. But the law does not require this. Instead, it "affords the trademark holder with the right to control the quality of the goods manufactured and sold under its trademark. The actual quality of the goods is irrelevant; it is the control of the

---

[73]514 U.S. 159, 163–64 (1995).

[74]*See, e.g., Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1545, 1546–47 (11th Cir. 1985) (explaining that confusion need not only relate to the origin of the product itself, but to "the public's knowledge that the *trademark*, which is 'the triggering mechanism' for the sale of the product, originates with the plaintiff."); *Univ. of Pittsburgh v. Champion Prods., Inc.*, 686 F.2d 1040, 1047 (3d Cir. 1982); *cf. Univ. Book Store v. Univ. of Wis. Bd. of Regents*, 33 U.S.P.Q.2d 1385, (T.T.A.B. 1994).

[75]*TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 882 (7th Cir. 1997).

30

quality that a trademark holder is entitled to maintain."[76]

It is undisputed that KU's marks have been in use for long periods of time to reference either the University, the athletic teams, or the places where football and basketball games are played at KU.  Plaintiffs' expert, Dr. Hirt, also opines that highly identified KU students, fans, and alumni are motivated to purchase "school-identifying apparel" to show their affiliation with KU.  It is also undisputed that at least some of the marks generate millions of dollars in sales revenue and that they enjoy unsolicited media coverage, locally and nationally.  The Court finds these facts are sufficient to create a genuine issue of material fact about whether the marks that do not enjoy incontestable status have acquired secondary meaning or are inherently distinctive and are, thus, protected under the Lanham Act.

However, as the Court emphasizes throughout this opinion, the distinctiveness acquired by plaintiffs for its marks, does not dictate a finding of liability against defendants for every blue or red shirt it produces with a possible reference to KU on it.  As described more fully below, plaintiffs' claims require the Court to conduct numerous fact-intensive inquiries.  In conducting these analyses, the Court is dependent upon the parties, and the plaintiffs in particular, to point it toward specific evidence of infringement, unfair competition, or dilution of particular trademarks.  This is part and parcel of plaintiffs' overall burden of proof in this matter.  The Court does not find that plaintiffs' marks are amenable to generalization.  To the extent that plaintiffs fail to point the Court to the specific marks or types of marks used by defendants that infringe upon specific marks owned by KU, they fail to meet the high burden placed on a

---

[76]*Shell Oil Co. v. Comm. Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991) (quotation omitted).

moving party who also carries the ultimate burden of proof at trial.[77]

### A.   *Trademark Infringement*

The Lanham Act prohibits the unauthorized use in commerce of a counterfeit or imitation of a registered mark "likely to cause confusion in the marketplace concerning the source of the different products."[78]  In determining whether a likelihood of confusion exists, the Court considers the following nonexhaustive list of factors:

> (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks.  These factors are interrelated and no one factor is dispositive.  In this circuit, likelihood of confusion is a question of fact but one amenable to summary judgment in appropriate cases.[79]

In addition to these enumerated factors, the Court will consider the impact of the disclaimers posted at the Joe-College.com retail store and on the website.  "[T]he key inquiry is whether the consumer is 'likely to be deceived or confused by the similarity of the marks.'"[80]  Plaintiffs allege that the following marks are infringing: "Kansas," "KU," "Jayhawks," the Jayhawk designs, "the Phog," "Hawks," and use of  the crimson and blue scheme in combination with other indicia.

---

[77]*Cross v. Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (quoting *Downes v. Beach*, 587 F.2d 469, 472 (10th Cir. 1978)) (explaining that on summary judgment, parties should not depend on the trial court to conduct its own search of the record.")

[78]*Sally Beauty Supply Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002); *see also* 15 U.S.C. § 1114(1).

[79]*Sally Beauty Supply Co.*, 304 F.3d at 972 (citations omitted); *see also Vail Assocs., Inc. v. Vend-Tel-Co.*, –F.3d–, No. 05-1058, 2008 WL 342272, at *7 (10th Cir. Feb. 7, 2008).

[80]*Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 832 (10th Cir. 2005) (quoting *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998)) (internal quotation omitted).

### Similarity of the Marks

The Tenth Circuit has advised that "[i]n both confusion of source and confusion of sponsorship cases, the similarity of the marks factor constitutes the heart of our analysis."[81] Similarity between marks is tested on the levels of sight, sound, and meaning.[82]  The Court examines these factors "in the context of the marks as a whole as they are encountered by consumers in the marketplace."[83]  The Court is not to engage in a side-by-side comparison.[84] Instead, the Court should determine "whether the alleged infringing mark will be confusing to the public when singly presented."[85]  Further, the Court should "give the similarities of the marks more weight than the differences,"[86] "especially when the competing marks are used in virtually identical products packaged in a similar manner."[87]  This factor is also important because "one's adoption of a mark similar to a preexisting mark not only bears independently upon the likelihood of confusion, but also may support an inference that one intended to draw upon the reputation of the preexisting mark."[88]

While the Court is cognizant that it is not to conduct a side-by-side comparison of the marks at issue, its task of analyzing this factor is complicated by the failure of the parties to

---

[81] *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999).

[82] *See, e.g., id.*

[83] *Id.* (quoting *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986)).

[84] *See, e.g., id.*; *Universal Money Ctrs., Inc. v. AT&T*, 22 F.3d 1527, 1531 (10th Cir. 1994).

[85] *King of the Mountain Sports, Inc.*, 185 F.3d 1090.

[86] *Id.*

[87] *Sally Beauty Supply Co.*, 304 F.3d at 972 (citing *Beer Nuts*, 805 F.2d at 925).

[88] *Vail Assocs., Inc. v. Vend-Tel-Co.*, –F.3d–, No. 05-1058, 2008 WL 342272, at *11 (10th Cir. Feb. 7, 2008).

specifically compare the marks in their summary judgment briefs.  KU alleges that over 150 of defendants' shirt designs are infringing, yet provides the Court with a limited discussion of how the specific marks or designs, or categories of marks or designs, compare.  Some shirts are alleged to contain identical marks to federally registered trademarks, while other shirts are allegedly infringing based on the combination of various registered and unregistered marks.  Additionally, KU has submitted hundreds of exhibits of officially licensed products that the Court is apparently expected to cull through in order to determine the similarities and differences.  While the Court maintains that these shirt designs are not amenable to generalization, it  nonetheless conducts a separate analysis with regard to a small amount of shirts singled out by KU that are substantially similar in design to certain KU marks and are substantially different than the remaining shirt designs at issue.

       **1.**        **Substantially Similar Designs**

The Court first addresses defendants' shirt designs that contain substantially similar marks as certain KU marks found on officially licensed products.  According to defendants, these T-shirts were only available for sale prior to the initiation of this lawsuit.  Examples specifically cited by plaintiffs include two shirts that bear the word "Kansas" on the front in white block lettering; one is crimson and one is blue.  A third T-shirt is blue with the KU logo on the front.  The fourth is blue with the words "HAWK KUTIE" on the front.[89]

The Court finds that the similarities of these shirts to officially licensed KU products are

_____

[89]Plaintiffs' specifically identify these shirts in their summary judgment motion; they are found at Doc. 144, Ex. A at 1-3, 85.  However, in their statement of uncontroverted facts, plaintiffs refer to these as "examples."  While the Court is unable to locate other instances like these in its cursory review of the exhibits, its findings with regard to these shirts apply to any other shirts that similarly include KU's marks without any other differentiating marks or additional non-infringing language.  It is incumbent upon plaintiffs to identify any such additional shirt designs.

overwhelming and weigh heavily in favor of a finding of likelihood of confusion.  Both "Kansas" shirts bear KU's colors and have similar block lettering as those that are officially licensed.[90]  While defendants are correct that the lettering is not identical, no reasonable jury could conclude that the lettering is not substantially similar.  Defendants provide no explanation as to how a consumer, encountering these T-shirts in the marketplace, would identify the subtle difference in font and associate this difference with whether the products are licensed or not.

