ams

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNIVERSITY OF KANSAS and KANSAS ATHLETICS, INC.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 06-2341-JAR** |
| **LARRY SINKS, CLARK ORTH, LARRY SINKS ENTERPRISES, INC. and VICTORY SPORTSWEAR, L.L.C. (collectively d/b/a/ Joe-College.com),** | ) ) ) ) ) | |
| **Defendants.** | ) ) ) ) | |

## MEMORANDUM AND ORDER

Plaintiffs University of Kansas ("KU") and Kansas Athletics, Inc. allege various trademark claims against defendants Larry Sinks, Clark Orth, Larry Sinks Enterprises, Inc. and Victory Sportswear, L.L.C. ("Victory Sportswear"). These claims involve the sale of certain T-shirts that reference KU, at the Joe-College.com retail store and website. The parties have filed cross motions for summary judgment, asking the Court to consider certain expert testimony. The Court now considers Plaintiffs' Daubert Motion to Exclude the Survey and Expert Report of James T. Berger (Doc. 120) and defendants' Motion to Exclude the Testimony and Opinions of Plaintiffs' Expert Witness (Doc. 129), Dr. Edward R. Hirt. The motions are fully briefed and the Court is prepared to rule. As discussed more fully below, the Court denies plaintiffs' motion to exclude the Berger survey and grants in part and denies in part defendants' motion to exclude the testimony and report of Dr. Hirt.

## I.      Standard

The Court has broad discretion in deciding whether to admit expert testimony.[1] Fed. R. Evid. 702 provides that a witness who is qualified by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[2]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."[3] In order to determine whether an expert opinion is admissible, the Court performs a two-step analysis. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his discipline.'"[4] Second, the district court must further inquire into whether the proposed testimony is sufficiently "relevant to the task at hand."[5] An expert opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required."[6] And it is not necessary to prove that the expert is "indisputably

---

[1]*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citation omitted).

[2]Fed. R. Evid. 702.

[3]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

[4]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[5]*Id.* (quoting *Daubert*, 509 U.S. at 597).

[6]*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

correct," but only that the "method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements."[7]

   *Daubert* sets forth a non-exhaustive list of four factors that the trial court may consider when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.[8]  But "the gatekeeping inquiry must be tied to the facts of a particular case."[9]

   It is within the discretion of the trial court to determine how to perform its gatekeeping function under *Daubert*.[10]  The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated.[11]  In this case, the parties have not requested a hearing on these motions.  The Court has carefully reviewed the exhibits filed with the motions and believes this review is sufficient to render a decision without conducting an oral hearing.

## II.   James T. Berger

   Plaintiffs move to exclude the survey and report of defendants' expert, James T. Berger. Berger filed an expert report in this matter, after conducting an internet survey relating to issues in this case.  An invitation to participate in the survey was sent via email to individuals listed in

---

[7]*Id.*

[8]*Daubert*, 509 U.S. at 593–94.

[9]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotations omitted).

[10]*Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

[11]*Id.*

the University of Kansas directory and to residents of Lawrence, Kansas and its suburbs.  The

double-blind method was employed, meaning that neither the companies who conducted the

testing, nor the respondents knew the purpose of the survey.

The survey depicted six T-shirts that were alphabetically labeled: (A) a licensed navy

blue T-shirt with the "Kansas" mark on the front in red and white lettering; (B) a royal blue

unlicensed T-shirt that reads "Muck Fizzou" in white lettering, sold by defendants; (C) a

licensed red T-shirt that reads "Nebraska Huskers" and includes a Nebraska Huskers "N" logo;

(D) the following royal blue unlicensed shirt, sold by defendants;



(E) a licensed gray T-shirt with the "Kansas" mark in blue lettering above a Jayhawk design

mark; and (F) the following green unlicensed shirt, sold by defendants:

4



The respondents were then asked eleven questions about these T-shirts.  The questions focused on whether the T-shirts appeared to be licensed by KU, what factors influenced the respondents purchase of a T-shirt bearing the name of a college, university, or professional sports team, how the respondents rated the quality of the materials and workmanship of the T-shirts, and how the respondents felt after KU won or lost a game.

