IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNIVERSITY OF KANSAS and KANSAS ATHLETICS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.  06-2341 JAR-GLR |
| LARRY SINKS, CLARK ORTH, LARRY SINKS ENTERPRISES, INC. and VICTORY SPORTSWEAR, L.L.C. (COLLECTIVELY D/B/A JOE-COLLEGE.COM), | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' RENEWED MOTION *IN LIMINE* TO EXCLUDE THE SURVEY AND OPINIONS OF JAMES T. BERGER

Plaintiffs University of Kansas and Kansas Athletics, Inc. ("Plaintiffs") submit the following Memorandum in support of their renewed motion *in limine* to exclude the survey prepared by Mr. James T. Berger ("Berger Survey" or "Survey") and the Amended Research Report of James T. Berger ("Berger Report"), as well as Mr. Berger's testimony at deposition and at trial.

## I.    INTRODUCTION

At the summary judgment stage of this case, Plaintiffs sought to exclude this Court's consideration of the Berger Survey and Berger Report on a variety of grounds.  In its Order on Plaintiffs' motion to exclude, the Court identified four major and fatal flaws in the methodology of the Berger Survey.  Indeed, in its Order, this Court found that the "survey results are suspect." *See* Docket No. 229, at p. 11.  Nevertheless, the Court declined to exclude the Berger Survey and Report in consideration of Plaintiffs' summary judgment motion.

Plaintiffs file this renewed motion *in limine* to exclude these materials from evidence to be presented to the jury because this court's gate-keeping function requires the exclusion of the unreliable and prejudicial survey and opinions of Defendants' expert witness, Mr. James T. Berger. Where, as here, the survey and related opinions are so fundamentally flawed that they are rendered unreliable and can only serve to mislead and confuse the jury, they should be excluded under both Federal Rule of Evidence ("FRE") 403 and under the criteria set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Just as Mr. Berger's surveys were excluded in two other trademark cases, his survey should be excluded here.

## II.    FACTUAL BACKGROUND

The factual background for this Memorandum is set forth in detail in Plaintiffs' Memorandum in Support of Plaintiffs' *Daubert* Motion to Exclude the Survey and Expert Report of James T. Berger (Docket No. 121) at Section II. In sum, Plaintiffs allege that Defendants' apparel, which uses KU's marks but is neither manufactured nor authorized by Plaintiffs, is confusingly similar to and likely to dilute KU's famous trademarks.

In their defense, Defendants offer the fatally flawed and prejudicial survey and report of James T. Berger. Defendants served the Amended Berger Report on April 16, 2007,[1] which was based upon a flawed Internet survey.[2] In response to the Berger Survey and Report, on May 4, 2007, KU served the rebuttal report of its expert, Mr. Robert N. Reitter.[3] Mr. Reitter examined the Berger Survey's deficiencies in detail and concluded that the "significant flaws in the design, execution, and reporting of the Berger Survey render it unreliable and incapable of supporting

---

[1] A true and correct color copy of the Amended Research Report of James Berger is attached as Exhibit A to the Declaration of Lauren Sullins in Support of Plaintiffs' Renewed Motion to Exclude the Survey and Expert Report of James T. Berger ("Sullins Dec.").

[2] A true and correct color copy of the T-Shirts Depicted in the Berger Survey are attached as Exhibit B to the Sullins Dec.

[3] A true and correct color copy of the Robert N. Reitter Rebuttal Report on the Amended Research Report of James T. Berger ("Reitter Rebuttal") is attached as Exhibit C to the Sullins Dec.

the opinions stated in the Berger Report, including, most significantly, the conclusion that the Joe College T-shirts are not likely to cause confusion with or dilute the distinctiveness of the KU trademarks." Reitter Rebuttal, at p. 3.

On June 12, 2007, Plaintiffs filed a Motion to Exclude the Survey and Expert Report of James T. Berger (Docket No. 120) and a memorandum in support thereof (Docket No. 121).[4] The defects in the Berger Survey are numerous and, accordingly, only a brief litany of the errors were set forth in Plaintiffs' original memorandum and reply.

In its March 19, 2003 Order (Docket No. 229), this Court recognized many significant flaws in the Berger Survey, including that (1) the Survey universe was improper, (2) the Survey sample was not representative of the sample universe; (3) the Survey failed to replicate marketplace conditions; and (4) the Survey used suggestive and leading questions that pointed respondents to the desired response.  While acknowledging that "there are significant flaws in the methodology of the survey," the Court determined that these errors should "go to the weight and not the admissibility of the survey."  *See* Docket No. 229, at p. 12.  The Court further explained its rationale by stating that these errors could be exposed to the jury through cross-examination and the presentation of Plaintiffs' rebuttal expert. *See id.*

There is no reason to present the jury with a survey that is so error-ridden and unreliable that it is of no probative value and will only serve to mislead and confuse.  Even if Plaintiffs address the errors in the Survey through cross-examination and rebuttal witnesses, because of their lack of exposure to proper survey methodology, it is likely that the jury will still make improper conclusions based upon the flawed survey.  The express purpose of the *Daubert* criteria and FRE 403 is to prevent this type of situation.

---

[4] Defendants filed their response on July 13, 2007 (Docket No. 157) and Plaintiffs' replied on June 27, 2007 (Docket No. 171).

