ams

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNIVERSITY OF KANSAS and KANSAS ATHLETICS, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 06-2341-JAR |
| | ) | |
| LARRY SINKS, CLARK ORTH, and VICTORY SPORTSWEAR, L.L.C. (collectively d/b/a/ Joe-College.com), | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

The Court now considers various post-trial motions filed by the parties since Judgment

was entered in this matter.  After a trial, the jury returned a verdict in favor of plaintiffs on all

claims.  The jury further found all three defendants liable on each of the six claims.[1]  On

December 1, 2008, the Court entered a Memorandum and Order denying plaintiffs' motion for

judgment under Fed. R. Civ. P. 50(a) and granting in part and denying in part their motion for

judgment under Rule 50(b) and denying defendants' motion for judgment under Rule 50(a).

Judgment was then entered:

> this judgment incorporates the verdict entered in this matter except
> with regard to the following T-Shirts on pages 6, 7, and 93 of the
> Verdict Form: Exhibits 77, 78, 125, 126 and 416 at pp. 78. As to
> those T-Shirts, judgment is entered for plaintiffs. This judgment
> also incorporates the injunctive relief set forth in Doc. 333.[2]

---

[1]The jury made separate findings on the trademark infringement/unfair competition claims and the trademark dilution claims with regard to each of the 206 T-shirt designs at issue in the case.  (Doc. 332.)

[2](Doc. 363.)

Defendants have since filed: (1) Motion for Judgment as a Matter of Law (Doc. 364); and

(2) Motion to Alter Judgment (Doc. 365).  Plaintiffs have filed: (1) Motion for Contempt

Sanctions and Seizure Order; and (2) Motion to Amend/Correct Order of Permanent Injunction

(Doc. 396).[3]  These motions are fully briefed and the Court is prepared to rule.  As explained

below, the Court denies defendants' motions for judgment as a matter of law and to alter or

amend, denies plaintiffs' motion for contempt, and grants plaintiffs' motion to amend the order

of permanent injunction.

## I.    Defendants' Motion for Judgment as a Matter of Law

Defendants renew their motion for judgment as a matter of law under Rule 50(b) on the

sufficiency of evidence for plaintiffs' trademark dilution claims.  "Judgment as a matter of law is

appropriate only if the evidence points but one way and is susceptible to no reasonable

inferences which may support the opposing party's position."[4]  The Court must consider the

evidence admitted at trial, construing it and the inferences from it in the light most favorable to

the non-moving party.[5]  The Court may not make credibility determinations or weigh the

evidence.[6]

Defendants contend that judgment is appropriate on the dilution claims for two reasons:

(1) there was insufficient evidence of actual dilution on the eleven T-shirts that the jury found

diluting; and (2) the evidence shows plaintiffs' marks have only achieved "niche fame," and not

---

[3]The Court will address plaintiffs' Motion for Attorney Fees and Expenses (Doc. 372) in a separate order.

[4]*Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 812 (10th Cir. 2000).

[5]*Id.*

[6]*Id.*

the widespread fame required to sustain a dilution claim.  As an initial matter, the Court notes

that this latter argument was not raised in defendants' Rule 50(a) motion, which only addressed

whether there was sufficient evidence of actual dilution.  A renewed motion under Rule 50(b)

"cannot assert grounds for relief not asserted in the original motion."[7]  However, plaintiffs do not

discuss this issue in their response memorandum, resulting in waiver, so the Court will address

defendants' niche fame argument.[8]

### A.     *Actual Dilution*

Plaintiffs must show actual dilution under the Trademark Dilution Revision Act

("TDRA") of 2006 in order to recover monetary damages.[9]   The marks utilized on the T-shirts

found to be diluting by the jury are: "Kansas,"[10] "Phog,"[11] "Jayhawk,"[12] and "Crimson and

Blue."[13]  All of the T-shirt designs found to be diluting were printed on blue or red T-shirts.  In

denying defendants' motion under Rule 50(a), the Court pointed to Jim Marchiony's testimony

about being approached by anonymous KU fans complaining about the negative effect that

defendants' T-shirts have on the University's reputation, and to web blog entries in the *Lawrence

Journal World* that show that certain people in the Lawrence, Kansas community believed the T-

---

[7]*Marshall v. Columbia Lea Reg'l Hosp*., 474 F.3d 733, 738 (10th Cir. 2007).