The KU shirt is a plain blue T-shirt bearing the "KU" mark in the same font as other officially licensed KU materials.  KU routinely uses this particular font in conjunction with its "KU," marks—with a line from the "K" sweeping underneath the "U."  A comparison of the "Hawk KUTIE" shirt with an officially licensed shirt that says "KUTIE" is likewise extremely similar except for the absence of "Hawk."  But of course, defendants shirt adds to, rather than takes away from KU's officially licensed design that contains the KU mark in its distinctive font. None of these shirts bear the Joe-College.com logo and all of them are highly similar to officially licensed products when comparing their overall look, sound, and meaning.  The Court finds no genuine issue of material fact that these T-shirts, when singly presented to consumers, contain similar marks and that this factor weighs heavily in favor of a finding that a likelihood of confusion exists as to these specific shirts.

## 2.      Remaining Shirts

There are a number of similarities between defendants' remaining shirts and shirts that are officially licensed by KU.  It is beyond dispute that "the meaning" of defendants' shirts is to reference KU.  References to Kansas, the Jayhawk, Hawks, individual athletes and coaches, the

---

[90] *King of the Mountain Sports, Inc.*, 185 F.3d at 1090–91 (comparing colors and lettering of marks).

KU football field and fieldhouse, and KU's rivals all seek to tap into support of the University and its athletic teams, even if the marks used are not independently registered marks of KU. The deposition testimony of both Orth and Adams and Dr. Hirt's report support this conclusion, as well as a plain reading of the shirts themselves.

The words on some of the remaining the shirts are identical: some bear the word "Kansas" on the front of a crimson or blue shirt, which is identical in scheme to some officially licensed shirts, as previously discussed. The colors and lettering of "Kansas" on these shirts are again, substantially similar to those of officially licensed shirts. But all of the remaining shirts that contain the mark "Kansas" on the front contain additional language on the back. KU fails to point the Court to officially licensed materials that are similar in look, sound or meaning to the multitude of messages on the backs of these shirts, which contribute to the overall presentation of the marks.

Many of defendants' shirts bear the mark "Hawk" or "Hawks" or reference Kivisto Field, Allen Fieldhouse or "The Phog." KU argues that marks such as these, in conjunction with the crimson and blue color scheme, render the shirts similar enough to officially licensed products to cause confusion in the marketplace. KU urges that "[i]t is simply inconceivable that someone seeing a royal blue shirt in Lawrence, Kansas with the phrase "Hawk Basketball" emblazoned on it would not consider it to be a shirt referencing KU's basketball program." KU also relies on the fact that the media refer to KU at times as "the crimson-and-blue" or "hawks." While these shirts may reference KU, it is not the focus of analysis on this factor. Instead, the Court is to evaluate similarity of the marks based on sight, sound, and meaning.

Comparing the T-shirt examples provided by KU in its memorandum in support of

summary judgment, the Court is unable to conclude that all of the shirts are similar or different as a matter of law.  It seems clear that each of these shirts should be evaluated separately, or at least analyzed in categories.  For example, the "Beware of the Phog" shirt in Doc. 144, Tab 2, Ex. A contains similarities in sight, sound and meaning to the shirt referenced in Doc. 143 Tab 1, Ex. L.  Both incorporate the phrase "Beware of the Phog," a well known reference to the banner that has hung for decades in Allen Fieldhouse.  The phrase is also printed in similar white lettering and both are printed on blue T-shirts.  The officially licensed shirt, though, does contain two Jayhawk designs, while the defendants' shirt does not.  The defendants' mark contains the Joe-College.com logo.  In contrast to this example, the shirts compared by KU on page 23 of the memorandum provide for a different analysis, as the defendants' shirts use the word "Jayhawk," and "Hawk," but in two of the three examples, also use offensive language that does not appear on any licensed product.  In this instance, a reasonable jury could conclude either (1) that these phrases are not the dominant aspect of the shirts, and therefore, do not assuage confusion, or (2) that these phrases actually distinguish the shirts from those officially licensed from KU, and thus weigh against a finding of likelihood of confusion.[91]  Notably, a reasonable jury could reach different conclusions about each of defendants' T-shirt designs.  The Court declines to conduct a separate analysis for each T-shirt at issue on its own, absent some guidance by plaintiffs beyond mere generalizations.

Defendants point out that all of the allegedly infringing shirts contain the Joe-

---

[91]The Court is also hesitant to find similarities between the sounds of "Hawk" and "Jayhawk," as Tenth Circuit precedent discourages the shortening of a trademark for likelihood of confusion analysis.  *See Vail Assocs., Inc. v. Vend-Tel-Co.*, –F.3d–, No. 05-1058, 2008 WL 342272, at *11 (10th Cir. Feb. 7, 2008) (declining to compare a mark that the plaintiff had no service mark protection for); *Sally Beauty Supply Co. v. Beautyco, Inc.*, 304 F.3d 964, 973 (10th Cir. 2002) (explaining that there is no authority for shortening word of trademark for comparison to infringing mark); *Universal Money Ctrs., Inc. v. AT&T*, 22 F.3d 1527, 1531 (10th Cir. 1994).

College.com logo, which KU licensees' shirts do not have.  It is true that the Joe-College.com logo appears on these remaining shirts, though it is arguably not prominently displayed.[92]  The Court is unable to conclude that this, standing alone, is sufficient to find that the shirts are not similar as a matter of law.

More importantly, the overall look, sound, and meaning of the shirts is also different than the licensed shirts in that they reference either sex or alcohol, use irreverent language, make insulting references to rival universities such as Kansas State University or the University of Missouri, or reference individual players and coaches of the KU athletic teams in contravention of an NCAA rule.  KU cannot deny that these are important differences in the overall presentation of the marks to consumers and it is undisputed that these references are neither condoned by KU nor used on officially licensed products.

There are both similarities and differences between these remaining marks, and the Court is cognizant that it must give more weight to the similarities since the marks are being used in identical products that are used in the same manner (i.e. as T-shirts worn to show support for KU).  Even taking this into account, the Court is unable to conclude as a matter of law that the marks, other than the few discussed at the outset, are similar or dissimilar as a matter of law.  Instead, a genuine issue of material fact exists about whether these shirts are so similar that they would "be confusing to the public when singly presented."

---

[92]*See Universal Money Ctrs., Inc.*, 22 F.3d at 1531 (explaining that even though dominant portion of each mark is entitled to greater weight, presence of house mark prominently displayed contributes to finding of perceptible distinctions between the products); *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46–47 (2d Cir. 2000) (collecting cases holding that prominent use of house mark can weigh against a finding of confusing similarity); *Bd. of Supervisors of the La. State Univ. v. Smack Apparel Co.*, 438 F. Supp. 2d 653, 656 (E.D. La. 2006) (giving little weight to house mark because of the small size of the mark compared to the other marks on the products).

*Defendants' Intent*

Under this factor, the Court focuses on "whether defendant[s] had the intent to derive benefit from the reputation or goodwill of plaintiff[s]."[93]  While "deliberate adoption of a similar mark may lead to an inference of intent to pass off goods as those of another which in turn supports a finding of likelihood of confusion,"[94] "mere knowledge should not foreclose further inquiry."[95]  Instead, the Court should look to the "larger factual context of the case."[96]  And, "if the evidence indicates a defendant did not intend to derive benefit from a plaintiff's existing mark, this factor weighs against the likelihood of confusion."[97]

Plaintiffs argue that defendants intended to draw on the commercial magnetism of KU's marks, pointing to the fact that Sinks' former company was a KU licensee, that he was familiar with KU's licensing program, and that he applied for and was denied a license for Victory Sportswear before producing the infringing products.  Defendants argue that they have deliberately avoided adopting KU's marks by refraining from using the marks "The University of Kansas," "KU" and the Jayhawk designs.  Defendants further point to a lack of evidence that they intended to design shirts that cause confusion among consumers.  As for the shirts with the "Kansas" mark, Sinks attests under oath that these shirts are sold in "a rainbow of colors which is intended to relate to the song 'Somewhere over a rainbow' from the movie 'The Wizard of Oz,' which fictionally took place in Kansas.  Sinks attests under oath that this use of the word

---

[93]*See, e.g.*, *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1091.