Based on the survey results, Berger reached certain conclusions, including that:

a.      There is no confusion or likelihood of confusion with respect to Joe College products v. officially licensed products.

b.      There is no confusion with officially licensed products when the unlicensed product is blue in color or has the names Kansas or Jayhawk printed on it.

c.      The fact that a product is officially licensed is the least most important factor for customers in purchasing T-shirts or sweat shirts.

. . . .

i.      There is no evidence of dilution of KU's trademarks.

j.      There is no evidence of any perception that Joe College has imitated any T-shirt goods manufactured of [sic] licensed by the University of Kansas.

k.      There is no evidence that Joe College has made any attempt to compete with University of Kansas T-shirts.

Plaintiffs ask the Court to exclude the report and survey because the survey is flawed and

5

unreliable under Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[12] and *Kumho Tire Co. v. Carmichael*[13] or because it is likely to mislead the jury under Fed. R. Evid. 403.

As a general rule, "public recognition surveys may be used to establish a likelihood of confusion."[14]  And "[t]echinical and methodological deficiencies in a survey usually relate to the weight to be given to the survey, not its admissibility."[15]  However, "when the deficiencies are so substantial as to render the survey's conclusions untrustworthy, a court should exclude the survey from evidence."[16]  To determine if a survey is reliable and trustworthy, the Court considers a variety of factors that include whether: (1) the universe was properly chosen and defined; (2) the sample chosen was representative of that universe; (3) the questions asked of the interviewees were framed in a clear, precise and nonleading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered were accurately reported; (6) the data were analyzed in accordance with accepted statistical principles; and (7) objectivity of the entire process was assured.[17]

### *Sample Universe*

---

[12]509 U.S. 579 (1993).

[13]526 U.S. 137 (1999).

[14]*Hogdon Powder Co. v. Alliant Techsys., Inc.*, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007); *see* 15 U.S.C. §§ 1114, 1125 (requiring proof of likelihood of confusion).

[15]*Id.* (citing *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 523 (10th Cir. 1987)).

[16]*Id.* (quotation omitted).

[17]*Id.* (citing *Citizen Fin. Grp., Inc. v. Citizens Nat'l Bank*, No. Civ.A. 01-1524, 2003 WL 24010950, at *1 (W.D. Pa. Apr. 23, 2004) (citing J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 32:159 (4th ed. 2003); Rudolf Callman, 3A Callman on Unfair Competition, Trademarks and Monopolies § 21:67(4th ed. 2001))); *see also Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 778 (W.D. Mich. 2006).

First, plaintiffs argue that Berger tested an improper universe.  Berger used two "delivery systems" to target KU students and citizens of Lawrence and its suburbs.  One system constructed a random list from the KU student directory.  The second system used a non-random sample of a "Lawrence (KS) and suburbs consumer panel."  A total of 11,695 emails were sent and the survey generated 253 usable replies.  The threshold question asked whether the respondent had ever purchased a T-shirt or sweatshirt that bears the name of a college, University, or professional sports team.  95.6% of respondents replied that they had.  Plaintiffs argue that this produced an overinclusive universe of respondents, as purchasers of sweatshirts or apparel bearing professional sports teams' names are outside the relevant target market of consumers. Plaintiffs also suggest that the survey only qualifies past purchasers of sports apparel, when the relevant universe should include prospective purchasers of defendants' apparel.