Plaintiffs maintain that the significant flaws set forth in its original motion and supporting memoranda are more than sufficient to mandate the exclusion of the Berger Survey and Report. In an attempt to further persuade this Court, however, Plaintiffs readdress the significance of the previously mentioned errors and call to the Court's attention to additional methodological deficiencies in the Survey which render the Survey so unreliable, irrelevant and prejudicial that it must be excluded from the jury.

## III.   THE BERGER SURVEY AND RELATED OPINIONS DO NOT SATISFY THE LEGAL STANDARDS FOR EXPERT EVIDENCE

The admissibility of expert testimony, including survey evidence, is governed by both *Daubert* and the provisions of FRE 403.  The Berger Survey fails to satisfy the criteria of either of these standards.  First, the survey fails to follow accepted survey research principals and thereby must be excluded under *Daubert* as unreliable and irrelevant.  Second, the survey is riddled with so many significant and manifest errors that any probative value is outweighed by the danger of misleading and confusing the jury, requiring exclusion under FRE 403.

### A.   The Berger Survey Is Inadmissible Under *Daubert* Because It Does Not Conform   to   Generally   Accepted   Survey   Principles.

It is well established that a district court must act as the "gatekeeper" for expert witness testimony in a jury trial due to the heightened power of "expert" evidence to mislead.  *See Daubert*, 509 U.S. at 579-580.   Under *Daubert*, a trial judge must "ensure that any and all scientific testimony or evidence admitted is **not only relevant, but reliable**." *Daubert,* 509 U.S. at 589 (emphasis added); *see also* Fed. R. Evid. 702.  This gate-keeping responsibility extends to survey evidence. *See Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1465 (D. Kan. 1996).[5]

---

[5] The proponent of the expert testimony (here, Defendants) bears the burden of establishing its admissibility by a preponderance of the evidence. *See Estate of Mitchell v. Gencorp, Inc.*, 968 F. Supp. 592, 595 (D. Kan. 1997)

Accordingly, a judge must determine **at the outset** whether the proffered expert evidence is sufficiently grounded in accepted scientific technique so as not to mislead the jury, but to "assist the trier of fact to understand or determine a fact in issue." *See Daubert*, 509 U.S. at 592 (emphasis added); *Winning Ways*, 913 F. Supp. at 1465 (explaining that it is "a trial judge's responsibility to examine expert testimony critically to ensure that it is both reliable and relevant before admitting it"); *see also Learning Network, Inc. v. Discovery Commc'ns, Inc.*, 153 F. Supp. 2d 785, 789 (D. Md. 2001) (excluding survey and noting that it is necessary for the court to decide the threshold question of the validity of a survey before submitting the results to a jury).

Specifically, for a survey to be admissible, it must be "properly designed, executed, and described" and must be "conducted in accordance with generally accepted survey principles." *See* Shari Seidman Diamond, *Reference Guide on Survey Research in*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 229, 231-234 (2d ed. 2000) (hereinafter "Diamond, *Reference Manual*"); *see also Hodgdon Powder Co., Inc. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178, 1182 (D. Kan. 2007) (finding that survey was not conducted according to generally accepted survey principles and was therefore inadmissible). As acknowledged by this Court, when determining the reliability and trustworthiness of a survey, the court considers a variety of factors that include whether: (1) the universe was properly chosen and defined; (2) the sample chosen was representative of that universe; (3) the questions were framed in a clear, precise, and nonleading manner; (4) sound interview procedures were followed; (5) the data gathered were accurately reported; (6) the data were analyzed in accordance with accepted statistical principles; and (7)

---

(holding expert testimony unreliable and inadmissible under *Daubert*), *aff'd*, 165 F.3d 778 (10th Cir. 1999); *Nat'l Football League Props. v. New Jersey Giants, Inc.*, 637 F. Supp. 507, 513 (D.N.J. 1986) ("proponent of a consumer survey has the burden of establishing that it was conducted in accordance with accepted principles of survey research"). Defendants have failed to carry this burden.

the objectivity of the entire process was assured.  Docket No. 229, at p. 6.  (citing *Hodgon*, 512
F. Supp. 2d at 1181).  "[F]ailure to satisfy one of these criteria may result in the exclusion of the
survey."  *Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, No. 02-CIV-3691(DCL),
2004 WL 326708, at *8 (S.D.N.Y. Feb. 32, 2004) (excluding survey where the flaws diminished
the survey's relevance).  As explained below, the Berger Survey unquestionably fails practically
every one of these factors and should thereby be excluded under *Daubert*.

Indeed, this Court identified four major methodological flaws in the Berger Survey,
which are discussed in greater detail in Section IV.A. below:

- "This Court finds that the survey universe was not properly limited to potential
  purchaser's of defendant's T-shirts.... the survey was flawed in not ensuring that it was
  testing the correct market."  Docket No. 229, at p. 8.

- "This Court considers this as evidence that the sample chosen by Berger was not
  representative of the sample universe."  Docket No. 229, at p. 10.

- "Therefore, the Court agrees that the survey results are suspect because they do not
  accurately account for the marketplace conditions under which consumers encounter
  these shirts."  Docket No. 229, at p. 11.

- "The Court also finds that some of the questions posed to the respondents in this survey
  are suggestive and leading....The questions are problematic not only because they are
  close-ended, but because they point the respondent toward a certain response."  Docket
  No. 229, at p. 11.