[8]*See id.* at 739.

[9]15 U.S.C. § 1125(c)(5); *see adidas-America, Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1061–62 (D. Or. 2008).

[10](Doc. 332 at 9, Exs. 132, 133; 14, Ex. 142; 18, Ex. 151; 28, Ex. 173; 29, Exs. 177, 178; 31, Ex. 182.)

[11](Doc. 332 at 53, Ex. 233.)

[12](Doc. 332 at 71, Ex. 281.)

[13](Doc. 332 at 87, Ex. 313.)  The jury also answered "Yes" to Question 7 that asked: "Do you find actual confusion with regard to the trademark infringement and unfair competition claims and/or do you find actual dilution with regard to the dilution claims?"

3

shirts to be offensive.  Defendants ask the Court to reconsider because none of this evidence

pertained to the specific T-shirts that the jury found to be diluting.

Dilution by blurring "is association rising from the similarity between a mark or trade

name and a famous mark that impairs the distinctiveness of the famous mark."[14]  Dilution by

tarnishment is "association arising from the similarity between a mark or trade name and a

famous mark that harms the reputation of the famous mark."[15]  Under the tarnishment theory,

plaintiffs must show that the KU marks will "suffer negative associations" through defendants'

use.[16]  "Some cases have found that a mark is tarnished when its likeness is placed in the context

of sexual activity, obscenity, or illegal activity."[17]

The Court declines to change its ruling that the Marchiony testimony could allow a

reasonable jury to conclude that the defendants' use of the "Kansas," "Phog," "Jayhawk," and

"Crimson and Blue" marks caused actual dilution as described above.  It is of no moment that

Marchiony failed to identify the specific shirts that fans and alumni complained to him about.

Defendants are correct, Marchiony's testimony is that fans complained about "those shirts," in

the plural.  Marchiony testified that "it happens a handful of times at every home event that I

attend.  Mostly football games—home football games—and home basketball games.  Which is,

again, our—our most highly attended events."[18]  When construing this evidence in the light most

---

[14]*Id.* § 1125(c)(2)(B).

[15]15 U.S.C. § 1125(c)(2)(C).

[16]*Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996); *Sony Computer Enter., Inc. v. Connectix Corp.*, 203 F.3d 596, 608 (9th Cir. 2000).

[17]*Hormel Foods Corp.*, 73 F.3d at 507 (collecting cases).

[18](Doc. 356 at 101.)

favorable to plaintiffs, Marchiony's testimony is direct evidence that KU fans find many of

defendants' shirts offensive or inappropriate and, notably, believed that KU could "do something

about it."  A reasonable jury could infer that these fans believed that defendants' irreverent T-

shirts impaired the distinctiveness of plaintiffs' marks.

Moreover, the jury could have concluded that defendants' use of the marks constituted

actual dilution through tarnishment based on a review of the T-shirts alone in concert with

Marchiony's testimony.  Every T-shirt that the jury found to be diluting involved placing

plaintiffs' mark or marks in the context of sexual activity or obscenity.  Marchiony testified that

fans complained to him about defendants' T-shirts at home football and basketball games and

asked if the University could do anything about it.  This is evidence, upon which a reasonable

jury could rely, that defendants' use of the University of Kansas ("KU") marks impaired the

identification of its marks with its own licensed merchandise.  Therefore, the Court is unable to

conclude that the evidence is not susceptible to reasonable inferences that may support a finding

of actual dilution.

### B.    Fame

Next, defendants argue that there was no evidence at trial that plaintiffs' marks enjoy

widespread fame sufficient to support a finding of liability on the dilution claims.  Defendants

point to the language in the TDRA requiring the mark to be "widely recognized by the general

consuming public of the United States."[19]

Defendants rely entirely upon the analysis set forth in *Bd. of Regents, the University of*

---

[19]15 U.S.C. § 1125(c)(2)(A).