[94]*Universal Money Ctrs., Inc.*, 22 F.3d at 1531.

[95]*GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir. 1990).

[96]*W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1272 (10th Cir. 2005).

[97]*See, e.g.*, *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 556 (10th Cir. 1998).

'Kansas' is not intended to mean or refer to the University of Kansas.'"[98]

But the record is clear that defendants intended to reference KU in their products.  The products are sold at a retail store in the town where KU's main campus is located, entitled "Joe-College.com."  Most of the allegedly infringing shirts portray various marks and images on shirts in KU's official colors of crimson and blue that, as a whole, clearly reference KU.  Defendant Sinks was familiar with the licensing process at KU; had sought a license and was denied.   But the focus of this factor is not whether defendants intended to refer to KU, but whether they intended to derive a benefit from the goodwill or reputation of KU; whether they intended to confuse.[99]  "Usually, parties show defendant's intent to confuse consumers by producing evidence that the defendant tried to 'pass off [his] product as that of another.'"[100]

While there is no direct evidence of defendants' intent in the summary judgment record, the Court finds that, for the same reasons discussed under the similarity of the marks factor, there is substantial evidence that defendants intended to infringe KU's marks by producing the first category of shirts—those substantially similar to officially licensed products containing KU's marks.  The high degree of similarity weighs strongly in favor of a finding of intent; the use of almost identical marks supports a conclusion that defendants intended to derive a benefit from KU's reputation, rather than rely upon their own.  Finally, the fact that Victory Sportswear was denied a license to produce goods bearing KU's trademarks, followed by defendants producing these particular shirts, is evidence that strongly suggests defendants intended to pass off these

---

[98](Doc. 139, Ex. A § 25.)

[99]*See Jordache Enters., Inc. v. Hogg Wyld,, Ltd.*, 828 F.2d 1482, 1485 (10th Cir. 1987); *see also Universal Money Ctrs.*, 22 F.3d at 1531.

[100]*Tex. Tech Univ. v. Spiegelberg*, 461 F. Supp. 2d 510, 522 (N.D. Tex. 2006).

products as those licensed by KU.  Therefore, in the larger context of the case, the Court finds

that a presumption of intent applies to defendants on these particular shirts.[101]  But similarity

does not support an inference of intent as to the remaining majority of defendants' marks.

In *Texas Tech University v. Spiegelberg*, the Northern District of Texas found that

evidence on this factor weighed heavily in favor of a likelihood of confusion where the infringer

had knowingly placed tags on unlicensed University products indicating that they were

"officially licensed," imitated packaging material, code numbers, and adopted similar

distribution methods.[102]  No such evidence is present in this case.  Any licensed material stocked

by Joe-College.com was displayed on a separate wall of the store and removed entirely sometime

in late 2006 or early 2007.  Importantly, there is no evidence that defendants were trying to pass

the remaining infringing shirts off as their own—the placement of the Joe-College.com mark, as

well as the disclaimers posted in the store and online could persuade a reasonable jury that

defendants were instead attempting to capitalize on their own reputation for supplying irreverent

T-shirts that refer to KU but that are explicitly not authorized by KU.

KU heavily emphasizes the fact that Sinks was denied a license by KU before

proceeding to produce these T-shirts.  But evidence that Sinks was aware of KU's trademarks,

alone, is insufficient to establish his intent to infringe.[103]  While it may be undisputed that

defendants intended to derive a benefit from the reference to KU, a reasonable jury could

---

[101]*See Universal Money Ctrs.*, 22 F.3d at 1532.

[102]461 F. Supp. 2d at 522; *see also Marker Int'l v. deBruler*, 635 F. Supp. 986, 1000 (D. Utah 1986) (finding intent where infringer stated "without equivocation that he continued to use the Marker name and sloping "M" because he believed people might associate that reputation with the Marker Surf America products.").

[103]*Universal Money Ctrs.*, 22 F.3d at 1531; *Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1329 (D. Kan. 2005).

conclude that defendants relied on their own publicity and reputation as makers of irreverent and, at times, offensive shirts, rather than KU's reputation or goodwill.

### *Actual Confusion*

Although it is not necessary in order to prevail on a trademark infringement claim, "evidence of actual confusion in the marketplace may be the best indication of likelihood of confusion."[104] To show actual confusion, plaintiffs point to the Lawrence Journal World weblog evidence.[105] Specifically, KU points to the following anonymous postings:

> #458498—Fri Sep 01 2006 05:16 PM by oreadical: I saw somebody wearing a "Rock Out with Your Hawk Out" shirt last year on TV at AFH. I have never seen one of these anywhere else. It was a standard Ku blue shirt, bearing a strong resemblance to the other KU "novelty" shirts (like the "Muck Fizzou" design). But I wonder now if it was a homemade effort. Does anybody know where to get one?
>
> . . . .
>
> #458606—Sat Sep 02, 2006 3:23 AM by HawkInDaHaus89: I see no problem with the win or lose shirt as long as the person is not puking on national TV. However, the Muck fizzou shirt is bad. Are these sold at the bookstore of officially licensed by the University. If they are licensed then its not a good thing. Ku expects to win against Mizzou every year. When Mizzou wins in BB or Football they storm the field or court. That's my clue they aren't up to par.

While this evidence is admissible evidence of actual confusion, at best, it shows that two

---

[104]*Vail Assocs., Inc. v. Vend-Tel-Co.*, –F.3d–, No. 05-1058, 2008 WL 342272, at *7 (10th Cir. Feb. 7, 2008) (quoting *Sally Beauty Supply Co. v. Beautyco, Inc.*, 304 F.3d 964, 974 (10th Cir. 2002)) .

[105]As discussed earlier in this order, the Court grants defendants' motion to strike the declarations of the KU Bookstore and KUStore.com employees. Therefore, the Court does not consider this actual confusion evidence. Even if the Court did consider this evidence, it would be de minimus, as it constitutes "relatively few anecdotal incidents" of confusion. *See, e.g.*, *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092–93 (10th Cir. 1999); *Big Dog Motorcycles, L.L.C.*, 402 F. Supp. 2d at 1333 n.16; *Rush Indus. v. Garnier L.L.C.*, 496 F. Supp. 2d 220, 228 (E.D.N.Y. 2007).

anonymous individuals were confused as to the source of defendants' T-shirts.[106]  Plaintiffs also

point to evidence that defendant Sinks' wife, Carrie Sinks, was confused about whether certain

shirts sold by Joe-College.com are licensed.  In fact, Carrie Sinks merely testified that she was

unsure about whether certain shirts that were available through the Joe-College.com website

were officially licensed.  Therefore, while there is some evidence of actual confusion, it is

minimal.  While the Court is cognizant that actual confusion evidence is not necessary in order

for plaintiffs to prevail, it finds that, as a factor in the overall likelihood of confusion analysis, it

does not weigh in favor of a finding of a likelihood of confusion.

### Similarity of Products and Manner of Marketing

In comparing the products and manner of marketing between defendants and officially

licensed retailers, defendants urge the Court that they are dissimilar because Joe-College.com

strictly sells T-shirts, while all other retailers sell a variety of KU merchandise in addition to T-

shirts and other apparel.  Plaintiffs argue that the products are sold in similar channels of trade,

and target the same customers.  Additionally, plaintiffs point out that the Joe-College.com retail

store is within feet of many other officially licensed retailers in downtown Lawrence.