As one district court has explained,

> Courts consider the selection of the proper universe as one of the most important factors in assessing the validity of a survey as well as the weight that it should receive. Selection of a proper universe is so critical that even if the proper questions are asked, the results are likely to be irrelevant.  In a trademark infringement case such as this, where the plaintiff alleges that the defendant's mark causes consumers of the defendant's products to mistakenly believe that the defendant's products are from the same source as, or are connected with, the plaintiff's products, the proper universe is the potential purchasers of the defendant's, i.e., the junior user's, products.[18]

Defendants argue that Berger selected the proper universe because he chose to survey

---

[18]*Leelanau Wine Cellars, Ltd.*, 452 F. Supp. 2d at 781–82 (quotations and citations omitted).

respondents "whose connection to and affinity for KU and its marks is the strongest."

Defendants may be correct that the highest concentration of allegiant KU fans are either KU

students, or citizens of Lawrence, Kansas and its surrounding communities.  However, the fact

that Berger may have surveyed the most allegiant fans does not render the universe of

respondents proper.  The proper universe here is the potential purchasers of T-shirts from the

Joe- College.com retail store and website.

        During his deposition, Berger admitted that he did not include a "screener" question in

the survey, asking if the respondent was likely to purchase a T-shirt in the future.  Instead,

Berger asserts that the fact so many of the respondents stated that they had purchased a shirt in

the past, "is a very strong indication that they intend to purchase like product in the future."[19]

        The Court finds that the survey universe was not properly limited to potential purchasers

of defendants' T-shirts.  There is no indication, except for Berger's emphatic assertions, that the

respondents of this survey either purchased a school T-shirt in the recent past or intended to do

so in the near future.  The fact that the respondents had, at some point in their lives, purchased a

shirt bearing the name of a college, University, or professional sports team, does not mean that

they are potential customers of defendants' retail or online store.[20]  While the survey universe

may very well include potential purchasers of defendants' products, the survey was flawed in not

ensuring that it was testing the correct market.  The Court thus agrees with plaintiffs that the

---

[19](Doc. 122, Ex. D at 21; *see also id.* at 22–24.)

[20]*See, e.g.*, *id.* (finding overinclusive universe because expert failed to screen participants to ensure that they were potential customers); *Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1334 (D. Kan. 2005) (finding survey results have essentially no probative value where expert did not attempt to limit the survey universe to potential purchasers); *Jordache Enters., Inc. v. Levi Strauss Co.*, 841 F. Supp. 506, 518 (S.D.N.Y. 1993).

universe of respondents in this survey was overinclusive, and will weigh this factor in determining the admissibility of the survey.[21]

### Response Rate

The vendors utilized by Berger sent out a total of 11,695 emails, generating 253 usable replies, or 2.16%.  Plaintiffs argue that this is an unacceptable response rate that undercuts the reliability of the survey's results.  The parties cite to competing authority about the appropriate response rate for surveys.  Plaintiffs argue that if a response rate dips below 50%, it should be viewed with significant caution,[22] while defendants argue that this standard is outdated and that a response rate in telephone surveys of higher than 30% is difficult to achieve.[23]

The Court is persuaded by defendants' source that explains that the 50% benchmark for telephone surveys, (a) is not necessarily translatable to internet surveys, and (b) is outdated. However, the Court agrees with plaintiffs that 2.16% appears, by any standard, to be quite low.[24] The low response rate could point toward non-response bias or diminish the validity of the results.  The Court also takes into account plaintiffs' rebuttal expert, Robert N. Reitter, who explains that regardless of the rate of response, "it is extremely likely that the non-response level

---

[21]*See Big Dogs Motorcycles, L.L.C.*, 402 F. Supp. 2d at 1333–34 (explaining that the court should only exclude the survey if the "sample of respondents clearly does not represent the universe it is intended to reflect," but that if the issue is only about sufficiency of the sample, it goes to the weight and not the admissibility of the evidence).

[22]Shari Seidman Diamond, *Reference Guide on Survey Research,* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, at 245 (2d ed. 2005).

[23]Gary T. Ford, *The Impact of the* Daubert *Decision on Survey Research Used in Litigation*, J. PUB. POL'Y & MARKETING, Fall 2005, at 234, 246.