Any of these errors alone are sufficient to render the results unreliable, misleading, and thereby
inadmissible.  *See Mastercard,* 2004 WL 326708, at *8 (noting that failure to satisfy one of the
survey criteria may result in exclusion of the survey).

Collectively, the four major methodological flaws mandate exclusion of the Berger Survey. Although methodological deficiencies in a survey may bear on the weight to be given to the survey's conclusions rather than to its admissibility, **courts have routinely excluded surveys where, as here, the deficiencies are "so substantial that they render the survey's conclusions untrustworthy."** *See Hodgdon*, 512 F. Supp. 2d at 1181 (excluding survey evidence with numerous flaws as unreliable and irrelevant) (emphasis added) (citations omitted); *Winning Ways*, 913 F. Supp. at 1466 (excluding survey due to methodological flaws); *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 369 (D.N.J. 2002) (excluding survey and stating, "Only if the expert testimony and related survey are useful, reliable, and have probative value after all their deficiencies are taken into account is the evidence admissible."); *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 307 (S.D.N.Y. 2001) (excluding survey because the methodology was flawed and the findings were irrelevant to the issues); *see also Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984) (excluding survey that was "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion.").

"The court need not and should not respond reflexively to every criticism by saying it merely 'goes to the weight' of the survey rather than to its admissibility." *Simon Prop. Group L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1039 (S.D. Ind. 2000) (citation omitted) (excluding survey under *Daubert* and Fed. R. Evid. 403). As detailed below, the Berger Survey is so filled with methodological errors that any reliance on its findings is unreasonable and contrary to the purpose of *Daubert*. *See Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004) (excluding survey and noting that "[i]n some cases, however, serious flaws in a survey will make any reliance on that survey unreasonable.... Otherwise, any survey, no matter how

tendentious, would force the parties to trial...") (internal citation omitted). The Berger Survey, and related opinions, should be excluded for failing to satisfy the *Daubert* criteria of relevance and reliability.

**B.     The Berger Survey Should Be Excluded Under FRE 403 Because It Is of No Probative Value and Will Prejudice Plaintiffs, Confuse the Issues, and Mislead the Jury.**

The Berger Survey is so severely flawed that it has no probative value and would only confuse and mislead the jury. To be clear, even if the Berger Survey satisfied the requirements set forth in *Daubert*, which is does not, this Court may still exclude the Berger Survey and related opinions under FRE 403. *See Daubert*, 509 U.S. at 587, 595; Fed. R. Evid. 401.

A survey must be excluded under FRE 403 where it is so flawed in methodology that its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See Trouble*, 179 F. Supp. 2d at 307 (excluding survey that was "flawed in several respects"); *see also Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999) (finding that "any probative value of the survey was outweighed by its potential to confuse the issues in the case" and noting that it was proper for the district court to exclude a survey from evidence before the jury because the survey questions were irrelevant); *Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, No. 02-CIV-3691(DLC), 2004 WL 326708, at *9 (S.D.N.Y. Feb. 32, 2004) (excluding survey under FRE 403 and noting that "defects in the [s]urvey undermine its reliability"). Here, the Berger Survey and Report are so error-ridden and skewed that their exclusion is necessary to avoid confusing and misleading the jury.

**1.     In a Jury Trial, as Opposed To a Bench Trial, It Is Of Heightened Importance That Significantly Flawed and Misleading Surveys Be Excluded.**

Without proper protection from the court, jurors can be easily confused by irrelevant or

misleading information. *See* J. Thomas McCarthy, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 32:170 (4th ed. 2007) ("*McCarthy*"). Accordingly, in a jury trial, as opposed to a bench trial, exclusion of improper or misleading evidence is of heightened importance. *See The Learning Network, Inc.* 153 F. Supp. 2d at 789 (noting that it is "necessary for a district court to pass upon the threshold question of the validity of a survey before submitting the results to a jury for their consideration"); Kenneth A. Plevan, *Daubert's Impact on Survey Experts in Lanham Act Litigation*, 95 Trademark Rep. 596, 605 (2005) (hereinafter "Plevan, *Survey Experts*") (noting that that in all fourteen recent cases where surveys were excluded, a jury trial had been demanded). Indeed, "juries . . . must be shielded from inadmissible evidence whereas judges, by virtue of their special training, can rationally and unemotionally reach a decision completely ignoring the improper evidence." *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.* 559 F. Supp. 1189, 1202 (E.D.N.Y. 1983) (excluding evidence because it did not reflect sufficient indicia of trustworthiness and noting that the decision to receive improper evidence is of lesser importance in a bench trial); *see also Hutchinson v. Essence Commc'ns*, 769 F. Supp. 541, 557 (S.D.N.Y. 1991) (noting that the trial "was not before a jury" and acknowledging that this fact affected the judge's decision to admit the questionable survey).

In keeping with the mandate of the Federal Rules of Evidence and established trademark principles, the jury in this case should not be exposed to Mr. Berger's severely flawed and unreliable survey. *See* Plevan, *Survey Experts*, at 605 (noting that "if a judge believes that a survey's probative value is weak, it can be excluded because of the concern that the appearance of an expert sponsoring a discredited survey will unfairly prejudice or confuse the jury").