*Texas System v. KST Electric, Ltd.*,[20] which adopted the Magistrate Judge's recommendation to

grant summary judgment in favor of the defendant because the evidence failed to show that the

University of Texas's ("UT") logo achieved widespread fame, as opposed to "niche fame."[21]

The mark at issue was the "longhorn silhouette logo."  The court rejected the plaintiff's

circumstantial evidence of fame[22] because it all related to the use of the logo at or concerning

sporting events.[23]  The Court explained that such evidence "hardly equals presence with the

general consuming public (nearly the entire population of the United States).  Simply because

UT athletics have achieved a level of national prominence does not necessarily mean that the

longhorn logo is so ubiquitous and well-known to stand toe-to-toe with Buick or KODAK."[24]

Defendants argue that plaintiffs relied entirely on the national prominence of KU's

athletic programs in attempting to establish fame.  Defendants contend that because the fame is

only associated with athletics, as in *University of Texas*, they can only establish "niche fame,"

---

[20]550 F. Supp. 2d 657, 679 (W.D. Tex. 2008).

[21]Plaintiffs suggest that the district court only adopted the report and recommendation of the Magistrate Judge because the plaintiffs "gave the district court their express permission."  To be sure, the district court's order explains that the plaintiffs chose not to file an objection to the report and recommendation but instead filed a "response," setting forth their disagreement with the Magistrate Judge's recommendation on the niche fame issue. The district court found no plain error in the Magistrate Judge's report and recommendation and adopted it, notwithstanding the plaintiffs' "response."  *Id.* at 662.

[22]This evidence included that UT football and men's basketball games were nationally televised on a regular basis, that UT beat University of Southern California in the Rose Bowl national championship game in the highest rated college football game since 1987, that UT football players appear on *Sports Illustrated*, that the UT helmet was displayed on two separate Wheaties' boxes, and that UT earns record royalties and has made millions in retail sales from UT licensed products.  *Id.* at 677–78.

[23]*Id.* at 678.

[24]*Id.*

which is no longer acceptable under the TDRA.[25]

The Court finds that plaintiffs submitted sufficient evidence of national fame in order to satisfy the current incarnation of the TDRA.  First, the Court agrees with plaintiffs that the *University of Texas* decision does not stand for the proposition that no collegiate mascot nor word mark may enjoy national fame.  Instead, that decision, in the posture of summary judgment, simply found that UT failed to present evidence of its logo outside the context of sporting events.  Here, plaintiffs submitted an abundance of evidence on the use of the various marks both within and outside the context of sporting events.  In addition to national media coverage and exposure of the athletic teams, plaintiff submitted evidence that KU has been referred to as "Kansas" since the 1930s and that KU has used the crimson and blue color scheme and the Jayhawk mascot for over 100 years.

Furthermore, Paul Vander Tuig testified that "the Phog" has been used in media guides since 1988.  He further testified that it has been used on licensed apparel since at least the early 1990s when he began working at KU.  Vander Tuig also testified about "Rock Chalk Jayhawk."[26]  He explained that the phrase was first used by students in the 1880s and has been used for years at KU events as well as on licensed KU products since at least as early as he has worked for KU.  When viewed in the light most favorable to plaintiffs, this evidence, along with evidence of advertising, unsolicited media references, brochures about the University, and substantial sales of KU's licensed merchandise displaying the marks, supports the jury's finding

---

[25]*See, e.g.*, *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 164 (3d Cir. 2000) (explaining mark entitled to protection even if it is not famous to the general public if it enjoys a high degree of fame in a niche market, under the pre-2006 Act).

[26](*See* Pl. Trial Ex. 73.)

of national fame.       Likewise, defendants' evidence of third-party use of the marks does not

require judgment in their favor as a matter of law.  While the jury could certainly consider this

evidence in making a determination of fame on the dilution claims, it was not required to weigh

it more heavily than plaintiffs' evidence of fame.  Under the standard this Court must apply on a

motion for judgment as a matter of law, there was sufficient evidence upon which the jury could

have found fame despite the evidence of third-party use.

**II.      Defendants' Motion to Alter or Amend, for Remittitur, and Alternative Motion for New Trial; Plaintiffs' Motion for Seizure Order and Civil Contempt Sanctions**

### A.      *Profits Award*

Defendants seek a reduction in the amount of profits awarded by the jury in this matter,

$119,087.00, arguing it is excessive.  Alternatively, they seek a new trial.  Defendants

specifically urge the Court to rely upon Defendants' Trial Exhibit 651, a summary of sales for

specific T-shirts by Joe-College.com prepared by defendant Larry Sinks and admitted at trial and

find that the profits award should be reduced to $29,946.85.  Defendants maintain that the jury's

profits award was erroneous, as it did not credit this evidence.