The Court agrees with plaintiffs that, while defendants' products may be a small piece of

the overall universe of products officially licensed by KU, it is a piece of that universe

nonetheless.  It is undisputed that there are multiple retailers in downtown Lawrence that sell T-

shirts officially licensed by KU.  And it is undisputed that one of the products routinely licensed

by KU is the T-shirt.

Defendants urge that the second part of this factor, manner of marketing, weighs in their

---

[106] *Cf. Sally Beauty Supply Co.*, 304 F.3d at 974; *Universal Money Ctrs., Inc.*, 22 F.3d 1535–36.

favor because they do not market or advertise their products.  Plaintiffs argue that defendants'

use of a website to distribute T-shirts constitutes internet marketing.  The Court considers "the

similarity between the parties' marketing efforts in light of the overarching purpose of our

inquiry—determining whether consumers are likely to be confused as to the origin of the

[trademark]."[107]  There is no evidence in the summary judgment record that either party points

to, characterizing plaintiffs' marketing efforts.  Thus, a comparison of marketing efforts is

impossible.  Even to the extent the Court assumes that KU markets its licensed products through

the internet, "'[s]ome use of the Internet for marketing . . . does not alone and as a matter of law

constitute overlapping marketing channels.'"[108]  In order to determine whether there is evidence

that the parties use similar marketing channels, the Court would need to be able to determine

> (1) whether both parties use the Internet as a substantial marketing
> and advertising channel, (2) whether the parties marks are utilized
> in conjunction with Internet-based products, and (3) whether the
> parties' marketing channels overlap in any other way.[109]

The Court is unable to reach the conclusion that defendants' use of the Internet constitutes, as a

matter of law, overlapping marketing channels as there is no evidence in the record about any of

these factors.

On this factor, the Court finds *Spiegelberg* and *Board of Supervisors of the Louisiana

State University v. Smack Apparel Co.*[110] to be instructive.  In *Spiegelberg*, the district court

---

[107]*Vail Assocs., Inc.*, 2008 WL 342272, at *13.

[108]*Big Dog Motorcycles, L.L.C.*, 402 F. Supp. 2d at  1329 (quoting *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002) (emphasis in original)).

[109]*Id.* at 1331 (citing *Therma-Scan, Inc. v. Thermascan, Inc.*, 295 F.3d 623, 637 (6th Cir. 2002)).

[110]438 F. Supp. 2d 653 (E.D. La. 2006).

found important that (1) defendants sold licensed and unlicensed goods side-by-side; and (2) consumers who purchase licensed and unlicensed products are the same—they are purchasers "who wish to show their support for Texas Tech."[111]  The court further found that the marketing factor weighed against the defendant because he utilized a similar design to the Texas Tech mascot in his advertising.[112]  The court noted that the defendant advertised with this design in the student newspaper, the internet, television, and radio.[113]

In *Smack*, the court found that this factor weighed in favor of the Universities, as the defendant "sold in booths and kiosks set up by retailers near stadiums on the days on which the respective university plaintiffs play football. . . . [and] sold in retail outlets alongside those of the plaintiffs."[114] As far as advertising, the court relied upon evidence that the defendant participated in the same trade shows as the plaintiffs and that it advertised its shirts at those trade shows.

The facts of this case are somewhat analogous to the facts present in *Speigelberg* and *Smack* regarding channels of trade, but can easily be distinguished in terms of manner of marketing.  Here, while plaintiffs may sell only T-shirts, they do sell the T-shirts in downtown Lawrence near a number of officially licensed retailers who sell officially licensed apparel that includes T-shirts.  The fact that these retailers also sell KU merchandise other than T-shirts does not take away from the fact that the T-shirts are sold in the same type of retail outlet as officially

---

[111]461 F. Supp. 2d 510, 521 (N.D. Tex. 2006).  The Court stops short of making any finding that this conclusion translates into a finding that "those individuals who purchase unlicensed tee-shirts bearing [plaintiffs'] marks care one way or the other whether the University sponsors or endorses such products or whether the products are officially licensed.  Instead . . . it is equally likely that individuals buy the shirts to show their support for the University."  *Bd. of Governors of the Univ. of N.C. v. Helpinstine*, 714 F. Supp. 167, 173 (M.D.N.C. 1989).

[112]*Spiegelberg*, 461 F. Supp. 2d at 522.

[113]*Id.*

[114]*Smack*, 438 F. Supp. 2d at 660.

licensed apparel that includes T-shirts. There is also evidence that at least for a time, defendants sold both licensed and unlicensed merchandise. While the licensed apparel may have been separated, it was still sold through the same retail outlet. The products are sold in the same channels of trade, weighing in favor of plaintiffs.

However, there is no evidence in the summary judgment record that defendants are marketing their T-shirts in the manner employed by the defendants in *Spiegelberg* or *Smack*. The logo used by defendants is the Joe-College.com logo. There is no allegation that this logo makes any reference to KU specifically, or utilizes the Jayhawk design or any similar design. Further, there is no evidence that defendants participate in trade shows where officially licensed merchandise is advertised. Aside from making the T-shirts available over the internet, there is no evidence that defendants advertise at all. Thus, the manner of marketing factor weighs in favor of defendants.

### Degree of Care Likely to be Exercised by Purchasers

The fact that consumers exercise a high degree of care in selecting a product reduces the likelihood of confusion.[115] And "buyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse."[116] "The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase."[117] It is undisputed that the shirts available through Joe-College cost approximately $15 each. Defendants argue that while the T-shirts are relatively inexpensive, consumers exercise greater care in this context because the

---

[115]*Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 557 (10th Cir. 1998).

[116]*Sally Beauty Supply Co. v. Beautyco, Inc.*, 304 F.3d 964, 975 (10th Cir. 2002).

[117]*Id.*

message on the T-shirt is more important to them than the price—citing a survey conducted by their expert, James Berger.  As explained in this Court's memorandum and order on the admissibility of this survey evidence,[118] the survey's problematic methodology significantly reduces its probative value.  As such, this factor tips in favor of plaintiffs.

### Strength of the Marks

The stronger the mark, the greater the likelihood of consumer confusion.[119]  In terms of conceptual strength, there are five categories of trademarks: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful; generic being the weakest and fanciful being the strongest.[120]  Categorization along this scale is generally an issue of fact.[121]  Plaintiffs do not suggest which category or categories their marks fall within, but do emphasize those marks that are federally registered, arguing that they are "incontestable."[122]  As the Court has previously addressed, plaintiffs' insistence on lumping all of its marks together for purposes of this analysis is problematic.  Each of these marks requires a separate examination in terms of where it falls on the conceptual strength scale, much like the analysis the Court performed in determining whether the marks were protectable.

To be sure, "one cannot challenge the secondary meaning of an incontestable mark."[123]

---

[118]The memorandum and order on the Daubert motions is filed on the same date that this memorandum order is filed.

[119]*See, e.g., id.*

[120]*Id.* (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).

[121]*Big Dog Motorcyles, L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1336 (10th Cir. 2005).

[122]*See* 15 U.S.C. § 1065 (providing for incontestable right to use mark in continuous use for five consecutive years after the date of registration).

[123]*Vail Assocs., Inc. v. Vend-Tel-Co.*, –F.3d–, No. 05-1058, 2008 WL 342272, at *9 (10th Cir. Feb. 7, 2008).