[24]*Id.* n.24 (stating that the Marketing Research Association in 2003 estimates that the response rate to digit dialing surveys is approximately 10%).

exerted a bias on the results."[25]  Importantly, Reitter explains that Berger did not take any steps

to reduce the effect of non-response bias, to determine how differently the non-respondents

answer compared to those who willingly responded.[26]  The Court considers this as evidence that

the sample chosen by Berger was not representative of the sample universe.

### Replication of Marketplace Conditions and Questions Posed

Plaintiffs next argue that the survey failed to replicate market conditions because it asked

the respondents to conduct a side-by-side comparison of the licensed and unlicensed T-shirts.

Indeed, the Tenth Circuit has repeatedly explained that "it is axiomatic in trademark law that

'side-by-side' comparison is not the test."[27]  A survey that conducts such a side-by-side

comparison "bears little resemblance to the actual workings of the marketplace."[28]

Berger's survey showed the respondents six different shirts: three licensed by KU, two

unlicensed shirts, and one shirt licensed by the University of Nebraska.  The survey then asked

the participants: (1) to identify the shirts that appeared to be officially licensed products; (2) to

identify the shirts that appeared to not be officially licensed; (3) whether the "Muck Fizzou,"

"Kansas Swim Team," or "Kansas O'Jayhawker" shirts appeared to be licensed by KU; (4)

whether there was anything about the "Kansas Swim Team" shirt that appears to be officially

licensed by KU; (5) whether there was anything about the  "Kansas O'Jayhawker" shirt that

---

[25](Doc. 122, Ex. C at 9.)

[26]*Id.*; *see Ford, supra* note 23, at 246 ("the expert must anticipate likely rebuttal testimony and, if possible, explain why the research is valid even though the methodology is inconsistent with accepted practice.").

[27]*See, e.g.*, *Universal Money Ctrs., Inc. v. AT&T*, 22 F.3d 1527, 1531 (10th Cir. 1994); *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487 (10th Cir. 1987) (quoting *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 940 (10th Cir. 1983) (quoting *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980))).

[28]*Jordache Enters., Inc.*, 828 F.2d at 1488.

appears to be officially licensed by KU; and (6) whether there is anything about the three unlicensed shirts that appear to be of higher or lower quality than the other three shirts.

The Court agrees that these questions ask the respondents to conduct a side-by-side comparison the products.  Likelihood of confusion is instead based entirely on the overall looks of the competing products, when singly presented.[29]  Purchasers are not shown an officially licensed KU T-shirt before they view or purchase one of defendants' T-shirts.  And there is no evidence that the products are ever sold side-by-side.  While there is evidence in the summary judgment record, that defendants sold licensed products for a short period of time, they concede that these products were sold in a separate area of the retail store from defendants' unlicensed products.  Therefore, the Court agrees that the survey results are suspect because they do not accurately account for the marketplace conditions under which consumers encounter these shirts.[30]

The Court also finds that some of the questions posed to the respondents in this survey are suggestive and leading.  The questions that ask about only defendants' and the Nebraska shirts single them out as unlicensed shirts and suggest that the same answer applied to all of the specified shirts.  The questions are problematic not only because they are close-ended, but because they point the respondent toward a certain response. The respondents were presented with the connection between the three unlicensed KU shirts, rather than being allowed to draw

---

[29]*King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999).

[30]*See Jordache Enters., Inc.*, 828 F.2d at 1488 n.5 ("Other surveys have easily avoided 'side-by-side' comparisons by simply showing a consumer the product bearing the allegedly confusing mark and asking who manufactures the product and what other products are sold by that manufacturer.").

that connection for themselves.[31]

### *Conclusion*

The Court finds, based on its review of Berger's credentials, that he is certainly qualified as an expert in this case to design a survey to test the hypotheses posed in his report.[32]  The Court also finds that the survey is relevant, as it goes to the likelihood of confusion between the competing marks in this case—the key inquiry in trademark infringement and unfair competition cases.   The admissibility of this survey turns on its reliability.   The Court finds that while there are significant flaws in the methodology of this survey,[33] they go to the weight and not the admissibility of the survey.   Because the flaws discussed herein may be adequately brought to the jury's attention through rigorous cross-examination and the presentation of plaintiffs' rebuttal expert, the Court declines to exclude Berger's survey and expert report.[34]