### 2. <u>Mr. Berger's Surveys Have Been Excluded Due to Their Unreliable and Misleading Nature In Previous Cases.</u>

As noted by this Court, Mr. Berger has a history of conducting flawed surveys. *See* Docket No. 229, at p. 12 n.32. Indeed, two of Mr. Berger's surveys have been previously excluded under FRE 403 due to their substantial flaws. In *Powerhouse Marks LLC v. Chi Shin Impex, Inc.*, No. 04-73923, 2006 WL 897254 (E.D. Mich. Apr. 5, 2006) ("*Powerhouse*"), the Court excluded Mr. Berger's survey specifically because the court "believe[d] the jury likely would be confused as to the survey's relevance and improperly rely on Berger's conclusions...." *Id.*, at *4 (noting the survey's inappropriate universe, leading questions, and conclusions based upon theories that were not tested). Likewise, the court in *Vista Food Exch.*, *Inc. v. Vistar Corp.*, No. 03-CV-5203DRHWDW, 2005 WL 2371958, at *7 (E.D.N.Y. Sept. 25, 2005) ("*Vista*") excluded the survey conducted by Mr. Berger because it was "flawed to the point that its probative value [was] substantially outweighed by the survey's potential for unfair prejudice and confusion." *Id.*, at *7 (recognizing the survey's leading questions, improper universe, and failure to replicate actual market conditions).

Mr. Berger does not appear to have learned from his mistakes – the Berger Survey suffers from the same flaws for which he was criticized by previous courts in *Vista* and *Powerhouse*.[6] *See infra*, Part IV. Moreover, Mr. Berger compounded these errors by making additional mistakes that render his survey even more unreliable than those excluded in *Powerhouse* and *Vista*. *Id.* Although it is true that the results in *Vista* and *Powerhouse* do not necessarily dictate exclusion in this case as a matter of law, the fact that these surveys contain the same flaws as those present in the Berger Survey, serves as further evidence that errors like those in the Berger Survey **can and have** led to exclusion of surveys under FRE 403 and should not simply go to the

---

[6] Plaintiffs stress that only 25 surveys have been excluded in the 13 years since *Daubert* – **two** of these excluded surveys were conducted by Mr. Berger.

weight of the evidence.  Just as Berger's survey was excluded in *Powerhouse* because it was likely to confuse and mislead the jury, the Berger Survey and Report should be excluded here.

## IV. THE BERGER SURVEY CONTAINS SIGNIFICANT ERRORS THAT RENDER THE SURVEY AND OPINIONS BASED UPON IT UNRELIABLE AND INADMISSIBLE

In its Order, this Court recognizes that there are "significant flaws in the methodology" of the Berger Survey and that "the survey results are suspect." Docket No. 229, at pp. 11-12.  The errors that have been recognized by the Court include the following: (1) the Survey universe was improper, (2) the Survey sample was not representative of the sample universe; (3) the Survey failed to replicate marketplace conditions; and (4) the Survey used suggestive and leading questions that pointed respondents to the desired response.

In addition to the four flaws identified by the Court, the Berger Survey suffers from the following fatal flaws:  (1) the three designs tested by the Survey do not accurately represent the 206 designs accused in this case; (2) the Survey failed to use a screener; (3) the Survey failed to use a control; (4) the questions are imprecise because the term "officially licensed" is not defined; (5) the Survey used hypothetical questions, which are not reliable; and (6) the Survey fails to test for sponsorship, affiliation, initial interest confusion, post-sale confusion, or dilution.

### A. The Methodological Flaws Identified By This Court Mandate Exclusion of the Survey and Related Opinions.

#### 1. The Survey Should be Excluded Because it Fails to Test the Proper Universe.

As recognized by this Court, the universe of the Berger Survey "was not properly limited to potential purchasers of defendants' T-shirts" and the Survey was "flawed in not ensuring that it was testing the correct market." (Docket No. 229 at p. 8).  This significant error undercuts the reliability of the entire Survey. *See Scott Fetzer Co.*, 381 F.3d at 487 (stating that the universe selected by the expert "severely limit[ed] the probative value of the survey's results").

The impact of an incorrect universe on the credibleness of a survey cannot be understated. "Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." *McCarthy* § 32:159 ("A survey of the wrong 'universe' will be of little probative value in litigation."). Indeed, "[a] survey that provides information about a wholly irrelevant universe of respondents is itself irrelevant." *Id.*; *see* Diamond, *Reference Manual*, at 241 ("[E]ven if the proper questions are asked in the proper manner, if the wrong persons are asked, the results are likely to be irrelevant.").

As recognized by Mr. Berger himself in his article, James T. Berger, *10 Easy Ways to Blow Away a Survey,* INTELLECTUAL PROPERTY TODAY, Jan. 2007, at 18 (hereinafter "Berger, *10 Easy Ways*"), it is "essential" that the expert "produce a written screener" to "focus on the precise target market and not some related market."[7] Despite Mr. Berger's admission that it is an "easy" way to "blow a survey," the Berger Survey contains no such "screener" to ensure that he was surveying the correct universe.

Like other courts that have frequently excluded surveys that utilize an incorrect universe as unreliable and potentially misleading, the Court should likewise exclude the Berger Survey for the same error. *See e.g., Hodgdon,* 512 F. Supp. 2d at 1181 (excluding survey with incorrect universe); *Powerhouse,* 2006 WL 897254, at *3 (excluding the Berger survey and noting that the precise universe for a survey "is not limited to actual buyers but rather potential buyers); *see also Jordache Enters. v. Levi Strauss & Co.,* 841 F. Supp. 506, 518 (S.D.N.Y. 1993) (excluding survey of participants who had purchased or had worn jeans within the past six months but it did not inquire as to whether those participants intended to purchase jeans in the future).