Under Rule 59, "[a]bsent an award that shocks the judicial conscience or raises an

irresistible inference that passion, prejudice, corruption or other improper cause played a part in

the jury's damage award," the Court should not disturb the jury's damage award.[27]  But under 15

U.S.C. § 1117(a), "[i]f the court shall find that the amount of the recovery based on profits is

either inadequate or excessive the court may in its discretion enter judgment for such sum as the

court shall find to be just, according to the circumstances of the case."

---

[27]*Woolard v. JLG Indus., Inc.*, 210 F.3d 1158, 1173-74 (10th Cir. 2000) (internal citation omitted); *see also Cook v. Med. Savings Ins. Co.*, 287 F. App'x 657, 667 (10th Cir. 2008).

The Court is unable to find that the jury's profits award is excessive given the evidence presented at trial.  The jury was essentially presented with competing evidence of profits made by the Joe-College store during the period in question.  Defendant Sinks testified about calculations that he reached, based on his own representations of the numbers of T-shirts sold, his expenses, and net profits.  According to Sinks, the business realized a net profit on all allegedly infringing T-shirts in the amount of $141,446.02.[28]

There was substantial evidence, however, upon which a reasonable jury could conclude that little if no weight should be given to this evidence.  Plaintiffs' accounting expert, Ian Ratner, testified that the information provided by Sinks in Ex. 651 was not reliable because it was not supported by underlying documentation.[29]  Sinks admitted at trial that he lacked the "backup documentation" for the figures provided in Ex. 651.  He testified that he compiled the list of sales by specific T-shirt about one month prior to trial by looking back through old invoices and trying to recreate how many shirts he sold and that the list represented his best guesses on these amounts.  Sinks admitted that the list was compiled in part based on his own memory and that he has no tracking system or accounting software that would show how many of each T-shirt design had in fact been sold and the actual profits for each T-shirt.  By contrast, Ratner reached a lost profits estimate based on subpoenaed bank records, invoices, and other underlying documents provided by defendants during discovery.  Ratner relied on invoices for about an eight-month

---

[28]*See* Defs. Trial Ex. 653A.

[29]"I just don't think that you can rely on, you know, a typed list like this.  There's no support for the unit sales and how you divide the units between infringing and noninfringing.  Just there's no way to audit this."  (Doc. 387 at 42.)  When asked which number would be more reliable, his own or defendant Sinks', he responded, "The 512.  It's based on data that you could verify, ratios that you could verify.  I think the 512 is a much better number."  *Id.* at 84.

period of sales.  Ratner also testified that defendants failed to disclose underlying data to him

that would normally be expected to be kept in the ordinary course of business by businesses such

as Victory Sportswear and Joe-College.com.

Ratner calculated a range of profits received by defendants for allegedly infringing T-

shirt sales.  On the low end, he calculated approximately $343,000 in total gross sales for Joe-

College.com and at the high end, approximately $512,000.[30]  The low end represented the

amount of sales provided by Sinks, while the high end represented the numbers Ratner was able

to verify by using bank statements and invoices.  He determined a profit margin of 55% by

comparing the purchase price on the T-shirts from Victory Sportswear and the sales price.  With

regard to Victory Sportswear, Ratner found a total gross sales range of approximately $241,000

to $2 million.  Ratner was unable to determine a profit margin for Victory Sportswear because he

was not provided with sufficient information, requested repeatedly by plaintiffs during

discovery, to render such a calculation.  Defendant Orth did not disclose during discovery any

evidence on the costs and deductions for the business, nor did he disclose any other financial

information, despite repeated attempts by plaintiffs to obtain such information.

Ratner further testified that defendants' cost calculations were erroneous.  He explained

that costs such as rent and payroll are fixed, rather than variable, and that under basic accounting

principles, these items should not be incremental to the sales of infringing products because they

would have been incurred even if defendants had not produced and sold the infringing products.