But "'[t]he fact that a trademark is the subject of a federal registration that has ripened into incontestable status should not dictate the conclusion that the mark is strong with no further analysis.'"[124]   Plaintiffs argue further that substantial sales evidence, significant consumer recognition and unsolicited media attention show that its marks are strong.   These are all factors that go to secondary meaning.[125]   As the Tenth Circuit recently explained:

> "Secondary meaning and likelihood of buyer confusion are separate but related determinations, the relationship rising from the same evidentiary findings. The stronger the evidence of secondary meaning, the stronger the mark, and the more likely is confusion." *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 821 (9th Cir.1980) (Markey, C.J., sitting by designation). If VA had introduced convincing evidence that consumers were actually confused by the 1-800-SKI-VAIL mark, then necessarily its Vail mark would have a strong secondary meaning. *See* McCarthy, *supra* § 15:11, at 15-21. On the other hand, the fact that VA proved secondary meaning by evidence other than actual confusion "does not necessarily mean that confusion is likely. . . .   While evidence of confusion is probative of secondary meaning, *non-confusion evidence of secondary meaning does not necessarily prove likely confusion caused by defendant's use*." *Id.* (emphasis added).[126]

Specifically, plaintiffs point to the use of "KU," "University of Kansas," "Jayhawks," and the crimson and blue color scheme as part of its Jayhawk mascot.   The Court agrees that the record supports historical use by KU of these specific marks.   The Court also agrees that there is evidence in the record showing that KU has used some marks on officially licensed goods for decades—in particular "KU," "Kansas," "Jayhawk," the Jayhawk design, and the crimson and

---

[124]*Id.* (quoting MCCARTHY, *supra* note 31, § 11.82 at 11–16).

[125]*See, e.g.*, *Sally Beauty Supply Co. v. Beautyco, Inc.*, 304 F.3d 964, 978 (10th Cir. 2002).

[126]*Vail Assocs., Inc..*, 2008 WL 342272, at *9.

blue color scheme in conjunction with KU's other marks.[127]   Plaintiffs also offer evidence of the amount of retail sales of licensed merchandise.  As the Court has previously noted, however, KU does not come forward with evidence of its marketing efforts for the marks allegedly infringed upon.[128]  Yet, a reasonable jury could look at the evidence of retail sales and conclude that this contributes to a finding that the mark is strong.

The court has denied plaintiffs' motion in limine to exclude evidence of third-party use of the KU marks.  Extensive use of a mark by third parties undermines its commercial strength:

> A strong trademark is one that is rarely used by parties other than the owners of the trademark, while a weak trademark is one that is often used by other parties.  The greater the number of identical or more or less similar trademarks already in use on different kind of goods, the less is the likelihood of confusion between any two specific goods incorporating the weak mark.[129]

In evaluating third-party use, the Court is cognizant of "the probable impact of the use of those marks on the minds of the target group of consumers."[130]  Defendants point the Court to listings of businesses in the State of Kansas and the City of Lawrence that utilize the marks "Kansas" and "Jayhawk."  In the State of Kansas, there were at least 300 business entities that used the term "Kansas" in their name, according to a search defendants conducted on the Secretary of State's website.  Of those listings, dozens were active and in good standing at the time

---

[127]*Bd of Supervisors of the La. State Univ. v. Smack Apparel Co.*, 438 F. Supp. 2d 653, 661 (E.D. La. 2006); *Tex. Tech Univ. v. Spiegelberg*, 461 F. Supp. 2d 510, 521 (N.D. Tex. 2006).

[128]*Vail Assocs., Inc..*, 2008 WL 342272, at *10 ("While evidence of a mark's promotion is relevant to prove the strength of a mark, 'standing alone without a context such evidence may not be sufficient to prove that a mark is very strong.'").

[129]*Universal Money Ctrs., Inc. v. AT&T*, 22 F.3d 1527, 1533 (10th Cir. 1994); *see also Big Dog Motorcyles, L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1336–37 (10th Cir. 2005) (comparing conceptual and commercial strength).

[130]*Big Dog Motorcyles, L.L.C.*, 402 F. Supp. 2d at 1337.

defendants conducted their search.  Likewise, a review of the Lawrence AT&T Yellow Pages shows twenty-seven listings for businesses that begin a company name with the "Jayhawk" mark.  There is no dispute that third parties use these marks.  The fact that a mark is used by "a significant number of entities" means it is a relatively weak mark.[131]  Yet, a reasonable jury could give little weight to this evidence if it finds that these entities do not use the marks on similar goods.

On balance, the Court finds that it is unable to conclude as a matter of law that the marks in question are either strong or weak; instead there is a genuine issue of material fact on the matter.  Plaintiffs come forward with some evidence of strength, yet decline to discuss strength on the conceptual strength scale.  Defendants point to evidence of weakness, but only to the extent that a genuine issue of material fact is created.

**Disclaimers**

Finally, the Court addresses the disclaimers posted at the Joe-College.com retail store and online that defendants argue make clear that their shirts should not be confused with those officially licensed by KU.  The Court must consider this evidence as it evaluates the marks as consumers actually encounter them in the marketplace.  Plaintiffs argue that the disclaimers are ineffective because they only address confusion at the point of sale and because there is no evidence that consumers actually read the disclaimers, and thus, the disclaimers do not serve to cure point-of-sale confusion.

Plaintiffs first urge that the disclaimers do not deal with initial interest confusion or with post-sale confusion, and thus, do not operate to cure the likelihood of confusion between

---

[131]*Vail Assocs., Inc..*, 2008 WL 342272, at *10 (discussing the geographically descriptive nature of the mark "Vail" coupled with extensive use by third parties).

defendants' T-shirts and officially licensed shirts.  The Tenth Circuit has recently explained:

> Initial interest confusion is a "bait and switch" tactic that permits a competitor to lure consumers away from a service provider by passing off services as those of the provider, notwithstanding that the confusion is dispelled by the time of sale. *See Syndicate Sales, Inc. v. Hampshire Paper Corp*., 192 F.3d 633, 638 (7th Cir.1999); *see also Australian Gold*, 436 F.3d at 1238-39. But a court cannot simply assume a likelihood of initial interest confusion, even if it suspects it. The proponent of such a theory must prove it. *See* McCarthy, supra § 23:6, at 23-30 ("[E]ven if the marks are almost identical, initial interest confusion is not assumed and must be proven by the evidence."). Until then, it remains just a theory.[132]

And post-sale confusion exists "when use of a trademark leads individuals (other than the purchaser) mistakenly to believe that a product was manufactured by the trademark-holder."[133]

While plaintiffs may be correct that the disclaimers would not necessarily serve to remedy any initial interest or post-sale confusion, they do not offer much evidence to support that either of these theories apply here.  They merely point to Erin Adams' testimony that there is no way for consumers who encounter defendants' apparel to know whether it is licensed or not. There is also some evidence of post-sale confusion provided by the weblog evidence, where anonymous posters ask where they can acquire defendants' T-shirts.  But none of this evidence shows that defendants' products serve to lure consumers away from licensed retail providers in the first instance.

To the extent the disclaimers are offered to disprove point-of-sale confusion, the Court finds that the disclaimers weigh against a finding of a likelihood of confusion. While "there is a body of academic literature that questions the effectiveness of disclaimers in preventing

---

[132]*Id.*

[133]*Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 432 F.3d 539, 548 (6th Cir. 2005).

consumer confusion as to the source of a product,"[134] disclaimers may "be effective to cure a minimal or moderate amount of confusion."[135]  Here, it is undisputed that there are over 100 disclaimers prominently posted at the Joe-College.com retail store and online.  Certainly, given that the likelihood of confusion evidence is not substantial enough to warrant summary judgment, a reasonable jury could consider this evidence and determine that it contributes to a finding of no likelihood of confusion at the point of sale.

### All Factors Considered as a Whole

Considering the factors as a whole, the Court finds that summary judgment is only appropriate as to the few T-shirts that the Court has singled out as displaying marks that are overwhelmingly similar to KU's marks.  These striking similarities trigger a presumption that defendants intended to infringe.  These two factors weigh so heavily in favor of a likelihood of confusion that no reasonable jury could find otherwise.  Additionally, it is uncontroverted that no disclaimers were present at the Joe-College.com store or website during the time these T-shirt designs were offered for sale. Accordingly, summary judgment on the trademark infringement claims is granted in favor of plaintiffs with regard to these specific T-shirt designs.