---

[31]*See* MCCARTHY § 32:175 (explaining that while it is not improperly leading to show the respondent the competing marks and ask "in a neutral manner if the respondent thinks there is or is not some connection, affiliation or sponsorship relation between the owners of the marks—or that the respondent doesn't know. . . , it will probably be improperly leading to suggest the desired response in the form of a yes or no question.").

[32]Plaintiffs heavily rely on two federal cases in which Berger's expert surveys were excluded.  *Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, No. 04-73923, 2006 WL 897254 (E.D. Mich. Apr. 5, 2006); *Vista Food Exch., Inc. v. Vistar Corp.*, No. 03-CV-5203DRHWDW, 2005 WL 2371958 (E.D.N.Y. Sept. 27, 2005). Of course, the Court does not find that the results in these cases dictate exclusion in this case.  The Court conducts its own analysis of the particular survey at issue in this case.  The Court further notes that the surveys in those cases were excluded, not due to issues of qualification or relevance, but under Fed. R. Evid. 403.

[33]The Court is not persuaded that the representativeness of the sample weighs against admission of this survey evidence.  As the Court discusses in detail in its Memorandum and Order on summary judgment, the sheer amount of different marks at issue in this case and the generalized analysis of the various types of allegedly infringing marks makes the Court's assessment of plaintiffs' claims difficult to conduct, as a matter of law.  In the instant motion, plaintiffs point to certain types of shirts that they feel are more representative than those Berger chose to include in his survey, but the choice of *which* shirts are infringing and on what basis is, at times, a moving target, or at least not articulated by plaintiffs consistently.  Nonetheless, plaintiffs are certainly able to bring this issue to the jury's attention during cross-examination of the witness.  To the extent that the shirts used in the survey are not representative, it goes to the weight and not the admissibility of the survey evidence.

[34]*Compare Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 778 (W.D. Mich. 2006) (finding close call, but admitting evidence despite presence of overinclusive universe, leading questions, and failure to approximate market conditions) *and Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1334 (D. Kan. 2005) (considering but giving almost no weight to survey with overinclusive universe ) *with Hogdon Powder Co. v. Alliant Techsys., Inc.*, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007) (excluding survey for,

III.    **Dr. Edward Hirt**

Plaintiffs seek to offer the testimony of Dr. Edward Hirt at trial, and refer to his conclusions on summary judgment.  In his report, Dr. Hirt discusses the psychology and motivations of those who seek to demonstrate allegiance to KU and its athletic teams and the methods employed by KU to protect its reputation and public image.  Defendants move to exclude the expert report and testimony of Dr. Hirt because (1) he is not qualified to opine on the issue of product confusion, (2) he failed to conduct empirical analyses about product confusion, (3) he is not sufficiently familiar with the parties in this case, (4) he was predisposed to offer an opinion in support of plaintiffs' position, and (5) his opinions are speculative.

Plaintiffs maintain that Dr. Hirt's testimony is being offered for the following purposes: (1) to explain the trademark significance of school colors and how those colors can drive fans to purchase particular products; and (2) to describe the negative impact defendants' products have on fans of KU.  With regard to the substantive claims in this case, plaintiffs seek to use Dr. Hirt's testimony to help establish that the school colors are protectable under trademark law, to discuss consumer sophistication and motivation in helping establish that a likelihood of confusion between the parties' marks exists, and to help establish their trademark dilution claims.