---

[7] A true and correct copy of this article is attached as Exhibit E to the Sullins Dec.

**2.    The Survey's Low Response Rate and Unrepresentative Sample Mandate Exclusion of the Survey.**

In addition to the other flaws in the Survey, Mr. Berger failed to obtain an appropriate response rate. As recognized by this Court, a 2.16% response rate "appears, by any standard, to be quite low" and "could point toward non-response bias or diminish the validity of the results." *See* Docket No. 229, at p. 9. In his rebuttal, Mr. Reitter asserts that "it is extremely likely that the non-response level exerted a bias on the results. Those invited to participate had every opportunity of examining the Survey questions before deciding whether or not to submit their response." *See* Reitter Rebuttal at pp. 8-9; *see also Proctor & Gamble Pharms., Inc. v. Hoffmann-La Roche Inc.*, No. 06-Civ 0034(DAC), 2006 WL 2588002, at *24 (S.D.N.Y. Sept. 6, 2006) (excluding survey that "fail[ed] to collect nonresponse information in accordance with generally accepted market survey principles"). Due to the Berger Survey's mere 2.16% response rate, any conclusions based upon these paltry results are unreliable and misleading to the jury. *See Mastercard*, 2004 WL 326708, at *9 (excluding survey in jury trial because, among other issues, the number of respondents was "too small to provide meaningful results").

The Court also found that the non-response level likely created a bias in the results and found that "the sample chosen by Berger was not representative of the sample universe." Docket No. 229. Indeed, "[a] survey is **inadmissible** when the sample is clearly not representative of the universe it is intended to reflect." *Winning Ways*, 913 F. Supp. at 1467 (emphasis added). Accordingly, this factor alone supports the exclusion of the Survey.

**3.    The Survey Fails to Replicate Marketplace Conditions and Must be Excluded.**

A survey that fails to replicate actual marketplace conditions should be excluded. *See Vista*, 2005 WL 2371958, at *5 (excluding Berger's survey because it "failed to replicate actual

marketing conditions and improperly skewed results in favor of responses indicating confusion."); *see also Coherent, Inc. v. Coherent Techs., Inc.*, 935 F.2d 1122, 1126 (10th Cir. 1991) (finding that the district court did not clearly err in rejecting survey evidence that failed to simulate market conditions); *J & J Snack Foods,* 220 F. Supp. 2d at 371 (excluding survey because it did not imitate the market conditions of the product).

As recognized by this Court, "the Tenth Circuit has repeatedly explained that 'it is axiomatic in trademark law that 'side-by-side' comparison is not the test' and that "[a] survey that conducts such a side-by-side comparison 'bears little resemblance to the actual workings of the marketplace.'" Docket No. 229, at p.10 (citations omitted). The questions in the Berger Survey "ask the respondents to conduct a side-by-side comparison of the products." Docket No. 229, p. 11. Thus, the Court found that the Berger Survey fails to replicate market conditions: "[t]he survey results are suspect because they do not accurately account for the marketplace conditions under which consumers encounter these shirts." Docket No. 229, at p. 11. Accordingly, the Berger Survey should be excluded for failing to replicate marketplace conditions.

4.     **The Berger Survey Contains Suggestive and Leading Questions That Skew the Results of the Survey in Favor of Defendants and Render it Inadmissible.**

As recognized by this Court, "some of the questions posed to the respondents in this survey are suggestive and leading." Docket No. 229, at p. 11. Most notably, Questions 3 and 8 obviously split the T-shirts used as stimuli into two distinct groups - licensed and unlicensed - as demonstrated below:

> Question 3:  Please look at T-shirts B, D, F.  Do any of these T-shirts appear to be licensed by the University of Kansas?

> Question 8:  Please look at T-shirts B, D, F.  In terms of quality of the materials

and workmanship, do these T-shirts appear to be of higher or lower quality than T-shirts A, C, E?

*See* Berger Report, at p. 22.

It is unacceptable for a survey that purports to test confusion to divide the stimuli in such an obvious and leading manner. There is no doubt that "[t]he questions that ask about only defendants' and Nebraska shirts [B, D, F] single them out as unlicensed shirts and suggest that the same answer applied to all of the specified shirts . . . they point the respondent toward a certain response." Docket No. 229, at p. 11. Indeed, respondents were improperly "presented with the connection between the three unlicensed KU shirts, rather than being allowed to draw that connection for themselves." *Id.* at pp. 11-12; *see also Universal*, 746 F.2d at 118 (finding survey question to be improperly leading where it "presented . . . [respondents] with the . . . connection rather than permit[ting] [them] to make their own association" and ultimately excluding the survey).

Not only does the Berger Survey lead the respondents by grouping the unlicensed T-shirts in its questions, but it even depicts the licensed and unlicensed shirts in graphically different ways. It is clear that the three licensed shirts (A, C, and E) are actual photographs of T-shirts while, in contrast, the unlicensed shirts (B, D, and F) are merely drawings of shirts. *See* Sullins Dec., Ex. B. This visual distinction encourages the respondents to group the unlicensed shirts (B, D, and F) together and further demonstrates the leading and biased nature of the Berger Survey.