Therefore, those items should not be deducted from the gross sales numbers in order to

---

[30]Ratner figured that the ratio of infringing to non-infringing sales was about 68% based on the amounts sold during the eight months' worth of invoices he reviewed.  He applied that ratio to the total amount of sales he was able to verify with the bank records to determine profit.

determine profit.[31]  Moreover, there was no data produced at all by defendant Orth concerning

his expenses prior to trial.  Nor did defendants produce evidence of their costs aside from

defendants' own testimony.  Defendants did not make a showing that certain fixed items were

actually related to the sale of the infringing products, which of course was their burden to

prove.[32]  Given the lack of data to support these figures, the jury could have rejected defendants'

profit estimates, or could have found their testimony entirely lacked credibility.  It is not this

Court's function to weigh the credibility of witnesses.

Given the evidence presented at trial, as set forth above, the Court is unable to conclude

that the jury's award of profits was excessive.  The jury awarded the amount sought by plaintiffs,

proportional to the percentage of T-shirts they found to be the subject of liability.  This figure

was reached by plaintiffs' expert—the only accounting expert who testified about damages—and

was based on verifiable data, despite the defendants failure to produce specific data with regard

to each T-shirt during discovery.  Given the circumstances of this case, the Court finds that the

jury's profits award is just and is not excessive.  Therefore, neither remittitur nor a new trial is

appropriate.

B.      *Defendants' Claim that Certain T-Shirts were Erroneously Included in the*
        *Judgment*

This argument is the subject of defendants' motion to alter or amend the judgment and of

plaintiffs' motion for seizure and contempt sanctions.  In its March 19, 2008 Memorandum and

Order, this Court granted plaintiffs' motion for summary judgment on four specific shirts

---

[31](Doc. 387 at 45–46.)

[32]*See* 15 U.S.C. § 1117(a); *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 177 (3d Cir. 2005); *Abbott Labs.
v. Unlimited Beverages, Inc*., 218 F.3d 1238, 1242 (11th Cir. 2000); *Nike, Inc. v. Variety Wholesalers, Inc.*, 274 F.
Supp. 2d 1352, 1373 (S.D. Ga. 2003), *aff'd*, 107 F. App'x 183 (11th Cir. 2004).

containing plaintiffs' marks.[33]  The Court found that those T-shirts displayed marks that are

overwhelmingly similar to KU's marks and that the striking similarities trigger a presumption

that defendants intended to infringe.  The Court found that the "Kansas" mark was protectable as

a matter of law because it is incontestable and found infringing two one-sided T-shirts, one

crimson and one blue, that bear the "Kansas" mark with no other differentiating marks.

Inexplicably, the parties proceeded to submit these shirts, found to be infringing as a matter of

law, to the jury.  The jury found these two shirts not to be infringing.  Immediately following the

trial, the Court entered an injunction, which was not opposed by defendants, "prohibiting the sale

of those shirts found to be infringing or diluting by the jury."[34]

In its December 1, 2008 Memorandum and Order ruling on plaintiffs' post-trial motions,

the Court declined to revisit its summary judgment ruling despite the fact that the parties had

opted to submit these T-shirt designs to the jury for consideration.  It also clarified its summary

judgment ruling,

> In its summary judgment order, the Court stated: "in their
> statement of uncontroverted facts, plaintiffs refer to these as
> 'examples.'  While the Court is unable to locate other instances
> like these in its cursory review of the exhibits, its findings with
> regard to these shirts apply to any other shirts that similarly
> include KU's marks without any other differentiating marks or
> additional non-infringing language.  It is incumbent upon plaintiffs
> to identify any such additional shirt designs."  In their renewed
> motion, plaintiffs identify three other T-shirts that were included
> on the verdict form: Trial Exhibits 77, 125, and 416 at 78 (Doc.
> 332 at 6, 93).  The Court agrees that these shirts are included in the
> Court's summary judgment ruling for plaintiffs.[35]

---

[33]Specifically, the Court granted summary judgment on the shirts presented in Doc. 144, Ex. A at 1-3, 85.

[34](Doc. 333.)

[35](Doc. 362 at 12–13 n.38.)

The Court entered judgment for plaintiffs on the T-shirt designs found to be infringing or diluting by the jury, those identified in the summary judgment order, and the additional T-shirt designs specifically referred to above that were identified in plaintiffs' renewed motion for judgment, despite the fact that the jury found some of these designs to be non-infringing.