The Court is unable to find as a matter of law that the likelihood of confusion factors, considered as a whole, tip in favor of either party with regard to the remaining marks, which constitute by far the majority of the T-shirt designs at issue in this case.  While certain factors weigh in favor of a likelihood of confusion, such as the degree of care exercised by purchasers and the fact that the products are sold in the same channels of trade, genuine issues of material

---

[134]*Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1315–16 (2d Cir. 1987).

[135]*ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 70–71 (2d Cir. 2002).

fact remain as to the remaining key factors, such as similarity of the marks and strength of the marks, and a reasonable jury could find for either party.  Therefore, both cross motions for summary judgment are denied as to the trademark infringement claims on these T-shirts.

### Damages and Attorneys' Fees

Under the Lanham Act, a successful plaintiff in a trademark action may recover as follows:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.  The court shall assess such profits and damages or cause the same to be assessed under its direction.  In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. . . The court in exceptional cases may award reasonable attorney's fees to the prevailing party.[136]

In their summary judgment motion, defendants argue that plaintiffs are not entitled to damages as a matter of law because they are unable to show actual consumer confusion.  They further argue that plaintiffs are not entitled to attorney's fees.  Plaintiffs maintain that they are entitled to actual damages, profits, and attorney's fees.

The Tenth Circuit has explained: "An accounting of profits is not automatically granted upon a showing of infringement. . . . Rather, the propriety of such relief is determined by equitable considerations."[137]  And the fact that actual damages may be unavailable does not

---

[136]15 U.S.C. § 1117(a).

[137]*Bishop v. Equinox Int'l Corp.*, 154 F.3d 1220, 1222 (10th Cir. 1998).

preclude the plaintiff from recovering an accounting of defendants' profits.[138]  An award of profits under § 1117(a) "involves a two-step process: (1) a finding of willfulness or bad faith; and (2) a weighing of the equities."[139]  On summary judgment , the Court should confine its analysis to the first step of this analysis and ask only whether a genuine issue of material fact exists as to willful infringement.[140]  Insofar as plaintiffs seek attorneys' fees, an "exceptional case" "is one in which the trademark infringement is malicious, fraudulent, deliberate, or willful."[141]

First, plaintiffs argue that they are entitled to actual damages in the form of the royalty that would have been charged if defendants had properly obtained a license to sell the infringing apparel.  "In order to recover damages on a Lanham Act claim, a 'plaintiff must prove [that he or she] has been damaged by actual consumer confusion or deception resulting from the violation.'"[142]  As discussed under the likelihood of confusion factors, plaintiffs have proffered some evidence of actual confusion in the form of weblog evidence and the testimony of Carrie Sinks.  This evidence is sufficient to withstand summary judgment and the Court finds there to be at least a genuine issue of material fact about whether actual confusion exists in the marketplace.

Regardless of whether actual damages are available, plaintiffs may be able to recover

---

[138]*Id.*

[139]*W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1272 (10th Cir. 2005).

[140]*Id.*

[141]*Id.* (collecting cases).

[142]*Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1241 (quoting *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 525 (10th Cir. 1987)).

profits if they can show willfulness.  Plaintiffs also must show willfulness in order to obtain

attorney's fees.[143]  Like the Court's analysis on the likelihood of confusion factor dealing with

defendants' intent, "the proper focus is whether defendant had the intent to derive benefit from

the reputation or goodwill of plaintiff."[144]  Intent "requires more than 'indifference' or a mere

'connection.'  It is a conscious desire."[145]

The Court has granted summary judgment to plaintiffs on a handful of T-shirts sold by

Joe-College.com.  All of defendants' evidence to the contrary relates to the issue of willfulness.

But there is a genuine issue of material fact regarding defendants' intent with regard to the

remaining shirts.  As such, the Court finds that plaintiffs are entitled to profits on the first

category of shirts, but summary judgment is denied with regard to the remaining shirts at issue.

The Court reminds the parties, however, that this finding is subject to a later determination of the

second step of the profits analysis: a weighing of the equities.  For "[e]ven with a finding of

willfulness, a court may still exercise its discretion to reduce or even eliminate a profit award in

the name of fashioning an equitable remedy to meet the needs of each case."[146]  Given that

summary judgment is denied on the majority of allegedly infringing products, the Court defers

its ruling on attorneys' fees pending resolution of the case.

### B.      *Unfair Competition*

Plaintiffs also allege a claim for unfair competition under the Lanham Act and maintain

---

[143]*W. Diversified Servs., Inc.*, 427 F.3d at 1273.

[144]*Id.*. (internal quotations omitted).

[145]*Id.* at 1274.

[146]*Id.* at 1273.

that they are entitled to summary judgment.[147]  In order to prevail, plaintiffs must show that (1) their marks are protectable, and (2) defendants' use of an identical or similar mark is likely to cause confusion among consumers.[148]  For the reasons already explained, the Court finds that the parties have demonstrated a genuine issue of material fact on whether defendants' marks are likely to cause confusion among consumers.  Accordingly, summary judgment is also inappropriate on this claim.

### C. Trademark Dilution

Claims for trademark dilution are governed by the Trademark Dilution Revision Act ("TDRA") of 2006.[149]  The TDRA provides,

> The owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.[150]

A mark is "famous" under the TDRA "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."[151]

---

[147]15 U.S.C. § 1125(a).  This claim was not the subject of defendants' cross motion for summary judgment. As such, plaintiffs must support their motion with credible evidence that would entitle them to a directed verdict if not controverted at trial. "Such an affirmative showing shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a 'genuine issue' for trial or to submit an affidavit requesting additional time for discovery."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 331, (1986) (Brennan, J., dissenting).

[148]*See, e.g., Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1215 (10th Cir. 2004).

[149]Pub. L. No. 109-312, 12-0 Stat. 1730 (amending Pub. L. No. 104-98, 109 Stat. 985 (1995)), codified at 15 U.S.C. § 1125(c)(1).

[150]15 U.S.C. § 1125(c)(1).

[151]*Id.* § 1125(c)(2)(A).

Therefore, to state a claim for dilution, a plaintiff must show:

> (1) that the plaintiff owns a famous mark that is distinctive;
> (2) that the defendant has commenced using a mark in commerce that allegedly is diluting the famous mark;
> (3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks; and
> (4) that the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous mark. In the context of blurring, distinctiveness refers to the ability of the famous mark uniquely to identify a single source and thus maintain its selling power. *See N.Y. Stock Exch. v. N.Y., N.Y. Hotel LLC*, 293 F.3d 550, 558 (2d Cir.2002) (observing that blurring occurs where the defendant's use creates "the possibility that the [famous] mark will lose its ability to serve as a unique identifier of the plaintiff's product") (quoting *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir.1994)); *Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796, 805 (9th Cir.2002) (same). In proving a dilution claim under the TDRA, the plaintiff need not show actual or likely confusion, the presence of competition, or actual economic injury. *See* 15 U.S.C.A. § 1125(c)(1).[152]

Defendants argue that summary judgment is appropriate on this claim because plaintiffs cannot show that their marks are famous and because defendants do not use KU's marks as trademarks. Plaintiffs argue that summary judgement is warranted in their favor because there is no genuine issue of material fact about whether their marks are famous and because they are able to show actual dilution. Even though the recent amendments to the TDRA only require a showing of a likelihood of dilution, in order to recover monetary damages on this claim, plaintiffs must show actual dilution since the allegedly unlawful conduct began before October 6, 2006.[153]

### Fame

The Court first considers evidence of fame. As in its argument on the strength of the

---

[152]*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 264–65 (4th Cir. 2007).