### *Trademark Protectability and Consumer Motivation*

To qualify as an expert, Dr. Hirt must possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and

---

among other reasons, an unobjective survey format where plaintiff's counsel designed the survey, the interviewers wore shirts with the plaintiff's logo, and only people familiar with plaintiff were selected to participate) *and Winning Ways, Inc. v. Holloway Spotswear, Inc.*, 913 F. Supp. 1454, 1470 (D. Kan. 1996) (excluding survey for, among other reasons, not presenting complete images of products to buyers of different trade dress than what was at issue in the case).

would tend to aid the trier of fact in his search for truth."[35]  A witness's lack of specialization does not affect the admissibility of the opinion, only the weight.[36]  Defendants argue that Dr. Hirt is not qualified to render an opinion on product confusion because his background is in psychology and not in matters relating to intellectual property law.  But according to plaintiffs, Dr. Hirt's testimony is not being offered to prove likelihood of confusion, outside of his limited testimony about consumer motivation.

Dr. Hirt has achieved a doctorate in social psychology and has spent considerable time researching the psychology of sports "fanship" and the self-concept.  He has authored numerous research articles and book chapters and routinely speaks publicly as an authority on this research. Dr. Hirt belongs to professional organizations in his field and is a fellow of the American Psychological Association.  The Court finds that Dr. Hirt is qualified to testify on the matters relating to trademark protectability and consumer motivation set forth in his report.[37] Defendants' arguments about Dr. Hirt's qualifications go to the weight and not the admissibility of his testimony, as they only comment on his lack of specific knowledge about the particular parties involved in this litigation.

On the issue of reliability, defendants first maintain that Dr. Hirt's opinion is not sufficiently reliable because he did not conduct any form of empirical analysis about product confusion.  The Court finds that this argument is inapplicable here because Dr. Hirt's testimony is not being offered to establish product confusion.

---

[35]*LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (quotation omitted).

[36]*First Savings Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078 (D. Kan. 2000) (citing *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991)).

[37]To the extent plaintiffs seek to offer this expert in support of the likelihood of confusion testimony at trial, defendants may renew the motion.

14

Second, defendants argue that Dr. Hirt was not familiar enough with KU or the Joe-College.com business, so he is unable to testify with precision about the allegiance of KU fans. Particularly, defendants complain that Dr. Hirt fails to discuss the disclaimers posted at the Joe-College.com store and website.  Firsthand knowledge, though, "is not requisite to the admissibility of an expert opinion."[38]  Dr. Hirt has conducted extensive research on the psychological aspects of "fanship" and the fact that this research has focused on other universities does not render his opinion unreliable.  To the extent that specific knowledge about KU and its fans should inform Dr. Hirt's opinions, defendants have ample opportunity to draw it out in their cross-examination of the witness.  The issue goes to the weight and not the admissibility of the evidence.

Next, defendants allege that Dr. Hirt is predisposed to offer an opinion supporting plaintiffs' case because he testified almost identically in *Texas Tech University v. Spiegelberg*,[39] a trademark case where the same plaintiffs' attorneys represented Texas Tech University ("Texas Tech") and prevailed on summary judgment against the manufacturer of infringing apparel.  Dr. Hirt admitted during his deposition that he indeed copied and pasted some of his report in the Texas Tech case into the report at issue in this case.  Plaintiffs maintain that he reached the same conclusions because the cases are extremely similar.

The Court declines to find that the similarity between Dr. Hirt's opinions in these cases renders his report unreliable, or that he was predisposed to reach the same conclusion in this case that he reached in the Texas Tech case.  It is clear that Dr. Hirt's conclusions in both cases largely stem from the independent research that he has conducted on the issue of fan allegiance

---

[38]*Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1244 (10th Cir. 2000).

[39]461 F. Supp. 2d 510 (N.D. Tex. 2006).

in the university context.  "That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science."[40]  Further, Dr. Hirt's report makes clear that in preparing his report, he reviewed the pleadings in this case, examined illustrations of items sold at Joe-College.com and visited its website.  The Court finds that Dr. Hirt's testimony is reliable and is relevant to the issues of trademark protectablility and consumer motivation in purchasing the T-shirts at issue in this case and is thus admissible for this purpose.