Mr. Berger has a history of conducting inadmissible surveys that are biased in favor of his clients. *See Powerhouse,* 2006 WL 897254, at *4 (excluding survey because it contained suggestive questions that led respondents to find connections); *Vista*, 2005 WL 2371958, at *5 (finding that Berger "improperly skewed results in favor of responses indicating confusion").

Likewise, here, the leading nature of the questions and images in the Berger Survey removes any validity to the Survey or any conclusions based upon it and renders them inadmissible. *See Hodgdon*, 512 F. Supp.2d at 1182 (excluding survey as "untrustworthy and inadmissible" where the phrasing of the questions "could have skewed the results"); *WGBH Educ. Found., Inc. v. Penthouse Int'l, Ltd.*, 453 F. Supp. 1347, 1351 (S.D.N.Y. 1978), *aff'd without op.*, 598 F.2d 610 (2d Cir. 1979) (noting that the leading nature of the question "seriously undercuts whatever validity the survey might otherwise have had").

**B.** **Additional Errors in the Berger Survey Clearly Demonstrate that the Survey Does Not Adhere to Established Survey Principles and Should Be Excluded.**

**1.** **The Three Joe-College T-Shirts Included in the Berger Survey Do Not Accurately Represent the T-Shirts at Issue.**

Plaintiffs have accused 206 designs in this case, however, the Berger Survey tests only three (3) T-shirts, displaying the phrases "Muck Fizzou," "Kansas Swim Team," and "Kansas O'Jayhawker," which were chosen based on Mr. Berger's own speculation as to what influences T-shirt purchases. *See* Berger Dep. at 31:1-4.[8] The stimuli chosen by Mr. Berger are "atypical and the data is correspondingly unreliable." *See* Reitter Rebuttal, at p. 5. None of the three stimulus shirts fits the general theme that binds the vast majority of the T-shirts together – namely, the use of the school's Crimson and Blue Color Scheme combined with images, sayings, and other indicia that suggest and directly relate to KU on two-sided shirts.

The three stimulus T-shirts are printed only on one side. In contrast, 152 of the 206 accused designs in this case are printed on two sides. *See* Sullins Dec. ¶6. Mr. Berger's Survey, therefore, cannot possibly encompass the substantial majority of T-shirts that have different messages and are printed on two sides. *See J & J Snack Foods*, 220 F. Supp. 2d at 370 (stating

---

[8] The relevant portions of the deposition of James T. Berger ("Berger Dep.") are attached as Exhibit D to the Sullins Dec.

that "[a]bove all, the survey's design must fit the issue which is to be decided by the jury, and not some inaccurate restatement of the issue, lest the survey findings inject confusion... confounding rather than assisting the jury."). Plaintiffs note that Defendants' two-sided T-shirts typically have one side that closely resembles licensed designs, showing only KANSAS, HAWK BASKETBALL, HAWK FOOTBALL or HAWK BASEBALL, while the other side of the T-shirt shows irreverent messages such as the ones tested in the Berger Survey. *See* Reitter Rebuttal, at p. 4. Mr. Berger's avoidance of such shirts in his Survey is due to one simple fact – consumers associate these marks with KU. *See* Reitter Rebuttal, at p. 4 (noting that the licensed shirt with KANSAS on a blue background was overwhelmingly identified as licensed T-shirt in the Survey).

Mr. Berger's Report also contains broad statements that are unsupported by his unrepresentative and under inclusive survey. In his Report, Mr. Berger proclaims "[t]here is no confusion or likelihood of confusion with respect to Joe College products v. officially licensed products." *See* Berger Report, at p. 14. To be clear, the Berger Survey does not contain enough data to enable Mr. Berger to reach such a general conclusion – **he only tested three (3) of the shirts at issue**. Mr. Berger cannot simply extrapolate his faulty findings regarding a handful of shirts to all 206 of the designs at issue. Even momentarily ignoring the numerous other flaws in the Survey, at the very most, Mr. Berger's findings could only be of limited relevance to the three actual shirts tested here and have no relevancy at all to the other 203 designs. *See Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1332 (N.D. Ga. 2008) (finding that survey results should not be presumed to represent consumer reaction to any of the challenged merchandise other than that two T-shirts that were actually tested).

Just as he did in *Vista*, Mr. Berger intentionally failed to present the marks at issue as

they would be encountered in the actual marketplace, and instead used unrepresentative stimuli to bias the results of his survey. *See Vista*, 2005 WL 2371958 at *5 (explaining that Berger's survey results were skewed because he focused on fragments of the marks and failed to replicate market conditions). As explained by Mr. Reitter, "Since these three shirts materially fail to represent the total body of [] shirts, the Berger survey is unreliable and the data do not support his conclusion." Reitter Rebuttal, at p. 4.

At a bare minimum, Mr. Berger's testimony and Survey should be admissible only as to the three designs to which it is relevant. The Berger Survey is not relevant to the 203 designs not tested and, therefore, Mr. Berger should be precluded from extrapolating the results of his survey from the three shirts tested to any of the other shirts accused of infringement. *See Wal-Mart Stores*, 537 F. Supp. 2d at 1332 (finding survey admissible only as to the designs actually tested); *Google Inc. v. Am. Blind & Wallpaper*, No. 03-5340 UF RF), 2007 WL 1159950, at *9 (N.D. Cal. Apr. 18, 2007) (finding survey is "relevant and admissible" only as to the marks tested by the survey). Furthermore, Question 9 asked participants a hypothetical question that bears no relevance to the accused designs at issue and, therefore, Defendants should be precluded from offering any evidence or testimony concerning Question 9. Finally, Mr. Berger should be precluded from offering testimony regarding dilution because the Berger Survey made no attempt to test for dilution and offers only conclusory remarks drawn from questions wholly unrelated to the issue of dilution.