Defendants seek reconsideration of the Court's decision to enter judgment on those T-shirt designs not explicitly identified in the summary judgment order.  A motion to alter or amend judgment pursuant to Rule 59(e) may be granted only if the moving party can establish: (1) an intervening change in the controlling law; (2) the availability of new evidence that could not have been obtained previously through the exercise of due diligence; or (3) the need to correct clear error or prevent manifest injustice.[36]  Such a motion does not permit a losing party to rehash arguments previously addressed or to present new legal theories or facts that could have been raised earlier.[37]

Defendants argue that the additional T-shirts identified by plaintiffs in their renewed motion for judgment are not "examples" of the "Kansas" T-shirts found to be infringing as a matter of law on summary judgment because they are not printed on crimson or blue shirts.  But this Court's summary judgment order did not hinge on the fact that the "Kansas" shirts were printed on red and blue T-shirts.  The Court found that the shirts bear KU's colors and have similar block lettering as those that are officially licensed.[38]  The Court further found that

---

[36]*Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 948 (10th Cir. 1995).

[37]*Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1332 (10th Cir. 1996), *cert. denied*, 520 U.S. 1181 (1997).

[38]*See King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090–91 (10th Cir. 1999) (comparing colors and lettering of marks).

13

> no reasonable jury could conclude that the *lettering* is not
> substantially similar.  The Court considered the overall appearance
> of the T-shirts, as they appear to the consuming public and found
> that consumers, encountering these T-shirts in the marketplace,
> would not be able to identify the subtle difference in font and
> associate this difference with whether the products are licensed or
> not.[39]

Also, in denying summary judgment on the two-sided "Kansas" shirts, the Court heavily relied

on evidence that the language on the back of each shirt created important differences in the

overall presentation of the marks to consumers given that such references are neither condoned

by KU nor used on officially licensed products.  The T-shirts in Exhibits 125, 77, and 416 at 78

are all one-sided "Kansas" T-shirts with no differentiating language.  They bear almost identical

lettering to officially licensed products and in some cases bear the school colors of crimson or

blue on either the T-shirt or the lettering.  The Court's Judgment was not in error, but was

instead an extension of its earlier ruling.

Defendants also suggest that this Court explicitly found non-infringing on summary

judgment the T-shirts identified by plaintiffs in their renewed motion for judgment.  The plain

language of the Court's summary judgment order belies this contention.  The Court explicitly

found on summary judgment that, to the extent the four T-shirt designs identified in the summary

judgment order were "examples" of KU marks that do not contain any other differentiating

marks, the ruling equally applied to similar T-shirt designs that plaintiffs were able to identify.

Because plaintiffs identified these items in their renewed motion for judgment, the Court added

them to the Judgment as infringing T-shirt designs.  This finding was not clear error; therefore,

defendants' motion to alter or amend the judgment is denied.

---

[39](Doc. 362 at 35 (emphasis added).)

Defendants' counsel represents in his response to plaintiffs' motion for seizure and sanctions that he did not immediately recognize that the Judgment in this matter encompassed additional T-shirts, in particular, those that are not printed on crimson and blue T-shirts.  He asserts that because the Judgment stated that it "incorporates the injunctive relief set forth in Doc. 333," which was immediately entered after the verdict, he was not enjoined from selling T-shirts other than those found to be infringing or diluting by the jury.  Singling out one line from this Court's twenty-page December 1, 2008 Memorandum and Order,[40] and apparently skipping over explicit exhibit references in the Judgment itself, counsel contends that he believed the Judgment only amended the verdict with regard to those one-sided T-shirts explicitly identified in the Court's summary judgment order.  Counsel represents that he attempted to contact counsel for plaintiffs on December 8, 2008 to provide him with copies of the exhibits referenced in the Judgment but that they did not respond to this request for assistance.  Thus, counsel did not advise his client to stop selling the additional shirts included in the Judgment, believing these additional references to be in error, until he received the motion for sanctions on December 16, 2008.  Therefore, there was a two-week period of time during which the Joe-College store sold certain infringing T-shirt designs.