[153]15 U.S.C. § 1125(c)(5).

mark under the likelihood of confusion analysis, plaintiffs first assert that the KU marks are famous and distinctive "in this District" based on their longstanding use, sales volume, and extensive unsolicited media references.  Plaintiffs also assert that the KU marks are "undoubtedly more well-known than many other marks for which federal dilution claims have succeeded," pointing to cases finding the marks "Panavision,"[154] "Pirelli,"[155] and "Intermatic"[156] to be famous.          The Court notes that "famous" and "distinctive" are not interchangeable; instead, a mark must be more than just distinctive to be famous.[157]  As the Court has previously addressed, plaintiffs' failure to classify their many marks in this case makes it difficult to conclude as a matter of law that all of KU's marks are strong beyond the minimum threshold of distinctiveness.  Under the statute, the Court is to consider the following factors to determine if a mark "possesses the requisite degree of recognition":

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
> (iii) The extent of actual recognition of the mark.
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.[158]

---

[154]*Panavision Int'l, Inc. v. Toeppen*, 141 F.3d 1316, 1324 (9th Cir. 1998) (discussing dilution claim solely on issues of whether defendant made commercial use of the mark and whether his use caused dilution).

[155]*Pirelli Armstrong Tire Corp. v. Titan Tire Corp.*, 4 F. Supp. 2d 794, 802 (C.D. Ill. 1998) (finding incontestable trademarks that had been registered for over eighty years to be famous).

[156]*Intermatic, Inc. v. Toeppen*, 947 F. Supp. 1227, 1239 (N.D. Ill. 1996) (finding mark famous as a matter of law because defendant does not dispute that it is famous and presented no evidence to contradict long history and use of mark, and finding mark is "fanciful.").

[157]*King of the Mountain Sports, Inc. v. Chrysler Corp.*, 968 F. Supp. 568, 578 (D. Colo. 1997); MCCARTHY, *supra* note 31, § 24.104.

[158]*Id.* § 1125(c)(2)(A).

Plaintiffs have come forward with evidence tending to show that, at least within the State of Kansas, the marks "Kansas," "KU," "University of Kansas," "Jayhawk," and the Jayhawk designs have a high degree of publicity through unsolicited media coverage, and through a large volume of sales, at least with regard to the "Kansas" and "KU" marks.  Plaintiffs do not specify the geographic extent of the sales of licensed apparel bearing these marks, but have come forward with evidence that KU sports events are broadcast by national media outlets and certainly KU students and alumni are not strictly confined to the State of Kansas.  Plaintiffs point to no evidence about the degree of recognition of the other marks and there is no evidence about the extent of actual recognition. But at least with regard to the specific marks referenced by plaintiffs, there is a genuine issue of material fact as to fame.  The Court finds that this evidence, while sufficient to survive summary judgment, does not entitle plaintiffs to summary judgment as a matter of law.

### *Commercial Use*

Next, defendants argue that KU has not come forward with evidence that defendants have commercially used the allegedly famous marks listed above.  To the contrary, plaintiffs have pointed the Court to evidence that defendants did, in fact, commercially use certain registered marks, at least for a period of time.  And plaintiffs' claims are not limited to registered marks.  A reasonable jury could find either that the marks are famous or not famous; or notably, could find that some marks are famous, while others are not.  Therefore, summary judgment is not warranted on this point.

### *Blurring*

Even if summary judgment was warranted on the issue of fame, there exists a genuine

issue of material fact on plaintiffs' first theory of dilution based on "blurring."  Dilution by blurring "is association rising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."[159]  Relevant factors include:

> (i) The degree of similarity between the mark or trade name and the famous mark.
> (ii) The degree of inherent or acquired distinctiveness of the famous mark.
> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
> (iv) The degree of recognition of the famous mark.
> (v) Whether the user of the mark or trade name intended to create an association with the famous mark.
> (vi) Any actual association between the mark or trade name and the famous mark.[160]

The Court has already conducted an extensive analysis of the similarity between the marks in this case when evaluating similarity under the likelihood of confusion factors.  The Court found that while a certain few marks utilized by defendants were nearly identical in look, sound, and meaning, there was a genuine issue of fact about whether the majority of marks at issue were similar.  The Court has also found genuine issues of material fact exist with regard to the degree of distinctiveness of the marks, and on the issue of intent.  While it is undisputed that KU licensees engage in substantially exclusive use of the marks[161] and that the degree of recognition may be high, there is little evidence of actual association between plaintiffs' and defendants' marks.  On balance, the Court is unable to conclude as a matter of law that these

---

[159]*Id.* § 1125(c)(2)(B).

[160]*Id.*

[161]The Court agrees with plaintiffs that the marks in this case do not need to have been manufactured by plaintiffs themselves in order to be protected, but instead, widespread use by officially licensed entities is sufficient. *See, e.g.*, *Univ. of Pittsburgh v. Champion Prods., Inc.*, 686 F.2d 1040, 1047 (3d Cir. 1982); *c.f. Univ. Book Store v. Univ. of Wis. Bd. of Regents*, 33 U.S.P.Q.2d 1385, (T.T.A.B. 1994).

factors establish actual dilution, much less a likelihood of dilution through blurring.

### Tarnishment

Dilution by tarnishment is "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark."[162]  Under this theory, plaintiffs must show that the KU marks will "suffer negative associations" through defendants' use.[163]  "Some cases have found that a mark is tarnished when its likeness is placed in the context of sexual activity, obscenity, or illegal activity."[164]

It is undisputed that an account representative for CLC routinely reviews KU licensees' products in the retail marketplace to make sure that they comply with product and licensing standards and that KU does not permit the use of offensive language or references to sex or alcohol on officially licensed products.  It is also undisputed that KU monitors authorized uses of its color scheme and has set standards to instruct KU representatives and licensees as to how the crimson and blue color scheme is to be presented.   However, the Court has already found that a reasonable jury could conclude that the marks are dissimilar and that this dissimilarity, in itself, may function to cure any negative association with KU.

Plaintiffs also point the Court to anonymous weblog postings in the *Lawrence Journal World* as evidence that some consumers believe that defendants' products degrade the goodwill and positive associations of KU and its marks.  The three anonymous postings relied upon by KU all involve statements that defendants' T-shirts affect "public opinion of a group like the

---

[162]15 U.S.C. § 1125(c)(2)(C).

[163]*Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996); *Sony Computer Enter., Inc. v. Connectix Corp.*, 203 F.3d 596, 608 (9th Cir. 2000).

[164]*Hormel Foods Corp.*, 73 F.3d at 507 (collecting cases).

University."  While these postings certainly show that three people hold such an opinion, a reasonable jury could choose to give little weight to this evidence for the reasons explained in the Court's limine ruling.  Therefore, the Court is unable to find tarnishment as a matter of law on this record, but instead finds a genuine issue of material fact exists and summary judgment is not appropriate.

### D.   *Affirmative Defenses*

Defendants assert multiple affirmative defenses to plaintiffs' claims and plaintiffs' move for summary judgment on these affirmative defenses.  Therefore, since these are only the subject of plaintiffs' motion and defendants' have the ultimate burden of proof, summary judgment may be granted if plaintiffs demonstrate that no material issues of fact remain.[165]  For the reasons outlined below, the Court finds that plaintiffs have met their initial burden on summary judgment.  Because defendants fail to respond, they fail to meet their burden of coming forward with specific facts that would demonstrate genuine issues of material fact on the essential elements of any of these affirmative defenses.

### *Laches, Estoppel, and Waiver*

First, defendants claim estoppel, laches and waiver.  Because defendants Larry Sinks Enterprises, Inc. and Victory Sportswear, along with other vendors, have sold products similar to those sold by the Joe-College.com operation for fifteen years without opposition, defendants argue that plaintiffs should not be permitted to allege trademark infringement.  To show laches, defendants must prove: (1) inexcusable delay in instituting suit, and (2) resulting prejudice to

---

[165]*Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002) (explaining implications of a party's failure to respond to a summary judgment motion).

defendant from such delay.[166]  The Court agrees with plaintiffs that: (1) up until 1996, Larry

Sinks operated his business as a licensee of KU, thus any use of the marks was authorized by KU

and did not constitute trade infringement; (2) it is undisputed that Sinks opened the Joe-

College.com business in January 2006 and that this case was filed approximately seven months

later; and (3) Perkins' cease and desist letter was sent in May 2006, approximately five months

after the Joe-College.com store opened.[167]  Plaintiffs have met their burden of showing no

material issues of fact remain on the laches and estoppel defenses because there was no

inexcusable delay in instituting suit in this matter.

There is likewise no evidence that plaintiffs waived their rights in this matter by

approving defendants' designs.  In the Pretrial Order, defendants assert facts in support of their

theory on this affirmative defense that do not appear in the summary judgment record.  Thus,

plaintiffs have met their initial summary judgment burden on these affirmative defenses and

because defendants fail to come forward with evidence to show a genuine issue of material fact

exists, summary judgment is granted.

### Fair Use

Defendants assert the fair use defense, which "permits the use of a name or term, *other

than as a trademark*, that is descriptive and is used fairly and in good faith only to describe the

goods.  This defense is not available if the alleged descriptive use is in fact a trademark use."[168]

It is unclear how any of the trademarks at issue in this case would be descriptive of the products

---

[166]*Brunswick Corp. v. Spirit Reel Co.*, 832 F.2d 513, 523 (10th Cir. 1987).

[167]*See Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 239, 360 (S.D.N.Y 1998).

[168]*Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 937 (10th Cir. 1983) (emphasis in original)
(citing 15 U.S.C. § 1115(b)(4)).

sold by defendants—T-shirts.  There is no evidence the defendants intended to use any of plaintiffs' marks in the descriptive sense.  Plaintiffs point to a lack of evidence on this issue and defendants fail to meet their summary judgment burden to come forward with facts that show a genuine issue of material fact exists.

### Functionality

Under the functionality doctrine, a product feature cannot serve as a trademark "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage."[169]  One who produces an allegedly infringing product may defend its use by arguing that the mark is functional, "and therefore that all competitors must be permitted to copy it in their own products, regardless of any producer-identifying capacity it may possess."[170]  The Court agrees with plaintiffs that there is no evidence that KU's marks are essential to the quality of T-shirts, or affect how the T-shirts "work."[171]

### First Amendment

Defendants claim that their use of the marks at issue is protected by the First Amendment.  In the Pretrial Order, defendants specifically argue that the messages that appear on their T-shirts are protected commercial speech.  While defendants have a right to express whatever views they purport to be expressing in printing these T-shirts, KU's marks "need not yield to the exercise of First Amendment rights under circumstances where adequate alternative

---

[169]*Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995).

[170]*Voronado Air Circulation Sys., Inc. v. Duracraft Corp.* 58 F.3d 1498, 1503 (10th Cir. 1995).

[171]Indeed, this is the very argument defendants made in support of their contention that the marks are not protectable under the Lanham Act.

avenues of communication exist."[172]  The Court agrees with plaintiffs that there are many ways in which defendants could express their views without allegedly infringing on KU's trademarks.[173]  Further, the Court notes that the Government may constitutionally regulate "deceptive or misleading" commercial speech .[174]  Summary judgment is appropriate on this affirmative defense.

### Standing

Defendants assert in the Pretrial Order that plaintiffs lack standing because they have not suffered a distinct and palpable injury based on the fact that they have "conveyed" the marks to other persons or entities.  Plaintiffs argue that they are likely to be damaged, and thus have standing to bring the claims in this action.[175]  Under the Lanham Act, a cause of action may be asserted under section 1125 by "any person who believes that he or she is or is likely to be damaged by such act,"[176] and under section 1114(1) by the registrant of the trademark at issue.[177]  At least two circuit courts have adopted the test for prudential standing under the Clayton Act set forth in *Associated General Contractors of California, Inc. v. California State Council of*

---

[172]*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206 (1979) (internal quotation omitted).

[173]*See id.*; *Mutual of Omaha Ins. Co. v. Novak*, 648 F. Supp. 905, 911 (D. Neb. 1986), *aff'd*, 835 F.2d 397 (8th Cir. 1987), *cert. denied*, 488 U.S. 933 (1988).

[174]*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.,* 483 U.S. 522, 535 (1987).

[175]*Friends of the Earth, Inc. v. Laidlaw Env. Servs.*, 528 U.S. 167, 180–81 (2000); *see also Tandy v. City of Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004); *Schaffer v. Clinton*, 240 F.3d 878, 882 (10th Cir. 2001) (citations omitted).

[176]15 U.S.C. § 1125(a);

[177]*Id.* § 1114.

*Carpenters*,[178] to determine standing under § 1125(a) of the Lanham Act.[179]  The Court finds that under this approach, plaintiffs have standing to bring suit.

### *Failure to Protect*

Finally, defendants suggest in the Pretrial Order that plaintiffs failed to protect their marks, which is an affirmative defense to plaintiffs' claims.  Defendants suggest that the evidence of third-party use of plaintiffs' marks supports this affirmative defense.  The Court agrees with plaintiffs that this evidence is only relevant with regard to the strength of plaintiffs' marks, as discussed fully in the Court's discussion of the limine motion on this issue.[180]  The Court is unable to find any authority that this can be a distinct affirmative defense in a trademark case, beyond a claim of estoppel, which the Court has already rejected.

### IT IS THEREFORE ORDERED BY THE COURT THAT:

(1)     Motion for Summary Judgment on Plaintiffs' Claims (Doc. 130) by KU and Kansas Athletics is granted in part and denied in part.  The motion is granted on defendants' affirmative defenses and with regard to the T-shirts in Doc. 144, Ex. A at 1-3, 85, as well as any like T-shirts that plaintiffs are able to identify.  The remainder of plaintiffs' motion is denied;

(2)     Motion for Summary Judgment (Doc. 131) by defendant Clark Orth is denied;

---

[178]459 U.S. 519 (1983).

[179]*Id.* at 538–44 (providing the following factors to be addressed: (1) the injury "of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws"?; (2) the directness of the asserted injury; (3) the proximity or remoteness of the party to the alleged conduct; (4) the speculativeness of the damages claim; and (5) the risk of duplicative damages or complexity in apportioning damages); *see Proctor & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 562–63 (5th Cir. 2001) (applying test); *Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 229 (3d Cir. 1998) (same).

[180]*Herman Miller, Inc. v. Plazzetti Imports & Exports, Inc.*, 270 F.3d 298, 317 (6th Cir. 2001).

(3)     Motion for Summary Judgment (Doc. 134) by defendant Larry Sinks is denied;

(4)     Motion for Summary Judgment (Doc. 136) by all defendants is denied;

(5)     Motion in Limine to Exclude Evidence Concerning Third-Party Use of Plaintiffs' Marks

        (Doc. 116) is denied;

(6)     Motion to Strike Declarations of Vander Tuig, Drucker, Temple, Baker, Campbell and

        Bonilla (Doc. 158) is granted in part and denied in part.  The motion is granted as to the

        Temple, Baker, Campbell and Bonilla declarations and denied as to the Vander Tuig and

        Drucker declarations; and

(7)     Motion to Strike Weblog (Doc. 160) is granted in part and denied in part.  The motion is

        granted to the extent the evidence is offered to prove the truth of the matter asserted.

        **IT IS SO ORDERED**.

        Dated this 19th day of March 2008.

                                           S/ Julie A. Robinson
                                          Julie A. Robinson
                                          United States District Judge