### *Negative Impact of Defendants' Shirts on KU Fans/Trademark Dilution*

Beginning in paragraph 25 of his report, Dr. Hirt begins to opine about the importance of reputation to universities and their need to be vigilant in protecting their trademarks and designations.  Dr. Hirt states: "In my professional opinion, some of the apparel distributed by the defendants invites potential repercussions upon the University of Kansas."[41]  He goes on:

> Items that offend or condone behaviors that are orthogonal to the mission and values of the university can damage the university's reputation and public image. Thus, it is critical that universities maintain licensing agreements with all parties that sell official school-identifying apparel and merchandise in order to minimize any potential risks that may occur.[42]

Defendants urge that Dr. Hirt's opinion that defendants' shirts reflect negatively on KU, in support of the trademark dilution claims, is based on speculation and not empirical data.  They point to Dr. Hirt's deposition, where he is asked "Are you here as a scientist to express to us opinions about standards for what is or is not objectionable?"  Dr. Hirt replied, "No.  As a

---

[40]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995), *remanded by* 509 U.S. 579, 592 (1993).

[41](Doc. 133, Ex. 1 at 17.)

[42](*Id.* at 18–19.)

faculty member and as a representative of the university community."  Dr. Hirt acknowledged

that this part of his opinion was not the subject of his own prior research, but instead is supported

by other research that he referenced in his report.

The Court agrees with defendants that this portion of Dr. Hirt's opinion is problematic.[43]

Dr. Hirt did not conduct a survey, nor conduct any other empirical research on the issues

concerning dilution, i.e., how the various T-shirts sold by defendants are objectionable, what

effect the T-shirts have on those who read them, and how they impact KU's reputation.  Instead,

in his deposition he explains that his opinion is based on  "references [in his report] to some

studies of ingroup out, . . .  It's not specifically dealing with fans, but it's dealing with people

who are ingroup members."[44]  Dr. Hirt later clarified that he only referenced one such study in

his report, a study conducted in 1979 by Tajfel and Turner.[45]  The Tenth Circuit has explained

that "it is crucial for experts to examine the studies upon which they rely."[46]  At no point in his

report or deposition does Dr. Hirt explain how this research applies to his opinions relevant to

trademark dilution.  The research by Tajfel and Turner is discussed in an earlier part of his report

discussing fans' "tendency to derogate or 'blast' their team's rival."  The Court is unable to see

how this research can form the basis for the very different conclusion that the "objectionable" T-

shirts harm the reputation of KU.[47]  During his deposition, Dr. Hirt fails to explain how this

---

[43]Defendants also make this argument about Dr. Hirt's opinions on product confusion.  As already discussed, plaintiffs do not intend to rely on Dr. Hirt's opinions on product confusion so the Court does not address the issue.

[44](Doc. 133, Ex. 2 at 130–31.)

[45](*Id.*; Doc. 133, Ex. 1 at 7–8.)

[46]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 783 (10th Cir. 1999).

[47]Dr. Hirt admitted during his deposition that his opinions about which T-shirts are or are not offensive are based on his personal opinions.  (*See* Doc. 133, Ex. 2 at 173, 185.)

research supports his opinions on trademark dilution and admits that while he believes other studies support his opinion, he is unable to produce them.  It appears that these opinions are indeed not based entirely on scientific evidence, but instead on Dr. Hirt's opinions as a public university faculty member.   As such, the Court finds Dr. Hirt's opinions relevant to the trademark dilution claim inadmissible because they do not have a reliable basis in the knowledge and experience of his discipline.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Plaintiffs' Daubert Motion to Exclude the Survey and Expert Report of James T. Berger (Doc. 120) is denied and defendants' Motion to Exclude the Testimony and Opinions of Plaintiffs' Expert Witness (Doc. 129) is granted in part and denied in part.

**IT IS SO ORDERED**.

Dated this 19th  day of March 2008.

 S/ Julie A. Robinson
Julie A. Robinson
United States District Judge