### 2.   Mr. Berger Did Not Screen the Respondents.

Mr. Berger was aware that proper survey methodology requires a screener questionnaire to exclude potential respondents that would bias the survey; nevertheless, he did not use one here. *See Berger, 10 Easy Ways* at 18; *see also* Berger Dep. at 57-59. The Survey did not screen

for people with special knowledge, such as those who work in stores selling licensed items or those who were aware of this litigation. *See id.* at 14:20-20:19. In addition, the Berger Survey did not exclude "professional" or "regular" survey takers and it is possible that such individuals responded to the survey. *See id.* As Mr. Berger admitted in his own article, if "regular" survey takers are not excluded, it can "seriously damage the validity and reliability of the survey." *See* Berger, *10 Easy Ways*, at 18.

###        3.        The Survey Did Not Include a Control.

Although he has previously been criticized for not using a control in his survey, Mr. Berger repeated the same error here. *See Vista*, 2005 WL 2371958, at *6 (finding failure to include a control further exacerbated the survey's flaws). It is standard procedure in a survey to include a control group or question to compare the test results. *See* Diamond, *Reference Manual*, at 260 (recognizing control groups and control questions as "the most reliable means for assessing response levels against the baseline level of error associated with a   particular question" in a consumer survey).    Indeed, numerous courts, including this Court, have recognized the necessity of adequate controls in order for a consumer survey to be reliable. *See Winning Ways*, 913 F. Supp. at 1470 (finding survey did not control for noise). Mr. Berger's failure to use control questions in his Survey renders the resulting data "meaningless and [of] no evidentiary value." *See Major League Baseball Props., Inc. v. Sed Non Olet Denarius, Ltd.*, 817 F. Supp. 1103, 1124 (S.D.N.Y. 1993) (finding surveys "flawed" because they did not contain a control question).

###        4.        The Questions in the Survey are Imprecise Because the Term          "Officially Licensed" Is Not Defined.

The responses to the Berger Survey are unreliable because the Survey contains questions that are vague and undefined. For example, Questions 2 and 4 of the Berger Survey simply ask

whether the shirts are "officially licensed" and do not even identify by whom – at the very least these questions should have asked whether the shirts were officially licensed by KU. *See* Reitter Rebuttal at p. 7-8; *see also* Diamond, *Reference Manual* at 248 ("If a crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey"); *Manual for Complex Litigation (Fourth)* § 11.493 (2004) (questions should be clear).

**5.**      **The Survey Uses Improper Hypothetical Questions and Must be Excluded.**

The Berger Survey further fails to replicate actual marketplace conditions because it relies upon a hypothetical question.  Question 9 states:  "If you went shopping in Lawrence, Kansas, and you bought a blue sweater with nothing printed on it, would it appear to be licensed by the University of Kansas?"  Conclusions drawn from the answers to a hypothetical are less reliable than other forms of data.  *See Nat'l Football League v. Governor of Delaware*, 435 F. Supp. 1372, 1379 (D. Del. 1977) (finding evidence based on actual data to be more persuasive than hypotheticals used in an expert report).  If Mr. Berger had used proper methodology to seek an answer to this question, the Berger Survey would include a picture of blue sweater with nothing printed on it in his survey and would then have inquired "What entity, if you know, sponsors or is associated or affiliated with this shirt."  *See* Berger Dep. at 86:3- 86:15.  Mr. Berger, once again, did not follow recognized survey principles, and, accordingly, this hypothetical question further decreases the reliability of the Berger Survey, which is so unreliable that it must be excluded.

**6.**      **The Berger Survey Failed to Test for Sponsorship, Affiliation, Initial Interest Confusion, Post-sale Confusion, or Dilution.**

In his Report, Mr. Berger makes sweeping statements as to the absence of a likelihood of confusion between Defendants' products and those of Plaintiffs.  To be clear, Mr. Berger did not

test for all types of confusion – for example, he completely failed to test for initial interest confusion or post-sale confusion. *See* Berger Dep. at 53:2-5.

There is no question that both initial interest confusion and post-sale confusion are actionable in the Tenth Circuit. *See Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1238 (10th Cir. 2006) (adopting the theory of initial interest confusion and explaining that it occurs when "a consumer seeks a particular trademark holder's product and instead is lured to the product of a competitor by the competitor's use of the same or a similar mark"); *see also Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 989 (Fed. Cir. 1993) (finding that the District Court of Kansas abused its discretion by failing to consider the existence of post-sale confusion). Nevertheless, Mr. Berger did not even bother to review case law or literature on either of these theories. *See* Berger Dep. at 52:12-53:5.

Surveys that are not designed to test for particular types of confusion are not relevant as evidence of those issues. *See* 3A Rudolph Callmann, Louis Altmapo & Malla Pollack, CALLMANN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES, § 21:67 (4th ed. 2007) (noting that a survey measuring post-sale confusion is not relevant on the issue of point-of-sale confusion). Accordingly, Mr. Berger may not make broad conclusions about theories that his Survey was not designed to test. *See Powerhouse*, 2006 WL 897254, at \*4 (excluding Mr. Berger's broad conclusions about theories not tested in his survey because the jury was likely to be confused as to the survey's relevance and improperly rely on Mr. Berger's conclusions).

In addition, the Berger Survey failed to test for confusion as to sponsorship or affiliation. It is a basic tenet of trademark law that the Lanham Act protects a trademark owner not only against source confusion, but also grants broad protection against confusion as to "affiliation, connection, or association" or the "origin, sponsorship, or approval" of the goods. *See* 15 U.S.C.

§ 1125(a)(1)(A).  Under established survey principles, it is "standard practice to ask respondents not only about the source of the stimulus or its licensing but also to inquire as to whether there is any affiliation, connection or association between the stimulus and another party."  *See* Reitter Rebuttal, at p. 7.  Although Mr. Berger readily admits that he has tested for sponsorship or affiliation in other surveys (where he represented the plaintiff), he failed to do so here.  *See* Berger Dep. at p. 45:6-12.  *See McCarthy* § 32:170 ("[I]f the survey questions are not congruent with the issues in the case, the results will not only be irrelevant, but may also be prejudicially misleading to a jury. . .").

Furthermore, despite the absence of questions regarding dilution, conclusion "i" of the Berger Report states that there is "no evidence of dilution of KU's trademarks."  *See* Berger Report, at p. 15.  There is **no** other mention of dilution in the text of the Berger Report and "no theory is presented as to how the results of the Survey bear on the possibility of dilution."  *See* Reitter Rebuttal, at p. 11.  The Survey simply does not contain **any** questions that pertain to dilution and, because the Survey was not designed to test any form of dilution, Mr. Berger's conclusions on this theory are moot.  *See* Fed. R. Evid. 402 ("Evidence which is not relevant is not admissible.")

It is contrary to this Court's gatekeeping function, and the intent of Rule 403 and *Daubert* to permit the jury to consider Mr. Berger's unsupported conclusions on theories that were untouched in his Survey.  The Court should assess the degree to which an unwarranted aura of reliability attaches to Mr. Berger's "expert" evidence and balance the reliability of the evidence against the danger that it might confuse or mislead the jury.  *See* Plevan, *Survey Experts*, at 606 (noting the concern that "an expert sponsoring a discredited survey will unfairly prejudice or confuse the jury.").  Here, the answer is simple – because Mr. Berger failed to test for

sponsorship, affiliation, initial interest confusion, post-sale confusion, or dilution any such statements regarding such findings are baseless, irrelevant, and inadmissible. *Universal*, 746 F.2d at 118 (stating that "the survey must have been fairly prepared and its results directed to the relevant issues." (quoting *Nat'l Football League Props., Inc. v. Wichita Falls Sportswear*, 532 F. Supp. 651, 657 (W.D. Wash. 1982)).

## IV.   CONCLUSION

The biases and errors in the Berger Survey provide a clinic in how not to do a survey. It is clear that the Berger Survey suffers from "a fatal combination of flaws that renders [it] unreliable and inadmissible." *See Proctor & Gamble Pharms., Inc. v. Hoffmann-La Roche Inc.*, No. 06Civ0034(PAC), WL 2588002, at \*21 (S.D.N.Y. Sept. 6, 2006) (excluding survey because of inadequate data collection and because its questions were leading, closed-ended, and lacked a control). In addition, this Court has explicitly acknowledged many of the factual errors and agreed "that the survey results are suspect" (Docket No. 229, at p. 11).

Where, as here, the Berger Survey's deficiencies are "so substantial that they render the survey's conclusions untrustworthy," the Survey, and any opinions based upon it, must be excluded under both *Daubert* and FRE 403. *See Hodgdon*, 512 F. Supp. 2d at 1181 Exclusion of unreliable information is especially crucial in this case because it is a jury trial. *See* Plevan, *Survey Expert*, at 605 (discussing fourteen surveys that were excluded in jury trials). Accordingly, Plaintiffs respectfully requests this Court grant their renewed motion *in limine* to exclude the survey and related opinions of James T. Berger.

In the alternative, if the Court is inclined to admit the survey despite its numerous fatal flaws, at a minimum Mr. Berger should not be permitted to extrapolate the results of a survey on

three (3) shirts to hundreds of other shirts having different designs and verbiage; any opinions concerning the survey should be limited to those three shirts.

Respectfully submitted,

By:  /s/ Douglas M. Greenwald
Douglas M. Greenwald #12211
McANANY, VAN CLEAVE & PHILLIPS, P.A.
707 Minnesota Avenue, Fourth Floor
P.O. Box 171300
Kansas City, KS 66117
Phone: (913) 371-3838
Fax: (913) 371-4722

Jerre B. Swann (Admitted *pro hac vice*)
William H. Brewster (Admitted *pro hac vice*)
R. Charles Henn Jr. (Admitted *pro hac vice*)
Alicia Grahn Jones (Admitted *pro hac vice*)
KILPATRICK STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309
Phone: (404) 815-6500
Fax: (404) 815-6555

Attorneys for Plaintiffs University of Kansas and Kansas Athletics Inc. and Cross-Claim Defendant, The Collegiate Licensing Company

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2008, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Mr. Arthur E. Palmer, apalmer@goodellstrattonlaw.com
Mr. Cody G. Robertson, crobertson@goodellstrattonlaw.com
James W. Tilly, jtilly@tilly.com

Attorneys for Defendants

/s/ Douglas M. Greenwald