Plaintiffs seek the following relief: (1) that the Court authorize seizure of any shirts violating this Court's Permanent Injunction and Judgment; and (2) impose compensatory and coercive contempt sanctions in the form of a reasonable royalty, profits, a trebling of profits

---

[40]Counsel repeatedly refers to this Court's statement that it "declines to change its summary judgment ruling." Of course, the Court made this statement in the context of rejecting defendants' contention that the jury's verdict overrode this Court's findings on summary judgment with regard to the specific T-shirts identified in the summary judgment order. The Court fails to see how this statement is inconsistent with its further finding that additional T-shirts that plaintiffs identified in their motion are encompassed by the Court's summary judgment ruling.

and/or a fine, and the reasonable attorneys' fees and costs associated with bringing this motion. Plaintiffs must show by clear and convincing evidence that (1) a valid court order existed; (2) defendants had knowledge of the order; and (3) defendants disobeyed the order.[41]  There is no question that defendants had knowledge of a court order—the permanent injunction and the Judgment.  There is some question about the extent of defendants' knowledge of the orders and whether they disobeyed them.

While the Court finds it strange that counsel and defendants apparently did not have the wherewithal to examine the exhibit references in the Judgment in order to ascertain exactly which T-shirts the Court was referring to,[42] it is apparent that defendants misunderstood the Court's Memorandum and Order ruling on the first round of post-trial motions, and the Judgment.  The Court could have more clearly indicated in the Judgment that the injunction was to apply not only to those T-shirts found to be infringing or diluting on the verdict form, but also those found to be infringing by the Court as a matter of law, particularly since the Court granted plaintiffs' motion for judgment as a matter of law with regard to T-shirts not explicitly identified in the summary judgment order.  According to Mr. Tilley's affidavit, he contacted counsel for plaintiffs and conveyed that he could not determine which T-shirts were pictured in the exhibits referred to in the Judgment.  He asked counsel for plaintiffs for copies of the exhibits but they did not respond to this request.  This is further evidence that Mr. Tilley, and by extension his client, did not have full knowledge of the extent of the Court's Order.

While the Court admonishes counsel for not reading the Court's Order and Judgment

---

[41]*E.g.*, *Phone Directories Co. v. Clark*, 209 F. App'x 808, 813 (10th Cir. 2006); *FTC v. Kuykendall*, 371 F.3d 745, 756 (10th Cir. 2004).

[42]As plaintiffs correctly note, the verdict form is available electronically through PACER.

carefully, delaying advising his client accordingly, the Court cannot find by clear and convincing

evidence that defendants had knowledge of an injunction prohibiting the sale of the additional

shirts included in the Court's Judgment, yet disobeyed it.  Within two weeks of the Court's

Judgment, once they became aware that the Judgment referenced additional one-sided "Kansas"

T-shirts, defendants stopped selling the subject T-shirts.  Given the history of compliance set

forth in Mr. Tilley's affidavit, the Court is convinced that if they had understood the scope of the

Judgment, they would have complied earlier.  However, this Memorandum and Order should

place defendants and their counsel on unambiguous notice of what is and is not covered by the

injunction in this matter.  As set forth in detail below, the Court is granting plaintiffs' Motion to

Amend the Order of Permanent Injunction and will be entering an amended permanent

injunction in line with their request.  The Court will not tolerate noncompliance with this

injunction and defendants will be held in contempt for future violations.

### III.    Motion to Amend Order of Permanent Injunction

Plaintiffs ask the Court to modify the Order of Permanent Injunction, to prohibit

defendants not only from selling infringing products, but also from manufacturing, distributing,

advertising, marketing, promoting, displaying, or offering for sale any such T-shirts.  Of course,

the Court retains continuing jurisdiction to enforce and modify injunctions.[43]  Given that

defendants do not object to the relief sought so long as plaintiffs could demonstrate that the

Court retains jurisdiction to modify its injunction, the Court grants plaintiffs' motion and will

enter a modified injunction accordingly.  The injunction will make clear that the prohibited

conduct applies with regard to both the T-shirts found to be infringing by the jury as well by the

---

[43]*See, e.g.*, *Battle v. Anderson*, 708 F.2d 1523, 1539 (10th Cir. 1983).

Court.

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' Motion for

Judgment as a Matter of Law (Doc. 364) and Motion to Alter Judgment (Doc. 365) are **denied**;

plaintiffs Motion for Contempt Sanctions and Seizure Order is **denied**; and plaintiffs' Motion to

Amend/Correct Order of Permanent Injunction (Doc. 396) is **granted**.


Dated:  <u>July 28, 2009</u>

 S/ Julie A. Robinson         
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE